**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JIMORI ROBINSON,
JEFFREY WEIMER, TYE
EDWARDS and JUSTIN
HARRINGTON,**

      **Plaintiffs,**

**v.**                          **Civil Action No. 1:25-cv-75**

**NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,**

         **Defendant.**

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

*"…the NCAA acts as a buyer cartel or a collusive monopsony. Under the auspices of the NCAA, the member institutions collude to reduce competition among themselves in an effort to reduce costs and thereby generate more 'profit' for their athletic programs. Examples of collusive monopsony can be found throughout the country, but the NCAA is a particularly good example."*

--Roger D. Blair & Jeffrey L. Harrison, Monopsony in Law and Economics (2010)

       The Plaintiffs are not here to blaze new trails, advance novel legal theories, or revolutionize college sports.  They are here to claim the opportunities that other athletes across the country have already been given, but which for some reason have been denied Plaintiffs.  This case *isn't* about special treatment or why the rules do not apply to Plaintiffs, quite the opposite: this case is about how the National Collegiate Athletic Associate ("NCAA") is treating Plaintiffs differently than other athletes in the same position.

I.      **Introduction and Relevant Facts**

In 2019 Jimmori Robinson enrolled in Dodge City Community College (a non-NCAA institution) where he played on the football team.  Exhibit 1, Decl. of Jimmori Robinson.   The next season, he attempted to play at Monroe University, but the season was cancelled because of COVID restrictions.  *Id.* After that he spent 4 years at the University of Texas at San Antonio ("UTSA") but could only play 3 seasons there because of a redshirt year.  (UTSA is an NCAA institution. *Id.*)  Jimmori recently transferred to West Virginia University ("WVU") and had hoped to play for the football team. *Id.*

In 2018, Jeffrey Weimer enrolled at Hartnell College, a community college, where he too played football.  Exhibit 2, Decl. of Jeffrey Weimer.  After he redshirted during the 2019 season, he transferred to the City College of San Francisco ("CCSF") a community college.  *Id.* He was enrolled in CCSF for two seasons, but played only one (2021), because the 2020 season was cancelled due to COVID restrictions.  *Id.* He then transferred to the University of Nevada, Las Vegas ("UNLV") and played football there during the 2022 season.  *Id.* Personal reasons forced Jeff to leave school altogether in 2023.  *Id.* Luckily, he was able to resume both his studies and his football career at NCAA institution Idaho State University in the fall of 2024.  *Id.*  In the spring of 2025, Jeff enrolled at Fairmont State to continue his academic studies, but did not play any sports there.  *Id.* Jeff recently transferred to WVU and hoped to play for the football team.  *Id.*

In 2019, Tye Edwards enrolled at the Georgia Military College, a community college, where he played football.  Exhibit 3, Decl. of Tyjahree Edwards.  In 2020 he transferred to Hutchinson Community College, but did not play football in the fall due to COVID restrictions.  *Id.*  There was a limited, voluntary football season for Hutchinson

players in the spring of 2021 that does not count towards his eligibility.  *Id.*  After playing for Hutchinson for the 2021 season, he then transferred to UTSA, but did not play football after being granted a redshirt for the 2022 season.  *Id.*  Following that, he transferred to the University of Northern Iowa where he played on the football team in 2023 and 2024. *Id.*  Tye also recently transferred to WVU and hoped to play for the football team. *Id.*

In 2018, Justin Harrington enrolled in Bakerfield Community College and played on the football team in the 2018 and 2019 seasons.  Exhibit 4, Decl. Justin Harrington. He then transferred to the University of Oklahoma, but did not play football in 2020 after being redshirted.  *Id.*  He unfortunately did not play in 2021 after being redshirted again. *Id.*  Luckily he did play football in the 2022 season, but was redshirted again in 2023.  *Id.* He then transferred to Washington University, where he played football in the 2024 season.  *Id.*  Like the other three Plaintiffs, Justin also recently transferred to WVU and hoped to for the football team.  *Id.*

Why did all four Plaintiffs believe they would have eligibility to play football at WVU? On December 18, 2024, the U.S. District Court for the Middle District of Tennessee granted Diego Pavia an injunction preventing the NCAA from denying him eligibility based upon his past athletic career in junior college.  *Pavia v. NCAA*, 760 F.Supp.3d 527 (M.D. Tenn. 2024) (hereinafter referred to as "*Pavia*" for brevity).  Five days later, "[t]he NCAA Division I Board of Directors…approved a blanket waiver granting an additional year of eligibility to former junior college transfers in similar positions to…Pavia, opening the door

for a wave of college athletes across all sports to spend one more year in college athletics."[1]

Obviously, the Plaintiffs believed this waiver applied to them. All had started their college athletic careers in junior college and none had played more than three years at NCAA institutions. Plaintiffs' playing career is summarized in the tables below:

**Jimmori Robinson**

| Year | College | Played Football? |
|------|---------|------------------|
| 2019-2020 | Dodge City Community College | Yes (non-NCAA) |
| 2020-2021 | Monroe University | No (COVID) |
| 2021-2022 | UTSA | No (Redshirt) |
| 2022-2023 | UTSA | Yes (NCAA) |
| 2023-2024 | UTSA | Yes (NCAA) |
| 2024-2025 | UTSA | Yes (NCAA) |

**Jeff Weimer**

| Year | College | Played Football? |
|------|---------|------------------|
| 2018-2019 | Hartnell College | Yes (non-NCAA) |
| 2019-2020 | Hartnell College | No (Redshirt) |
| 2020-2021 | City College of SF | No (COVID) |
| 2021-2022 | City College of SF | Yes (non-NCAA) |
| 2022-2023 | UNLV | Yes (NCAA) |
| 2023-2024 | Not enrolled | No |
| 2024-2025 | Idaho State | Yes (NCAA) |

---

[1] Eli Lederman, *NCAA grants waiver to ex-JUCO players while appealing Pavia ruling*, ABC News (December 24, 2024), https://abcnews.go.com/Sports/ncaa-grants-waiver-juco-players-appealing-pavia-ruling/story?id=117079035; *see also* Student-Athlete Reinstatement (NCAA), https://www.ncaa.org/sports/2013/11/18/student-athlete-reinstatement.aspx

**Tye Edwards**

| Year | College | Played Football |
|------|---------|-----------------|
| 2019-2020 | Georgia Military College | Yes (non-NCAA) |
| 2020-2021 | Hutchinson Community College | Limited[2] |
| 2021-2022 | Hutchinson Community College | Yes (non-NCAA) |
| 2022-2023 | UTSA | No (Redshirt) |
| 2023-2024 | Northern Iowa | Yes (NCAA) |
| 2024-2025 | Northern Iowa | Yes (NCAA) |

**Justin Harrington**

| Year | College | Played Football |
|------|---------|-----------------|
| 2018-2019 | Bakersfield Comm. College | Yes (non-NCAA) |
| 2019-2020 | Bakersfield Comm. College | Yes (non-NCAA) |
| 2020-2021 | Oklahoma | No (Redshirt) |
| 2021-2022 | Oklahoma | No (Redshirt) |
| 2022-2023 | Oklahoma | Yes (NCAA) |
| 2023-2024 | Oklahoma | No (Redshirt) |
| 2024-2025 | Washington | Yes (NCAA) |

What none of the Plaintiffs realized was that despite its press clippings, the NCAA was intent on maintaining is "JuCo Penalty"—the collection of NCAA bylaws, such as 12.8.1 (the "Five-Year Rule") and bylaw 14.5.4.3 ("Academic Redshirt") that, along with their administration, discourage players from attending non-NCAA institutions and punish those who do.[3]  (A copy of the NCAA Division 1 Manual for 2024-25 is attached as Exhibit

---

[2]  There was no fall 2020 football season at Hutchinson Community College, but in the spring of 2021, a limited voluntary season was held that does not count towards eligibility.

[3]  "JuCo" is short for "Junior College," where the majority of college athletes who transfer into NCAA institutions formerly played, but there are other non-NCAA organizations and institutions

5.)  So when the Plaintiffs filed for their waivers, they were stunned to discover that they were all denied.

## II.    Legal Standard

In this case Plaintiffs seek a temporary restraining order, a preliminary injunction and/or a permanent injunction. The requirements for these remedies are the same and were established in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

The *Winter* decision altered the standard for injunctive relief.  Prior to *Winter*, the Fourth Circuit used a "balance-of-hardship test" that allowed a court to disregard some preliminary injunction factors if it found that the facts satisfied others. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  But following *Winter*, the Fourth Circuit "recalibrated" that test, requiring each preliminary injunction factor to be satisfied as articulated.  *Stinnie v. Holcomb*, 37 F.4th 977, 982 (4th Cir. 2022) (citing *Pashby*, 709 F.3d at 320, among others). To satisfy this requirement, therefore, a Plaintiff must make a clear showing that they satisfy all four independent requirements.  *Leaders of a Beautiful Struggle v. Balt. Police Dep't,* 979 F.3d 219, 226 (4th Cir. 2020) (citing *Winter,* 555 U.S. at 22).

---

that offer college sports and these discriminatory bylaws affect them as well. Where used herein, "JuCo" and "JUCO" are a shorthand for non-NCAA institutions.

### III.    Argument

### A.  The Plaintiffs Are Likely To Succeed On The Merits

While a Plaintiff is required to make a clear showing that he is likely to succeed on the merits in order to obtain injunctive relief, a Plaintiff is *not* required to establish with certainty that he *will* succeed on the merits.  *Pashby,* 709 F.3d at 321; *Roe v. U.S. DOD,* 947 U.S. 207, 219 (4th Cir. 2020).  Instead "[a] district court's determination that such a showing [of likelihood of success on the merits] has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome…." *Stinnie v. Holcomb,* 37 F.4th at 982 (quoting *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 276 (4th Cir. 2002)).  Moreover, in showing a likelihood of success on the merits, a Plaintiff is not required to demonstrate a likelihood of success on all claims.  *Power Balance LLC v. Power Force LLC*, No. SACV 10-1726, 2010 U.S. Dist. LEXIS 136574, 2010 WL 5174957, *5 (C.D. Cal. Dec. 14, 2010); *see Hudson v. AFGE*, 292 F.Supp.3d 145, 153 (D.D.C. Nov. 9, 2017) ("the Court begins with [movant's] likelihood of success on the merits of *at least one* claim" [emphasis added]); *see also Miller v. Garland,* 674 F.Supp.3d 296, 315 (E.D. Va. 2023); *see also Winter*, 555 U.S. at 19 n.4 (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint).

### a.  Multiple Courts Already Have Decided This Issue in Plaintiffs' Favor

Under similar facts and circumstances, a number of other federal courts have examined this very issue and ruled in favor of plaintiffs and enjoined the NCAA from enforcing the JuCo Penalty.  *Braham v. NCAA*, Case No. 3:25-cv-253, 2025 LX 296037, 2025 WL 2017162 (D. Nev. Jul. 18 2025) (hereinafter simply "*Braham*" for ease of reference); *Elad v. NCAA*, Case No. 25-1981, 2025 LX 60510, 2025 WL 1202014 (D.N.J.

Apr. 25 2025) (hereinafter simply "*Elad*" for ease of reference); and *Pavia v. NCAA*, 760 F.Supp.3d 527 (M.D. Tenn. 2024).

In *Braham*, the District Court for the District of Nevada examined the playing career of Cortez Braham, Jr.: in the Fall of 2019, 2020, and 2021 Braham was enrolled at Hutchinson Community College, playing football for just one season (his second season was cancelled because of COVID restrictions and he sat out his third season to focus on his grades). *Id.* at *4-6. Braham then transferred to West Virginia University and played football in Fall 2022 and 2023. *Id.* Braham then played an additional year at University of Nevada-Reno. *Id.* Braham's college football career almost exactly mirrors Plaintiff Edwards'—in fact, the two overlapped for two years at Hutchinson Community College.

Embracing the same legal theories as Plaintiffs' Complaint in this case, the Nevada District Court noted that the "Five-Year Rule harms competition in the relevant market by excluding a qualified cohort—namely, JUCO athletes," and held that Braham had a high likelihood of success on the merits. *Id.* at *14-15. The Court further noted that "the Five-Year Rule results in commercial harm by foreclosing the opportunity for JUCO players to pursue NIL compensation a the D1 level." *Id.* at *15. Not just that, but that "[t]he NCAA [l]acks [p]ro-[c]ompetitive [j]ustifications for [t]he [f]ive-[y]ear [r]ule." *Id.* at *16. As in this matter, in *Braham* the plaintiff faced irreparable harm and the balance of equities and public interest weighed towards an injunction. *Id.* at *20-28. As a result, the Court enjoined the NCAA from prohibiting Braham from playing college football in the fall of 2025. *Id.* at *28-29.

In *Elad v. NCAA* the court specifically looked at the NCAA's enforcement of "its Five-Year Rule as it applies to…time spent at a junior college" and found that the NCAA

should be enjoined from enforcing the JuCo Penalty.  *Elad* at *1-2.  After a year at NCAA institution Ohio University, "Elad came to appreciate that he was not ready for college or Division I football that first year" and in 2020 transferred to Garden City Community College, a junior college in Kanas.  *Id.* at *13-14.  He then played two years for UNLV. *Id.* at *15.   The court, noting the "uncertain landscape" of college sports post-*Alston*, nonetheless found that Elad should be awarded an injunction, specifically noting that its decision may "open up opportunities for others with junior college experience to also extend their playing time."  *Id.* at *30.  The Court there further noted that "[t]he NCAA has previously demonstrated an inherent ability to adapt to an ever-changing environment in college athletics" and "ha[d] no doubt it can do so here."  *Id.* at *30-31

In *Pavia v. NCAA*, the Federal District Court for the Middle District of Tennesee looked at the career of Diego Pavia, who spent two seasons at the New Mexico Military Academy (a non-NCAA institution), then two seasons at New Mexico State, an NCAA school, then another season at NCAA institution Vanderbilt University.  *Pavia* at 534-35. All told, Diego Pavia played football for five seasons (as many or more than any Plaintiff in this matter) but only 3 years were at NCAA institutions.  *Id.*  The court, analyzing the relevant market, granted Pavia an injunction, finding that the JuCo Penalty was anticompetitive and violated antitrust laws.  *Id.* at 536-45.

Here, then, is the peculiar scenario where multiple district courts have already analyzed other plaintiffs in this exact scenario and found that the exact same bylaws and the exact same acts by the exact same defendant violate federal antitrust laws and that injunctions against the enforcement of those bylaws were warranted.  As such, Plaintiffs have a very high likelihood of success.

### b. The Plaintiffs Are Likely To Succeed In Showing the NCAA Was Negligent

The Plaintiffs are likely to succeed in showing that the NCAA was negligent in communicating the terms of its "blanket" waiver for athletes that attended non-NCAA institutions.  There is no dispute that the NCAA decided to issue such a waiver in December 2024.  The Plaintiffs in this cause of action can easily show, both by their testimony and by documentary evidence, that they then withdrew from the National Football League ("NFL") draft based upon a reasonable understanding of the NCAA's statements and actions.  Many others interpreted the NCAA's actions and statements the exact same way as Plaintiffs: "…the Diego Pavia blanket waiver the NCAA provided in December…at least in the confusion of the moment, seemed like it would give all JUCO players whose eligibility expired an extra season."[4]  But, instead, "[s]ome athletes [got] a lifeline, [but] others [were] denied amid the NCAA's eligibility chaos." [5]  "Given that Diego Pavia and the former JUCO players were given the extra season of eligibility…many thought everyone could get granted the year. Instead, players across several sports have started to see their requests denied for various reasons."[6]

---

[4] Chris Hummer, *Months after landmark Diego Pavia ruling, some former JUCO transfers remain in eligibility limbo*, CBS Sports (Jun. 2, 2025), https://www.cbssports.com/college-football/news/months-after-landmark-diego-pavia-ruling-some-former-juco-transfers-remain-in-eligibility-limbo/

[5] Nicholas Rome, *Some athletes get a lifeline, others denied amid the NCAA's eligibility chaos*, Saturday Blitz (Jun. 6, 2025), https://saturdayblitz.com/some-athletes-get-a-lifeline-others-denied-amid-the-ncaa-s-eligibility-chaos-diego-pavia-corey-coley

[6] *Id.*

There is, therefore, a strong likelihood that Plaintiffs will succeed in showing that the NCAA was negligent in granting its Pavia waiver and/or providing guidance on that waiver, as well as in administering athletes' eligibility under that waiver.

### c. The Plaintiffs Are Likely To Succeed In Their Tortious Interference Claims

Plaintiffs are likely to succeed on their tortious interference claims (Counts I and II) which are directed to the NCAA tortiously interfering with Plaintiffs' relationships with both WVU and third-parties.  There is no real dispute that Plaintiffs have established (or attempted to establish) business or business-like relationships with WVU and third-parties such as the Hard Edge Trust.

There is, similarly, no doubt that the NCAA's arbitrary and capricious behavior in refusing to grant Plaintiffs eligibility like other athletes in similar circumstances unreasonably interferes with Plaintiffs' relationships both to WVU and to third-parties. Plaintiffs, therefore, have a high likelihood of showing that the NCAA has tortiously interfered with Plaintiffs' relationships with WVU and other third-parties.

### d. The Plaintiffs' Contract and Promissory Estoppel Claims Are Likely To Succeed

Similarly, Plaintiffs are also likely to succeed in their contract and promissory estoppel claims (Counts III and IV).  The NCAA admits in its bylaws that eligibility for membership is premised upon a school's acceptance and observance of the NCAA rules, regulations, and bylaws.  Ex. 5, Bylaw 20.1.1, p. 359-60. As a condition of its membership in the NCAA, an Active Member (i.e. a four-year accredited school with the right to

compete in a national championship and vote on legislation[7]) is required to "…administer its athletics programs in accordance with [NCAA] bylaws." *Id.*, NCAA Bylaw 20.2.4.1, p. 361; *see also Id.*, NCAA Bylaw 20.2.1.2, p. 361.  Members are required to "[e]nsure participating student-athletes are in good standing with the…national Association." *Id.,* NCAA Constitution Article 2, Section D.1, p. 6.  The very purpose of these agreements is to create an organization "dedicated to the well-being and lifelong success of college athletes"[8] that will "regulate the rules of college sport and protect young athletes."[9]  In fact, the NCAA promises "fair and inclusive competition" through its "rules and guidelines and provid[ing] enforcement."[10]  Plaintiffs, therefore, has a very high likelihood of showing that these agreements are for the benefit of student-athletes such as themselves.  Given the NCAA's refusal to treat athletes in similar situations reasonably and consistently, the Plaintiffs also have a high likelihood of showing that the NCAA has breached its agreements to administer its rules equitably for the benefit of student-athletes.

To the extent that Plaintiffs cannot show there was any such legally binding agreement or a breach thereof, Plaintiffs have a high likelihood of success in showing that they are entitled to play immediately based upon a theory of promissory estoppel.[11] Plaintiffs can show that they made decisions based upon guidance and statements by the

---

[7]  Ex. 5, NCAA Bylaw 20.02.3.1, p. 358.

[8] Overview, NCAA, https://www.ncaa.org/sports/2021/2/16/overview.aspx

[9] History, NCAA, https://www.ncaa.org/sports/2021/5/4/history.aspx

[10] Mission and Priorities, https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx

[11] In order to succeed on a theory of promissory estoppel, the Plaintiffs must merely show that they reasonably relied upon a misrepresentation—or even silence—by the NCAA.  The Plaintiffs do not need to show any deceptive intent by the NCAA.  *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 726 (2nd Cir. 2001); *In re Pubs of Champaign*, 618 F.2d 432 (7th Cir. 1980).

NCAA—statements that constitute promises—to Plaintiffs' detriment, including, for at least some Plaintiffs, forgoing the NFL draft based upon statements by the NCAA regarding their eligibility.  Based upon those promises (and more) Plaintiffs elected to remain involved in college athletics.  Plaintiffs, therefore, can show that they reasonably relied upon the NCAA's promises and now have done so to their detriment.  The Plaintiffs have a high likelihood of success in forcing the NCAA to abide by its promises.

### e.  The Plaintiffs Antitrust Claims Are Likely To Succeed

While antitrust claims are difficult complex matters that are not amenable to early resolution, in this case, several difficult matters have already been decided in Plaintiffs' favor.  As such, Plaintiffs are likely to succeed in their antitrust claims (Counts V – IX).

First, the NCAA has already been established as having monopsony power in the relevant market, "…athletic services in men's and women's Division I basketball and FBS football…." *NCAA v. Alston*, 594 U.S. 69, 81 (2021).  As the *Alston* Court explained, the NCAA admits that it participates in "horizontal price fixing in a market where the defendants exercise monopoly control." *Id*. at 87.  Moreover, it was noted by the Supreme Court that, at least in that case, "[n]o one dispute[d] that the NCAA's restrictions in fact decrease the compensation that student-athletes receive compared to what a competitive market would yield. No one question[ed] either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed." *Id.*

This case involves very similar issues.  There can be no serious dispute that by enforcing the JuCo Penalty—which explicitly *prevents college athletes from competing*— the NCAA is creating an artificial restriction in the market.  Like *Alston*, it is clear that a

decrease in compensation accompanies a decrease in participation by student-athletes in the relevant market—price and quantity are both suppressed.

The only difference between this case and *Alston* is that *Alston* involved compensation provided to athletes while Plaintiffs here challenge an even more direct and fundamental restraint on trade: the NCAA's JuCo Penalty, which unfairly and improperly limits a student-athlete's eligibility if they attend a non-NCAA institution.  As commentators have noted, "[t]he NCAA's members collude on two key inputs in the production of athletic competition: the student-athletes themselves and their coaches." Blair & Harrison, Monopsony in Law and Economics (2010) at 189 (a copy of Chapter Nine of Monopsony in Law and Economics, titled "Monopsony in Action – The NCAA" is attached as Exhibit 6).   "If [NCAA schools] agree among themselves and use their collective buying power to depress price, they can increase their profits at the expense of the athletes and coaches, and to the detriment of society….In order to maximize their collective profits, they will restrict employment…and thereby depress the wage…which is below the competitive wage." *Id.* at 190.  And the JuCo Penalty does not simply harm athletes, but JuCos as well: "Because the Five-Year Rule penalizes student-athletes who attend JUCOs, however, JUCOs are harmed in their ability to compete with NCAA schools in the labor market for student-athletes."  Exhibit 7, Expert Report Joel G. Maxcy submitted in *Elad*, at ¶ 39.

The relevant market here is the nationwide market for college football players, where the NCAA exercises clear monopsony power. *See NCAA v. Alston*, 594 U.S. at 90 ("The NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services."); *see also Pavia* at 539 ("Plaintiff asserts the relevant market

is the labor market for college football athletes in general and NCAA Division I football specifically….the NCAA…does not dispute that the proposed market is the relevant market for purposes of the Court's antitrust analysis."); *Braham* at *13 ("…the Court agrees with Braham that the relevant market is NCAA DI college football, as it is the sole pathway to NFL opportunities, and participation provides unique benefits, including NIL compensation, which are not available elsewhere, including at the JUCO level"); *NCAA v. Board of Regents,* 468 U.S. 85, 95 (1984) ("The District Court defined the relevant market as 'live college football television'…"); *but see Fourquean v. National Collegiate Athletic Association*, No. 25-1187, 2025 LX 236777, 2025 WL 1944005, *19 (7th Cir. 2025) (cautioning that reliance on *Alston*, 594 U.S. 69, to define the relevant market "overstates the scope of the Court's ruling," as the Supreme Court "did not decide the question of market definition" and reversed a grant of preliminary injunction where Plaintiff failed to show a likelihood of success on his Sherman Act claim challenging the NCAA's Five-Year Rule).  The opinion of among economists generally echoes that of courts:

> College athletes are in essence "selling" their labor to colleges/universities in exchange for scholarships, tuition, and other education-related expenses. If you are an amateur athlete, there is no other viable "buyer" in this labor market beyond colleges and universities. In short, the NCAA has established a monopsony labor market for amateur athletes (Figure 2).[12]

---

[12] Both this text and the accompanying Figure 2 are quoted from Amanda Geiger, *What Should College Athletes Be Paid? Market Structure and the NCAA*, Federal Reserve Bank of St. Louis – Page One Economics (July 13, 2023), https://www.stlouisfed.org/publications/page-one-economics/2023/07/13/what-should-college-athletes-be-paid-market-structure-and-the-ncaa



**Figure 2: NCAA System Monopsony**

In a monopsony all sellers must go to a single buyer.

In the labor market for college athletes there is only one buyer of a specific type of labor. In other words, there is only one employer. This gives the NCAA member schools the ability to influence (and usually depress) the wage/income of the college athletes.

In this labor market, current and prospective college students compete for roster spots on college football teams. NCAA member institutions compete to obtain and retain football players by providing benefits such as scholarships, access to academic programs, access to training facilities, and instruction from coaches. The compensation may now include revenue sharing as well as housing and food.  However, even with revenue sharing the amount of in-kind and cash compensation is still capped by means of the conspiracy alleged herein.  Few practical alternatives exist to NCAA football's unique benefits: elite coaching, national exposure, revenue sharing, and significant NIL opportunities.  So even though student-athletes are entitled to a share of the revenue generated by college sports, the NCAA's JuCo Penalty still affects their ability to be compensated.

That is because, in that market, as a collusive monopsony, the NCAA has adopted certain rules that directly and explicitly restrict the ability of student-athletes to compete in college sports and a "limit on the number of players limits a school's labor costs and limits the means of competing for players."  Ex. 6, Blair & Harrison, Monopsony in Law

and Economics (2010) at 197.  Plaintiffs have, therefore, a high likelihood of success showing that Defendant has committed a *per se* violation of the Sherman Antitrust Act.

But even if Plaintiffs cannot show a *per se* violation, further analysis under antitrust law does not diminish Plaintiffs' likelihood of success.  When analyzing a claim under Section 1 of the Sherman Act, courts normally look to a three-step burden shifting analysis.  *Alston,* 594 U.S. at 96; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). Under this analysis, the Plaintiff has the initial burden to show that the challenged restraint has a substantial anticompetitive effect.  *Alston,* 594 U.S. at 96.  If a Plaintiff meets this burden, "the burden shifts to the defendant to show a *procompetitive* rationale for the restraint." *Ohio v. Am. Express Co.*, 585 U.S. at 541 (emphasis added).  If the Defendant makes such a showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id*. at 542.

The NCAA, both in its public statements and prior court dealings, has all but admitted that its rules often serve as restraints on markets with substantial anticompetitive effects.  There is no reason to think that its JuCo Penalty—which directly restrains student-athletes—is not such a restraint.  The burden is then on the NCAA to show some procompetitive effect, which it cannot do.[13]  Moreover, the NCAA's "Pavia Waiver," announced in December 2024 and later "clarified" by the NCAA is an essential admission

---

[13] Any claim by the NCAA that its rules are not commercial in nature has already been considered and rejected by a whole host of courts: "…in a post-*Alston* world of NIL compensation and changed 'market realities,' *O'Bannon's* classification of NCAA eligibility rules as 'noncommercial'…is rendered moot."  *Braham* at *11 (internal citations omitted, citing also *Elad* at *7).  "And it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature."  *Pavia* at 537 (citing *Ohio v. NCAA*, 706 F.Supp.3d at 591).

that there is no rational or procompetitive reason for the NCAA's JuCo penalty. The blanket waiver is an admission that not counting Plaintiffs' time spent at non-NCAA institutions towards their NCAA eligibility will *not* harm competition. The NCAA can hardly be heard now to argue that holding that *some* years at a JuCo affect eligibility while others don't results in some procompetitive effect. And even if it could, it seems clear that there are many reasonable and easily fashionable rules that offer the same procompetitive effects without overly restricting or harming Plaintiffs and student-athletes like them.

Plaintiffs, therefore, have a high likelihood of prevailing on the merits with regard to their antitrust claims and—in fact—all claims.

### B.  The Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief

The opportunity to play major college sports is something so unique and so fleeting that destroying even a small part of it for no reason constitutes irreparable harm. In that regard the NCAA has been quite explicit about the benefits of playing college sports, and, hence, the irreparable harm Plaintiffs face by being excluded:

- "The advantages of competing in college sports are both immediate and lifelong. Participating in college sports provides opportunities to learn, compete and succeed."[14]

- "Student-athletes as a group graduate at higher rates than their peers in the general student body and feel better prepared for life after college."[15]

- "Student-athletes have the opportunity to travel across the country and around the world for competition, including regular-season, NCAA championships and foreign tours. Some student-athletes receive national and international exposure during competition. These experiences can open doors for the few who will compete

---

[14] Want to Play College Sports?, NCAA, https://www.ncaa.org/sports/2021/2/8/student-athletes-future.aspx

[15] *Id.*

professionally and for the majority who will go pro in something other than sports."[16]

- "Preparation for Life…By competing in college sports, student-athletes learn important skills, like leadership, time management and how to effectively work with others toward a common goal. Companies have specifically said that they seek to hire former student-athletes, and the majority of student-athletes say that participating in college sports prepares them for life after graduation."[17]

As Defendant's repeated public statements note, Plaintiffs face the loss of immediate and lifelong advantages, decreasing their odds of graduating college, preventing them from experiencing life-changing travel, preventing them from receiving national and international exposure which may open doors to playing professional sports, limiting their job prospects out of college, and overall leaving them less prepared for life.[18] It is hard to imagine a list of more irreparable harms than what Plaintiffs face.

---

[16] Benefits to College Student-Athletes, https://www.ncaa.org/sports/2014/1/3/benefits-to-college-student-athletes.aspx

[17] *Id.*

[18] As NCAA President Mark Emmert testified before the U.S. Senate Committee on Commerce, Science & Transportation:

> …research conducted by Nobel Prize winning labor economist Professor James Heckman…which he based on the National Education Longitudinal Survey (NELS), shows that participants in athletics are more likely to go to college, to stay and graduate from college, to secure a good job after college, and earn more money within a few years after college and for a lifetime. These results hold for football and men's basketball players, within Division I and across all divisions, and are accurate across many peer comparisons, including those from diverse racial and ethnic backgrounds as well as disadvantaged or difficult family circumstances, controlling for standardized testing variables and non-cognitive traits. College is a powerful force for social advancement and building human capital, and research shows that athletics has a positive relationship with that force. Participation in intercollegiate sports has been a significant means to realizing the benefits of college for hundreds of thousands of young people…

This is why Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." *S.A. v. Sioux Falls Sch. Dist. 49-5,* No. 4:23-CV-04139, 2023 U.S. Dist. LEXIS 185464, 2023 WL 6794207, *9 (D.S.D. Oct. 13, 2023) (quoting *Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834, 868 (D. Min. 2019); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of Tech., Inc.*, No. 6:22-cv-1950, 2023 U.S. Dist. LEXIS 27519, 2023 WL 2078264, *16-17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018); *but see Doe v. Portland Pub. Sch.,* 701 F.Supp.3d 18, 38-39 (D. Me. 2023); *Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.,* 798 A.2d 830, 836-37 (Commonwealth Court of Pa. May 21, 2002); *Hart v. NCAA*, 550 S.E.2d 79, 85, 209 W. Va. 543, 549 (W.V. 2001) ("…a student's ability to participate in athletic contests is not a right recognized by the law of [West Virginia].").

Indeed, the *Pavia, Elad,* and *Braham* cases looked at this exact issue with plaintiffs in the same position as those here and found they faced irreparable harm:

---

NCAA president's testimony on value of college model, NCAA, July 9, 2014, https://www.ncaa.org/news/2014/7/9/ncaa-president-s-testimony-on-value-of-college-model.aspx

- "The Court finds that the denial of the opportunity to play sports is irreparable harm." *Braham* at 21 (citing, *inter alia,* this Court in *Ohio v. NCAA*, 706 F.Supp.3d at 597).

- The "…lost opportunity to play a year of Division I football for a Big Ten team is incalculable in terms of personal experience." *Elad* at 26.

- "This Court has no trouble concluding, as many other courts have, that the denial of the ability to play sports is irreparable harm." *Pavia* at 543 (citing this Court in *Ohio v. NCAA*, 706 F.Supp.3d at 597).

It is clear, therefore, that Plaintiffs will suffer irreparable harm if Defendant's arbitrary and capricious decision to deny them eligibility this year is allowed to stand.

### C. The Balance of Equities Tips In Plaintiffs' Favor

The balance of equities in this matter tips strongly in Plaintiffs' favor. Plaintiffs merely ask that they be given the same opportunities that other players have already been given. Defendant cannot be permitted to claim that it has some right to decide Plaintiffs' fate arbitrarily and capriciously or to arbitrarily and capriciously restrain trade, commerce, and competition. The NCAA publicly professes that its highest concern is for student-athlete welfare, but it penalizes student-athletes who may be better off temporarily attending non-NCAA academic institutions.

There is no equitable position that calls for Plaintiffs to waste their gifts of athletic skill and opportunity for the sake of arbitrary bureaucratic decisions. There is no equitable position that calls for Plaintiffs to have less opportunity than that given to others. There is no equitable position that says Plaintiffs must suffer particularly so that the NCAA as a whole may benefit in some vague, amorphous, and immeasurable way. There no measurable harm to Defendant if Plaintiffs were to play football this season. There are

no damages or costs Defendant would incur by having an injunction issued in this matter. There is no massive and sudden detriment to anyone in granting Plaintiffs the same eligibility that other players have already been given.  The NCAA grants waivers like this on a regular basis with no apparent ill-effect to college sports or student-athletes.  Even the 7th Circuit in *Fourqurean v. NCAA* "…note[d] that the NCAA's bylaws allow the NCAA's Committee for Legislative Relief to grant 'relief from application of NCAA legislation to a particular situation in which no other entity has the authority to act,' which appears to create some flexibility for the NCAA to address the hardship to Fourqurean that concerned the district court." 2025 LX 236777 at *22-23.  But this court is expected to believe that a waiver for Plaintiffs would be a completely different matter altogether, would somehow harm Defendant, and, somehow, undermine college athletics.

As Plaintiffs do not seek any special treatment, but rather only seek the same opportunities already afforded other student athletes around the country, the equities in this matter squarely tip in Plaintiffs' favor.

### D.  An Injunction Is in The Public Interest

The public has an interest in seeing that college sports are administered fairly, rationally, and in accordance with published guidelines, as well as in seeing that labor markets and competition are as unrestrained as possible.  The public has an interest in seeing that college student-athletes are treated fairly and uniformly and that labor and other markets are not unnecessarily distorted.  The public has an interest in seeing young men live up to their full potential and take advantage of the opportunities they have.  The public has no interest in seeing arbitrary and capricious bureaucracies destroy opportunities for student-athletes.

### E.  This Court Must Enjoin the Rule of Restitution

Hovering like a dark cloud over this motion is the NCAA's now-infamous "Rule of Restitution."  The "Rule of Restitution" is a brazen punishment for student-athletes and schools that apply to courts for help.  Under NCAA Bylaw 12.11.4.2, a student-athlete that competes in college athletics *in accordance with the terms of a court restraining order or injunction* may still be penalized, along with the student-athlete's school, if that injunction or restraining order is voluntarily vacated, stayed or reversed or if the courts later determine that injunctive relief is not or was not justified.  Ex. 5, pp. 65-66.  It is no surprise, then, that such a rule has routinely garnered criticism for curtailing claims and injunctions by student-athletes.  *See, e.g.,* Richard G. Johnson, *Submarining Due Process: How the NCAA Uses Its Restitution Rule to Deprive College Athletes of Their Right of Access to the Court . . . Until Oliver v. NCAA,* 11 Fla. Coastal L. Rev. 459 (2010).  One court has even called the Restitution Rule "…a direct attack on the constitutional right of access to the courts."  *Oliver v. NCAA*, 920 N.E.2d 203, 216 (Ohio Erie Co. Ct. C.P. 2009).  The purpose and effect of such a pernicious rule is obvious and courts—including this one—have rightly recognized that it should be restrained.  *See, e.g., Ohio v. NCAA*, 706 F.Supp.3d 583, 601-02 (N.D.W. Va. 2023); *see also Braham* at *28.  The Rule of Restitution is in reality just another tool used by the Defendant to inconsistently, arbitrarily, and unreasonably restrain the opportunities of college athletes to participate in an already small and short-lived market.

Absent an injunction against the Rule of Restitution, any other injunctive relief this Court may award Plaintiff is essentially meaningless, as many universities will not permit student-athletes to compete even if they win a restraining order or injunction in court as

the school fears later punishment by the NCAA.  Indeed, for injunctive relief from this court to be practically effective, Defendant must be enjoined from punishing college athletes and member institutions under the Rule of Restitution for the "crime" of seeking their day in court to protect their constitutional right to fairness, due process, and equal treatment under the law.

### F.  Security

Plaintiffs respectfully request that this Court not require security for a temporary restraining order or preliminary injunction in this case. Given the injunctive relief sought by Plaintiffs, Defendant will not incur any costs or financial burden of any kind in complying with such an order. This request is consistent with both this Court's prior finding in *Ohio*, as well as other district court's findings in *Braham, Elad,* and *Pavia*.

## IV.    Conclusion

We no longer live in an era of a few leather-helmeted students running around the quad for a few hours.  When the NCAA was formed in 1906, Oklahoma, New Mexico, and Arizona were not even states yet.  It originally consisted of just 39 original members, only 4 of which were west of Mississippi River.  It now has approximately 1,100 member schools and oversees more than 500,000 athletes in all 50 states, Puerto Rico, and even Canada.  School athletic budgets can range into the hundreds of millions of dollars.

But in this changing landscape, the NCAA keeps falling further and further behind, failing to adapt where it can and should, and failing to recognize realities about the very sports and athletes it administers and is charged to protect and promote.  The result is that players here are awarded eligibility while similarly situated players there are not. "Blanket" waivers are granted, but only certain limited circumstances.  The decisions lack

rationality and fairness.  They do not advance or protect college sports but appear to exist merely because they can.  The result is a trampling of not just the rights of student athletes, but of the free-market forces that our federal and state laws protect.  Add in the Rule of Restitution and you have a powerful but absurd bureaucracy that belongs in a Joseph Heller or Franz Kafka novel rather than in U.S. colleges.

And so it is that the Plaintiffs here do not seek to upend college sports, or the NCAA, but merely seek to keep themselves from being victims of that absurd bureaucracy, from being prevented from having the same opportunities given other athletes and from being punished for exercising their constitutional rights.

This Court should award Plaintiffs an order enjoining the NCAA from preventing them from playing football immediately at West Virginia University and enjoining the NCAA from seeking revenge on Plaintiff in the form of the so-called "Restitution Rule."

s/ John Gianola_____

John F. Gianola (W.Va. Bar #10879)
James A. Gianola (W.Va. Bar #1378)
Lewis Gianola PLLC
1714 Mileground
Morgantown, WV  26505
(304) 291-6300

*Counsel for Plaintiffs*