**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JIMMORI ROBINSON,
JEFFREY WEIMER,
TYE EDWARDS, and
JUSTIN HARRINGTON,**

> **Plaintiffs,**

**v.**                                          **Civil Action No. 1:25-cv-75**
                                          **Hon. John Preston Bailey, Judge**

**NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,**

> **Defendant.**

**BRIEF OF *AMICUS CURIAE* STATE OF WEST VIRGINIA
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION AND INTERESTS OF *AMICUS CURIAE***

Old habits die hard. And the National Collegiate Athletic Association can't seem to quit violating the Sherman Act. The NCAA has been told to stop its anticompetitive behavior many times over the last forty years—including by this Court. But each time it's called out, it finds a new way to punish student-athletes who dare to defy its self-protectionist rules. This case presents another anticompetitive relapse.

The NCAA "enjoy[s] monopsony power in the market for student-athlete services." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 90 (2021). And especially when it comes to football, it wields that power. The four most prominent conferences combined to capture 70% "of all the minutes spent consuming college football games" in 2023. Anthony Crupi, *Big Ten, SEC Could Seize Majority Viewing Share By Themselves*, Sᴘᴏʀᴛɪᴄᴏ (Aug. 23, 2024), https://tinyurl.com/2kehshrk. That doesn't include Notre Dame—one of the country's most popular teams—the six other Football Bowl Subdivision conferences, or the eighteen Football Championship Subdivision conferences. *See Ohio State, Michigan ranked most popular college*

*football teams per study*, FOX SPORTS (Aug. 18, 2023), https://tinyurl.com/pa9p283w; *see also* ESPN, College Football Conferences (last visited Aug. 9, 2025), https://tinyurl.com/mve8hnxr.  As a result, "[t]here are no 'viable substitutes,'" and "the "NCAA's Division I essentially *is* the relevant market for elite college football."  *Alston*, 594 U.S. at 81 (cleaned up).

As one way of ensuring that no viable substitutes crop up, the NCAA has enacted the so-called Five-Year Rule.  ECF 5-5, PageID #132.  The Five-Year Rule requires a student-athlete to complete his or her "seasons of participation within five calendar years" of starting school at "a collegiate institution."  *Id.*  And the Five-Year Rule applies to "competition conducted by a two-year or four-year collegiate institution" regardless of whether the school is an NCAA member.  ECF 5-5, PageID #136.  The Rule is rife with exceptions, as those who do an internship, study abroad, compete in international athletics, or join the Peace Corps can get more time.  But not so for those who start college outside the NCAA.

The Five-Year Rule's message is clear: Student-athletes shouldn't attend non-NCAA institutions.  If they do, the NCAA will effectively punish them with fewer years of eligibility—as any remaining "seasons of participation" will disappear after an arbitrary clock runs out.  The punished athletes then enjoy fewer opportunities for national exposure, name, image, and likeness (NIL) deals, and elite coaching and competition.  That's using monopsonistic market power to stave off any competition from non-NCAA schools attempting to recruit Division I-caliber athletes.  And student-athletes—like the Plaintiffs here—suffer the most.

The State of West Virginia has an interest in ensuring free and fair competition in college athletics.  After all, the State is home to two NCAA Division I institutions, fourteen NCAA Division II institutions, one NCAA Division III institution, and several non-NCAA institutions. Plaintiffs are all West Virginia athletes who allege they've been harmed by the NCAA's practices.

So as a person charged with enforcing the Sherman Act on behalf of the State, 15 U.S.C. § 15c, and the chief enforcer of West Virginia antitrust law, West Virginia Code § 47-18-6, the Attorney General files this brief to vindicate that interest.

Plaintiffs deserve relief here.  This Court should enjoin the NCAA's anticompetitive conduct.

## I.    BACKGROUND

### a.  The NCAA's organizational structure and rules.

The NCAA and its member institutions, which include over 1,000 colleges and universities across the United States, are organized under a constitution, and member institutions are grouped into three divisions.  ECF 5-5 PageID #75.  Each of the NCAA's three divisions has the authority to determine its own governing structure and membership.  *Id.*  The NCAA is overseen by a Board of Governors that appoints the President to administer the Association and "implement directions of the Board of Governors and divisional leadership bodies."  ECF 5-5 PageID #81.  Each member institution is required to "hold itself accountable to support and comply with the rules and principles approved by the membership."  ECF 5-5 PageID #87.

Each NCAA division maintains its own legislative process for adopting bylaws, with some bylaws applying to only one division and others applying across divisions.  ECF 5-5 PageID #92.  Proposed bylaw changes that move through the divisional legislative process within an "area of autonomy" are adopted by certain conferences and their member institutions.  ECF 5-5 PageID #93.  Federated legislation—changes that are applicable only to the adopting division—can be made by a division-specific council; as relevant here, that's the Division I Council.  ECF 5-5 PageID #95.  The Division I Council is comprised of representatives from member institutions and conferences.  ECF 5-5 PageID #478.  Member institutions can propose amendments to the bylaws

for the Division I Council's review and can comment on proposed amendments under consideration.  ECF 505 PageID #95-96.

### b.  The Five-Year Rule.

The NCAA prohibits a student-athlete from engaging "in more than four seasons of intercollegiate competition in any one sport."  Bylaw 12.8 (ECF 5-5 PageID #132).  The NCAA says "intercollegiate competition" occurs "when a student-athlete in either a two-year or four-your collegiate institution" does any one of three things: (a) "[r]epresents the institution in any contest against outside competition, regardless of how the competition is classified"; (b) "[c]ompetes in the uniform of the institution, or, during the academic year, uses any apparel … received from the institution that includes institutional identification"; or (c) "[c]ompetes and receives expenses … from the institution for the competition."  Bylaw 12.02.6 (ECF 5-5 PageID #112).

The NCAA also imposes a time limit on completion of those four seasons—the Five-Year Rule.  Bylaw 12.8.1 provides that a "student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution."  Bylaw 12.8.1 (ECF 5-5 PageID #132).  The Rule has exceptions; among other things, student-athletes who spend time in the armed services, on official religious missions, or with recognized foreign aid services are excepted.  *Id.*

Unless one of the exceptions applies, the Five-Year Rule's clock runs without stopping from the moment a student-athlete is "registered at a collegiate institution."  Bylaw 12.8.8.1 (ECF 5-5 PageID #132).  A student-athlete is considered registered "when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes

for that term." *Id.* And for the NCAA's purposes, a "collegiate institution" is "an institution of higher education that" is accredited at the college level by the Department of Education and is authorized to offer at least a one-year program of study, "[c]onducts an intercollegiate athletics program" even if it's not accredited, or "[i]s located in a foreign country." Bylaw 14.02.4 (ECF 5-5 PageID #:218). So "junior colleges (although excluded from Division I) are included in the definition of 'intercollegiate competition.'" *Elad v. Nat'l Collegiate Athletic Ass'n*, No. CV 25-1981 (ZNQ) (JTQ), 2025 WL 1202014, at *4 (D.N.J. Apr. 25, 2025).

### c. This litigation.

Plaintiffs are four student-athletes who transferred to West Virginia University to play football during the 2025 season. Each Plaintiff started his collegiate career at a non-NCAA institution. Pls.' Mem. of Law 4-5 (ECF 6). And each applied for a Five-Year Rule waiver after the NCAA announced its blanket waiver for the upcoming season. *Id.* at 3-4. The NCAA denied all four waiver requests. *Id.* at 6.

## II.    ARGUMENT

The NCAA's application of the Five-Year Rule to student-athletes who attend non-NCAA institutions is anticompetitive. In the current era of NIL compensation, eligibility rules are commercial in nature. They dictate the number of years a student-athlete can market and profit from an NCAA Division I career. So the NCAA's eligibility rules are subject to the Sherman Act's prohibition on anticompetitive conduct. The Five-Year Rule crosses the line. It punishes junior colleges and the student-athletes who attend them—using exclusive market power to further exclude. And the NCAA's justifications fall flat. Indeed, in some instances, they reinforce the NCAA's anticompetitive aims. Therefore, the Five-Year Rule violates the Sherman Act. The Court should enjoin it from being applied against Plaintiffs.

### a. The Sherman Act prohibits anticompetitive behavior.

Monopolies (and monopsonies) are not inherently unlawful.  They are often the result of "a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  And the reward for taking risk and producing innovation is often "the opportunity to charge monopoly prices—at least for a short period."  *Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  But monopolies also tend to restrain "free competition in business and commercial transactions," which in turn "restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers."  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940).  Likewise, monopsony can invite "price fixing, refusals to deal [ ] and vertical integration."  *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1214 (D.N.M. 2014).

Congress struck a balance between these conflicting interests through the Sherman Act.  "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise.  They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."  *United States v. Topco Associates, Inc.*, 405 U.S. 596, 610 (1972).  The economic "freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster."  *Id.*  The Sherman Act balances those freedoms by "penaliz[ing] restraints on Commercial competition in the marketing of goods and services."  *Council for Employment & Economic Energy Use v. WHDH Corp.*, 580 F.2d 9, 12 (1st Cir. 1978).

Section 1 of the Sherman Act prohibits "every contract, combination … or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  "Restraint of trade" is

best read to mean "undue restraint." *Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018). Put simply, possession of monopoly power in a market *plus* "anticompetitive *conduct*" equals a federal antitrust violation. *Verizon Comms. Inc.*, 540 U.S. at 407 (emphasis supplied).

To determine whether a restraint is "undue," courts employ the "rule of reason" analysis. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure ... to assess the [restraint]'s actual effect' on competition." *American Express*, 585 U.S. at 541 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). "The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203, (2010).

The rule-of-reason assessment involves a "three-step, burden shifting framework." *American Express*, 585 U.S. at 541. First, the "plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Second, if the plaintiff carries that burden, "then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* And third, if the defendant makes that showing, "then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

### b.  The Five-Year Rule stifles competition.

#### i.  The labor market for college football athletes is the relevant market.

"A relevant product market 'is composed of products that have reasonable interchangeability for the purposes for which they are produced.'" *Berlyn Inc. v. Gazette Newspapers, Inc.*, 73 Fed. Appx. 576, 582 (4th Cir. 2003) (quoting *United States v. E.I. duPont de*

*Nemours and Co.*, 351 U.S. 377, 404 (1956)).  When analyzing a restriction in the context of "supplier markets such as the employment market . . . the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005).

The NCAA's eligibility regulations—including the Five-Year Rule—are horizontal agreements between member institutions.  *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 539 (M.D. Tenn. 2024) (citing *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 730 (1988) (horizontal agreements are agreements between competitors at the same level in a particular industry).  Those regulations affect the labor market for athletic services in Division I sports, generally, and, as relevant here, Division I football specifically.  The geographic market is the United States, as the NCAA and its member institutions are located across the country and engage in both on-field competition and competition in the relevant labor market throughout the United States.  And within the national Division I football market, college athletes compete for roster spots at NCAA institutions, while NCAA institutions compete against each other to recruit the best athletes to compete on their teams.

Plaintiffs operate in the labor market for college football athletes in general and NCAA Division I football specifically.  ECF 5-1, 5-2, 5-3, 5-4.  Courts considering antitrust challenges to the Five-Year Rule and other NCAA rules have "found that the labor market for college athletes, in this case college football, to be relevant labor markets." *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 539 (M.D. Tenn. 2024); *see also Alston*, 594 U.S. at 90 ("market for student athlete services"); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 761 (E.D. Tenn. 2024) ("market of Division I athletics"); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 592 (N.D.W. Va. 2023) (finding that "labor markets within NCAA Division I college

athletics in the United States are relevant antitrust markets"). "The NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *Alston,* 594 U.S. at 90. No alternatives to the benefits of participation in NCAA Division I athletics exist for college athletes, and in *Alston,* the NCAA did not contest "that student-athletes have nowhere else to sell their labor." *Id.* As a result, the NCAA and its member institutions maintain exclusive market power—they have the sole ability to dictate the rules and regulations for participation in Division I athletics.

NCAA Division I football has cornered the market to the point that there is no other market. Lucrative television deals are one example. The American Athletic Conference has a twelve-year, $1 billion television deal with ESPN. "Here's a look at all the current conference TV deals," ON3 (Aug. 2, 2021), https://tinyurl.com/d469u9jc. That means each of the eleven football-playing conference members receives over $7 million annually. *Id.* The Atlantic Coast Conference has a 20-year deal with ESPN that pays $240 million annually, with each school getting $17 million. *Id.* The Big 10 has a seven-year, $7 billion deal with Fox, CBS, and NBC. Adam Rittenberg, "Big Ten completes 7-year, $7 billion media rights agreement with Fox, CBS, NBC," ESPN (Aug. 18, 2022), https://tinyurl.com/4p8srbr9. The Big 12 starts a new deal this year. ESPN and Fox Sports are combining to pay $2.3 billion over six years, so each Big 12 school will rake in approximately $24 million annually. Dennis Dodd, Adam Silverstein, "Big 12 finalizing six-year, $2.3 billion extension of media rights deal with ESPN and Fox Sports," CBS SPORTS (Oct. 30, 2022), https://tinyurl.com/evxvvpx5. The Southeastern Conference has a ten-year, $3 billion deal with ESPN. Emily Caron, Anthony Crupi, "ESPN Signs $3 Billion Deal for SEC Football as CBS Era Nears End," YAHOO! SPORTS (Dec. 10, 2020), https://tinyurl.com/yzpd83zk. Every Division I member institution is thus making millions.

On the other hand, there are no reported deals for the National Junior College Athletic Association (NJCAA) or California Community College Athletic Association (CCCAA) beyond the announcement that NJCAA national championship games will stream online on ESPN+. "NJCAA and ESPN Announce Content Adjustments," NJCAA (Oct. 11, 2023), https://tinyurl.com/3fh3ajvx. Compare that *de minimis* exposure with the College Football Playoff's six-year, $7.8 billion contract with ESPN. Heather Dinich, "College Football Playoff, ESPN agree to deal through 2031-32," ESPN (Mar. 19, 2024), https://tinyurl.com/52w85c6n.

These numbers are important to the labor market—more so now than ever. NCAA member institutions in the Atlantic Coast Conference, Big Ten, Big 12, Pac 12, and Southeastern Conference can share up to 22% of the revenue from media rights, ticket sales, and sponsorships with student athletes. "About the House Settlement," College Sports Commission (last visited Aug. 11, 2025), https://tinyurl.com/yxzw4tk3. Each school can distribute up to $20.5 million to student-athletes for the 2025-26 academic year. *Id.* And the NCAA is now permitted to adopt roster limits for Division I sports. *In re College Athlete NIL Litigation*, No. 20-cv-03919 CW, 2025 WL 1675820, at *8 (N.D. Cal. June 6, 2025). So the NCAA could shrink roster spots, thereby decreasing demand in the labor market. Those student-athletes who lose out on a roster spot will lose out on revenue sharing and direct pay.

They'll also lose out on revenue sharing from product licensing, ticket sales, and other sponsorships. Ohio State University, for example, reported $64.3 million in revenue in 2023—just from football ticket sales. "Ohio State reports record athletics revenue in FY 2023," Ohio State News (Jan. 23, 2024), https://tinyurl.com/37zwy2fm. Hutchinson Community College, the 2024 NJCAA national champion, reported total cash receipts from *all* athletics of $870,242 in 2020. Hutchinson Community College Financial Statements at 54, available at

https://tinyurl.com/mu2u2sbf.  These examples show that the NCAA dominates the labor market for college football players.  And the schism between NCAA Division I football and even junior college's top-tier is so vast that NCAA Division I essentially *is* the market.

In addition to immediate financial considerations, the NCAA and its member institutions control student-athletes' future compensation.  In the 2020 NFL Draft, only 12 of 255 players selected spent time in junior college.  David Boclair, "Murchison's Journey From JUCO an NFL Rarity," TENNESSEE TITANS ON SI (May 5, 2020), https://tinyurl.com/2wdpwvyt.  And every one of those twelve played at NCAA member institutions between junior college and the pros.  So the NCAA dictates the labor market by holding the keys to players' futures, too.

Within the market they control, the NCAA and its member institutions engage in commercial transactions with college athletes.  A roster spot significantly affects the current and future earning potential of college athletes, and the athletes' labor yields significant financial revenue for the member institutions from the sizable consumer interest in college athletics.  What's more, these transactions pave the way for college athletes to profit from NIL agreements.  A rule limiting student-athletes' eligibility thus restricts their compensation.  So the relevant market is the labor market for college football athletes in general and NCAA Division I football specifically.

### ii. The Five-Year Rule is a commercial restriction with substantial anticompetitive effects.

NCAA member institutions must coordinate to some degree.  Indeed, "coordination between competitors within sports leagues can be procompetitive." *Alston*, 594 U.S. at 90.  That's because "the very competitions that consumers value would not be possible" without agreed-upon rules.  *Id.*  "Accordingly, even a sports league with market power might see some agreements among its members win antitrust approval in the 'twinkling of an eye.'" *Id.* (quoting *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010)).

But "[t]hat *some* restraints are necessary to create or maintain a league sport does not mean *all* 'aspects of elaborate interleague cooperation are.'" *Id.* (quoting *American Needle*, 560 U.S. at 199, n.7). Like the compensation-related restrictions at issue in *Alston*, the Five-Year Rule "fall[s] on the far side of this line." *Id.* at 91.

As a threshold matter, the Five-Year Rule is a commercial restraint. In today's world of NIL compensation, the "market realities" dictate that eligibility rules can be commercial in nature. *See Elad*, 2025 WL 1202014, at *7 (finding that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis") (cleaned up). So, while the NCAA's eligibility rules used to be considered "noncommercial," *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1066 (9th Cir. 2015), those rules are now "so intertwined with commercial rules and benefits that they are, in essence, 'commercial' in nature," *Braham v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-00253-MMD-CSD, 2025 WL 2017162, at *5 (D. Nev. July 18, 2025). Every year of eligibility "is tied to potential NIL agreements, which are 'commercial transactions.'" *Id.*

Moreover, eligibility is even more commercial now that the settlement has been approved in *In re College Athlete NIL Litigation*, No. 20-cv-03919 CW, 2025 WL 1675820 (N.D. Cal. June 6, 2025). NCAA member institutions in the five most prominent conferences can share up to 22% of the revenue from media rights, ticket sales, and sponsorships with student athletes. "About the House Settlement," *supra*. Each school can distribute up to $20.5 million to student-athletes for the 2025-26 academic year. *Id.* And the NCAA is permitted to adopt roster limits for Division I sports. *In re College Athlete NIL Litigation*, 2025 WL 1675820, at *8. So eligibility determinations now control who can share in a school's revenue and who can be paid directly by

NCAA institutions.  Each of the Plaintiffs seek to play for West Virginia University, a Big 12 institution.  Thus, each would be able to share revenues and be paid if he is eligible.

The Five-Year Rule also has substantial anticompetitive effects on junior colleges, student-athletes, and consumers.  The Five-Year Rule limits the NCAA Division I eligibility of student-athletes who attended junior college.  Junior college student-athletes are limited to "two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility." *Pavia*, 760 F. Supp. 3d at 539.  So the Rule "gives a competitive advantage to NCAA Division I member schools over junior colleges." *Id.*  And it is an example of type of horizontal agreements "between direct competitors … to reduce competition," ECF 5-7, PageID #534, the Supreme Court has warned of. *See Business Elec. Corp.*, 485 U.S. at 733-34 (discussing *per se* illegality of horizontal agreements).

The anticompetitive effect on junior colleges is exacerbated by the effect on student-athletes who attend them.  It "results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically." *Pavia*, 760 F. Supp. 3d at 539. The math is simple. "[E]ach season of [junior college] participation costs a football player one year of NCAA eligibility." ECF 5-7, PageID #537.  So "students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation." *Pavia*, 760 F. Supp. 3d at 539-40.  "The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice."

*Id.* at 540.  So the Five-Year Rule induces "potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest."  *Id.* These anticompetitive practices result in real, stark differences between NCAA and non-NCAA institutions.  NCAA institutions offer "[g]reater exposure and better coaching," which "increase the probability of a professional career."  ECF 5-7, PageID #537.  And "NIL allowances indicate the exposure gained by attending an NCAA Division I college, which offers considerable financial advantages in comparison to a" junior college.  *Id.*  So the Five-Year Rule's anticompetitive effect is akin to UnitedHealth and BlueCross BlueShield collusively refusing to pay any doctor who also did business with a small-town health insurer.

The Five-Year Rule has downstream effects, too.  Because it restricts the eligibility of former junior college student-athletes, it "harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level."  *Pavia*, 760 F. Supp. 3d at 540.  This deleterious effect on competition creates a lesser product for consumers of collegiate athletics.  And it harms student-athletes as well, as they are then limited in their ability to develop their skills before entering the professional market.

The downstream effects are similar to those caused by the Transfer Eligibility Rule this Court invalidated in *Ohio v. National Collegiate Athletic Association*, 706 F. Supp. 3d 583 (N.D.W. Va. 2023).  There, this Court analyzed an antitrust challenge to an NCAA bylaw that required a student-athlete to sit out of competition for an entire academic year following his second transfer.  *Id.* at 591.  The Court found three primary areas of harms to student-athletes: "(1) when student-athletes are making the decision on whether to transfer, (2) when college athletes decide to transfer and are searching for a new institution to attend; and (3) when college athletes are denied eligibility to compete for one year after transferring to a new institution."  *Id.* at 592.  And the Court found

that the Transfer Eligibility Rule "causes negative downstream effects on consumers" because "[t]he value of the product that the NCAA provides to consumers is diminished when student-athletes are prevented from competing." *Id.* at 594. Because "[t]eams may be less competitive without skilled transfer players … the Transfer Eligibility Rule is a barrier to increased parity in college athletics that would create a better product for consumers." *Id.* (cleaned up).

So too here. The Five-Year Rule pigeonholes student-athletes into selecting NCAA schools where they may not be able to get on-field time in competition. And it makes teams like West Virginia University less competitive without skilled transfer players like Plaintiffs. The Plaintiffs, therefore, are likely to succeed on the merits of their antitrust claim.

### iii. There is no procompetitive rationale for the Five-Year Rule.

While defending the Five-Year Rule in *Pavia*, the NCAA advanced three procompetitive rationales. The district court dispatched each with ease.

*First*, the NCAA said the Five-Year Rule "preserv[es] intercollegiate athletics as a unique offering." *Pavia*, 760 F. Supp. 3d at 541. The NCAA argued that, without the Five-Year Rule, "it could become the norm for many student-athletes to spend time developing their skills on [junior college] football teams before competing for Division I schools, thus diminishing their options upon high school graduation, distorting their college careers, delaying their professional careers, and changing the character of NCAA Division I Football as a differentiated athletic product." *Id.*

The district court wasn't convinced. The NCAA's five-year clock is delayed for several other types of students. Prep school student-athletes can earn credit toward a degree and compete athletically against junior colleges and other "collegiate institutions." *Id.* And the NCAA pauses the clock for other reasons, like "military service, religious obligations, professional careers in other sports, or even independent athletic or academic work." *Id.* at 542 (citing NCAA Bylaw

12.8.1.2); *see also* NCAA Bylaws 12.8.1.3 (Academic Study Abroad Exception), 12.8.1.4 (Internship or Cooperative Educational Work Experience Program Exception), 12.8.1.5 (Pregnancy Exception), 12.8.1.6 (Athletics Activity Waiver) (ECF 5-5, PageID #133).

Beyond the reasons cited by the district court, this "procompetitive" rationale isn't "procompetitive" at all. It's intended to discourage student-athletes from "spend[ing] time developing their skills on [junior college] football teams." *Pavia*, 760 F. Supp. 3d at 541. That's anticompetitive. And the NCAA's rules further show the intent to stifle junior college athletics. For instance, "[a]ny competition, regardless of time, during a season in an intercollegiate sport shall be counted as a season of competition in that sport." NCAA Bylaw 12.8.3.1 (ECF 5-5, PageID #135). That rule applies to "two-year or four-year collegiate institution[s] at the varsity or subvarsity level." NCAA Bylaw 12.8.3.1 (ECF 5-5, PageID #136). It even applies to scrimmages at junior colleges if an "official score is kept" or "admission is charged." NCAA Bylaw 12.8.3.1.1 (ECF 5-5, PageID #136). So the NCAA doesn't count a full year of eligibility if a student-athlete participates in a meaningless game, so long as the student-athlete's stats aren't counted and the junior college doesn't bring in any revenue. There's nothing "procompetitive" about that.

*Second*, the NCAA argued that the Five-Year Rule increases the total number of student-athletes and improves the student-athlete experience. *Pavia*, 760 F. Supp. 3d at 541. The NCAA argued that, "because Division I football opportunities are finite, if some students continue to play longer than the Rules currently allow, the total number of student-athletes will decrease, and the challenged rules create opportunities for younger athletes who want to attend a four-year college and compete immediately after high school graduation." *Id.* So the NCAA claimed that, without the Five-Year Rule, "student-athletes who have attended and competed at a junior college or other

16

non-NCAA college would have an advantage in being selected for Division I teams and 'crowd out' younger, less experienced student-athletes." *Id.*

The district court was unpersuaded. "Division I programs use the transfer portal to fill roster spots for the next season." *Id.* at 542. And those permitted transfers "take a spot that might otherwise go to an incoming freshman player." *Id.* So the NCAA's own rules result in "a school opting for a more experienced player," the very effect the Five-Year Rule is alleged to avoid. *Id.*

Again, this rationale has an anticompetitive undertone. The NCAA's stated goal is to "create opportunities for younger athletes who want to attend a four-year college." *Id.* at 541. That just means the NCAA wants to incentivize student-athletes to attend NCAA institutions to the exclusion of junior colleges. In other words, the Five-Year Rule sends a clear message to high school athletes: enrolling in a junior college will disadvantage you in Division I athletics.

*Finally*, the NCAA argued that "extending eligibility would also extend the academic careers of those student athletes thereby defeating the 'natural and standard degree progression timeline that is central to the NCAA's mission.'" *Id.*

The district court was again unconvinced. It found this argument to be "pretextual, particularly considering that the NCAA's Rules concerning the duration of eligibility have evolved over time." *Id.* at 542. The rule changes suggested to the district court "that strict adherence to the eligibility timeframe, including the restrictions applicable to junior college student-athletes, does not have procompetitive benefits." *Id.* The district court pointed out that freshmen previously couldn't play varsity football. *Id.* But that rule was "eliminated and the limit on eligibility was later increased to four seasons within five calendar years." *Id.* And the rules were amended again to "allow NCAA Division I football players (but not other Division I athletes) another half season (or potentially more) of play through the Redshirt Rule, which allows football players to play up

to four games per season without losing a year of eligibility." *Id.* (cleaned up).  The Bylaws were amended again to exclude "all post-season competition from the Redshirt Rule," increasing "the number of games that can be played in an exempt season from four games to a potential of nine games." *Id.*

What's more, the NCAA "changed its rules to allow student-athletes unlimited transfers between schools." *Id.* at 543.  The district court found it "highly implausible that frequent transfers, even those within NCAA institutions, benefit an athlete's academic career and promote 'natural and standard degree progression.'" *Id.*  That's because "institutions are not guaranteed to accept transfer credits from another institution whether it be another NCAA institution or a junior college." *Id.*  So the district court found the "standard degree progression" goal to be pretextual; the NCAA relies on it "when it is convenient and eschew[s] it when it is not." *Id.*

The "standard degree progression" rationale falls flat for another reason.  The NCAA allows postgraduate students to participate in athletics.  *See* NCAA Bylaw 14.6 (ECF 5-5, PageID #244) (Postgraduate Student Participation).  Dillon Gabriel, a third-round pick in the 2025 NFL Draft, played for three different NCAA Division I member institutions over a six-year collegiate career.  Pablo Uggetti, "Oregon QB Dillon Gabriel proud of 6 years in college," ESPN (Dec. 30, 2024), https://tinyurl.com/yc2x7vsz.  He and many other postgraduate students weren't in lockstep with the traditional four-year degree.  So this rationale is wholly pretextual.

### iv.  Less anticompetitive means exist.

Less anticompetitive means are easily identified.  The eligibility clock could start when a student-athlete first registers for classes at an NCAA member institution rather than at a "collegiate institution."  That's a simple fix to NCAA Bylaw 12.8.1.  ECF 5-5, PageID #132.  And it removes anticompetitive barriers.

The definition of "intercollegiate competition" in NCAA Bylaw 12.02.6 could be amended to refer to an athlete's enrollment "in an NCAA member institution" rather than "in either a two-year or a four-year collegiate institution," as it currently stands. ECF 5-5, PageID #112. This change would still confine players to the Five-Year Rule once they arrive at an NCAA institution. And it wouldn't punish them for starting their academic and athletic careers at junior colleges.

And Bylaw 14.3.3 could be amended to remove the line, "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." ECF 5-5, PageID #227. Deleting that sentence, in the context of making the other proposed amendments, still has the effect of limiting student-athletes to four years of Division I competition. But it doesn't have the anticompetitive effects against junior colleges and student-athletes who attend them.

In summary, the Five-Year Rule, as applied to student-athletes who attend junior colleges, is anticompetitive. It imposes an unreasonable restraint on the labor market for Division I college football athletes. The NCAA enjoys a monopsony in the relevant market, so its anticompetitive conduct is substantial enough to violate the Sherman Act. Therefore, the Plaintiffs are likely to succeed on the merits.

### c. Injunctive relief is appropriate.

"College students suffer irreparable harm when they are denied the opportunity to play sports." Pls.' Mem. of Law (ECF 6) (collecting cases). This is the end of the road for Plaintiffs. If they can't play football this year, their collegiate football careers are over. Their hard-earned roster spots are forfeited. Their NIL deals are in limbo. Their professional careers are even more uncertain. So an injunction precluding enforcement of the anticompetitive bylaws as to Plaintiffs is appropriate.

An injunction wouldn't harm the NCAA.  It would help it by putting a better product on the field.  And the equities favor allowing college athletes to realize present and future economic potential from their participation in college athletics.  The public interest is also served when labor markets are free and competitive.  Free and fair competition in labor markets is essential to the American economy.  But anticompetitive restrictions in the market harm both workers (student-athletes) and the overall economy.  An injunction would promote and protect competition.  That's the precise purpose of the Sherman Act.

**CONCLUSION**

This Court should grant Plaintiffs injunctive relief.

Respectfully submitted,

JOHN B. McCUSKEY
ATTORNEY GENERAL


*/s/ Caleb B. David*
Caleb B. David (12732)
  *Deputy Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
caleb.b.david@wvago.gov
Telephone: (304) 558-2021
Facsimile: (304) 558-0140


Dated: August 12, 2025                              *Counsel for* Amicus Curiae
                                                    *State of West Virginia*

20