**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| **JIMORI ROBINSON, JEFFREY WEIMER, TYE EDWARDS, and JUSTIN HARRINGTON,** | |
| *Plaintiffs*, | **Case No. 1:25-cv-00075** |
| v. | **Judge John Preston Bailey** |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | |
| *Defendant.* | |

<u>**DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S
RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**</u>

This case addresses the validity of eligibility rules that govern who can compete in college sports.  For decades, member schools in Division I ("DI") of the NCAA have established eligibility rules that ensure college sports are played by college students.  Plaintiffs seek to enjoin one of these rules, the "Five-Year Rule," which allows student-athletes to participate in four seasons of "intercollegiate competition" across five years.  (*See* Compl. ¶ 44, D.E. 1).[1]  Over thirty student-athletes have brought similar claims in federal courts across the country.  These suits follow a lone court's decision to grant an injunction in favor of a student-athlete challenging the Five-Year Rule under the Sherman Act.  *See Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024).  The plaintiffs have argued that one or more of their seasons of competition—most commonly one at a level other than DI—should not count toward their DI eligibility.  *Pavia* is an outlier.  The majority of district courts to adjudicate these student-athletes' requests have denied injunctive relief.[2]  The four

---

[1] The pertinent Bylaws are 12.8, which provides Division I athletes five years to complete four seasons of "intercollegiate competition" in their chosen sports (the "Five-Year Rule"), and 12.02.6, which counts all intercollegiate competition, including that at the junior college level, for purposes of the Five-Year Rule.  These rules are collectively referred to herein as the "Five-Year Rule."  Plaintiffs and the Attorney General each address two additional bylaws, Bylaw 14.5.4.3 and Bylaw 14.3.3, respectfully, but they do not explain how Plaintiffs have been impacted, let alone harmed, by the same.

[2] *Compare Wade v. NCAA*, No. 2:24-cv-196-TBM-RPM, 2024 U.S. Dist. LEXIS 232129 (S.D. Miss. Dec. 23, 2024); *Ciulla-Hall v. NCAA*, No. 25-cv-10271-DJC, 2025 U.S. Dist. LEXIS 22368 (D. Mass. Feb. 7, 2025); *Arbolida v. NCAA*, No. 25-2079-JWB, 2025 U.S. Dist. LEXIS 31283 (D. Kan. Feb. 21, 2025); *Goldstein v. NCAA*, No. 3:25-cv-27, 2025 U.S. Dist. LEXIS 36025 (M.D. Ga., Feb. 28, 2025); *Osuna Sanchez v. NCAA*, No. 3:25-cv-62-CEA-DCP, 2025 U.S. Dist. LEXIS 37500 (E.D. Tenn. Mar. 3, 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885-DCN, 2025 U.S. Dist. LEXIS 89791 (D.S.C. May 11, 2025); *Coley v. NCAA*, No. 5:25-cv-00098-D-BM, 2025 U.S. Dist. LEXIS 1083429 (E.D.N.C. June 6, 2025); *Hamilton v. NCAA*, No. 2:25-cv-924, 2025 U.S. Dist. LEXIS 107613 (E.D. La. June 6, 2025); *Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, 2025 U.S. Dist. LEXIS 111927 (E.D. Tenn. June 12, 2025); *Johnson v. NCAA*, No. 9:25-cv-00060-KLD, 2025 U.S. Dist. LEXIS 121766 (D. Mont. June 26, 2025); *Walker v. NCAA*, No. 3:25-CV-00514-JWD-EWD, 2025 U.S. Dist. LEXIS 131541 (M.D. La. July 1, 2025); *Giles v. NCAA*, No. 8:25-cv-01488-JVS-KES, ECF No. 13 (C.D. Cal. July 17, 2025) (declining to issue show-cause order); *Hill v. NCAA*, No. 4:25-cv-00591-LPR, ECF No. 31 (E.D. Ark. June 24, 2025); *Fourqurean v. NCAA*, No. 25-cv-68-wmc, 2025 U.S. Dist. LEXIS 22012 (W.D. Wis. Feb. 6, 2025), *rev'd*, No. 25-1187, 2025 U.S. App. LEXIS 17561 (7th Cir. July 16, 2025); *Hasz v. NCAA*, No. 8:25CV398, 2025 U.S. Dist. LEXIS 141455 (D. Neb. July 24, 2025); *Bellamy v. NCAA*, No. 3:24-cv-00750,  2025 U.S. Dist. LEXIS 152042 (M.D. Tenn. Aug. 7, 2025); *with Pavia*, 760 F. Supp. 3d 527; *Elad v. NCAA*, No. CV 25-1981 (ZNQ) (JTQ), 2025 U.S. Dist. LEXIS 78922 (D.N.J. Apr. 25, 2025); *Braham v. NCAA*, No. 3:25-cv-00253-MMD-CSD, 2025 U.S. Dist. LEXIS 137047 (D. Nev. July 18, 2025). *See also Robinson v. NCAA*, 3:25-cv-07661-ZNQ-TJB (D.N.J.) (voluntarily dismissed for want of personal jurisdiction); *Boyd v. NCAA*, 3:25-cv-00729

exceptions, including *Pavia*, have been appealed, and in the only appeal to have concluded, the appellate court reversed.[3]

Plaintiffs are the first, however, to obtain an amicus brief from a state attorney general. The amicus brief, (D.E. 9), conveys only one argument: *Pavia* got it right.  But the wave of litigation following *Pavia* indicates that the court's effort to create a "narrow" injunction "to preclude the NCAA from enforcing Bylaw 12.02.6 *as to Pavia*," 760 F. Supp.3d at 544, has had far from a limited effect.  Recently, the same district court judge who decided *Pavia* acknowledged the NCAA's contention that "no matter how narrowly the Court structures an injunction, preliminary relief concerning eligibility rules has sweeping implications — with each successfully obtained injunction comes a new challenge to the NCAA's eligibility rules," and denied a similar request for preliminary injunctive relief.  *Bellamy*, 2025 U.S. Dist. LEXIS 152042, at *20.

*Pavia* lacks any limiting principle.  If courts may enjoin counting intercollegiate competition at the junior college ("JUCO") level toward student-athletes' DI eligibility, the same logic necessitates that competition at the DIII, DII, NAIA levels not "count" toward DI—they too do not present the same opportunities.  The result would permit student athletes to compete in ***eighteen seasons of intercollegiate competition***: two seasons of JUCO competition, four seasons

---

(M.D. Tenn.) (filed June 30, 2025); *Robinson v. NCAA*, No. 2:25-cv-06454-JVS-KES (C.D. Cal.) (filed July 15, 2025); *Wingfield v. NCAA*, No. 2:25-cv-06875-DMG-RAO (C.D. Cal.) (filed July 28, 2025); *Martinson v. NCAA*, 2:25-cv-01376 (D. Nev.) (filed July 30, 2025).

[3] *See* The *Pavia* appeal is fully briefed and set for argument on October 23, 2025. *Pavia*, 6th Cir. Case No. 24-6153 (Dkt. No. 33). The *Elad* appeal is fully briefed and argument is set for September 15, 2025. *See Elad*, 3d Cir. Case No. 25-1870 (Dkt. No. 43). The NCAA filed its Notice of Appeal in *Braham* on August 8, 2025. *See Braham v. NCAA*, No. 3:25-cv-00253-MMD-CSD, ECF No. 32 (D. Nev.).  The Seventh Circuit in *Fourqurean* reversed the district court's grant of an injunction. *See Fourqurean*, 2025 U.S. App. LEXIS 17561.

in Division III, Division II, and NAIA competition, only then to matriculate to a DI member institution at roughly the age of thirty-two with a fresh four-season clock.[4]

The Executive Branch has rejected Plaintiffs' and the Attorney General's argument, recognizing that the Five-Year Rule preserves the unique nature of collegiate sports.  In *Zeigler*, the Department of Justice submitted a Statement of Interest, (attached as Ex. 1), explaining that the NCAA's eligibility rules generally survive antitrust scrutiny.  And the President recently issued an Executive Order entitled, "Saving College Sports," acknowledging that "college sports," a "uniquely American institution," is "under unprecedented threat" from "[w]aves of recent litigation[.]"    https://www.whitehouse.gov/presidential-actions/2025/07/saving-college-sports/. The White House explicitly called out "[o]ngoing lawsuits seek[ing] to tear down the foundational elements of college sports that distinguish it from professional sports" including those challenging "limits on how many seasons student-athletes can play."    https://www.whitehouse.gov/fact-sheets/2025/07/fact-sheet-president-donald-j-trump-saves-college-sports/.

Moreover, Plaintiffs' desire to compete for West Virginia University ("WVU") is at odds with WVU's own conduct.  WVU is a member of an athletic conference that has agreed to a settlement *affirming* the NCAA's Five-Year Rule.  *See House v. NCAA*, No. 4:20-cv-03919 (N.D. Cal. June 6, 2025) (D.E. 958-1, at 21, Art. 4, § 3(a); 979.)  WVU obtained valuable legal releases pursuant to that settlement and has repeatedly endorsed it.  It is accordingly hard to imagine WVU supporting Plaintiffs' claims, which are so obviously at odds with its legal position and interests.

---

[4] Even the district court in *Fourqurean* rejected a holding that would enable the foregoing result. 711 F. Supp. 3d at 1054 ("Plaintiff also proposes tolling an athlete's eligibility clock until he registers for class at a Division I institution, but this proposal also seems a non-starter, since it would arguably all but end any distinction between college and professional football. . . . Division II and Division III football programs would become nothing more than minor league teams for the most powerful Division I football programs.")

## BACKGROUND

It is undisputed for purposes of this Motion that Plaintiffs have each completed four seasons of intercollegiate competition across a five-year period and exhausted their DI eligibility.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remed[y] involving the exercise of very far-reaching power." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). To obtain a preliminary injunction, Plaintiff must show that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm if the injunctive relief is denied; (3) the balance of equities tips in his favor; and (4) injunctive relief would be in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A district court need not consider all four *Winter* factors if one is clearly absent. *See Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).

Plaintiffs seek a "mandatory" injunction that would "alter[] the status quo before the case even begins." *Id*. These injunctions are "disfavored[] and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). To obtain mandatory relief, Plaintiffs must present evidence clearly demonstrating that they are likely to prevail on the merits. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

## ARGUMENT

I.     PLAINTIFFS LACK A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs have not made a "clear showing" that they are likely to prevail on the merits. *Id*. at 230. The Five-Year Rule is not commercial in nature and not subject to Sherman Act scrutiny. Even if the Five-Year Rule were commercial, Plaintiffs offer no evidence that it has a substantial anticompetitive effect in a defined relevant market. Plaintiffs also fail to show the procompetitive benefits of the Rule could be achieved through a substantially less restrictive alternative.

A.     The Five-Year Rule Is Not Subject to the Sherman Act.

The Sherman Act does not apply to non-commercial activity like the NCAA's eligibility rules. *See, e.g.*, *United States v. Brown Univ.*, 5 F.3d 658, 665 (3d Cir. 2003); *Am. Bd. of Opticianry & Nat'l Contact Lens Examiners, Inc. v. Inst. For Credentialing Excellence*, No. 1:15-cv-1169, 2016 WL 11668712 (E.D. Va. Mar. 4, 2016).  The "dispositive inquiry" is not whether "the *entity* engaging in the [challenged conduct] is commercial" but whether the conduct itself is commercial. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co*, 156 F.3d 535, 541 (4th Cir. 1998).

Plaintiffs, citing *NCAA v. Alston*, 594 U.S. 69 (2021) and the recent *Pavia* decision to support their contention that the NCAA's eligibility rules are commercial,  (*See* Mem., ECF No. 6, at 14, 17), ignore the distinction between *compensation* rules and *eligibility* rules.  Federal courts have consistently described NCAA eligibility rules as non-commercial and not subject to the Sherman Act.  *Alston*, which addressed only compensation rules, did not overrule these decisions.

### 1.     Courts have recognized that NCAA eligibility rules are non-commercial.

Courts have consistently found that NCAA eligibility rules are not commercial in nature and therefore are not subject to antitrust scrutiny.  In *Smith v. NCAA*, the Third Circuit rejected a student's challenge to the so-called "Postbaccalaureate Bylaw," which permitted otherwise eligible postbaccalaureate student-athletes to participate in DI sports under limited circumstances.  139 F.3d 180, 185 (3d Cir. 1998).   The court stated in no uncertain terms that "the Sherman Act does not apply to the NCAA's promulgation of eligibility requirements."  *Id*. at 186.  Eligibility rules are "not related to the NCAA's commercial or business activities" because they "primarily seek to ensure fair competition in intercollegiate athletics."  *Id*. at 185.  In *Bassett v. NCAA*, the Sixth Circuit agreed with *Smith*.  528 F.3d 426, 433 (6th Cir. 2008) ("eligibility rules . . . are all explicitly non-commercial."). Similarly, in *Bowers v. NCAA*, the court dismissed a challenge to "all eligibility

requirements," including academic qualifications, because those rules were not related to commercial activities.  9 F. Supp. 2d 460, 497–98 (D.N.J. 1998) (quoting *Smith*, 139 F.3d at 185).

Many recent decisions involving the Five-Year Rule have reached the same result.  *See Goldstein*, 2025 U.S. Dist. LEXIS 36025, at *10 ("[the Challenged Rules are not] commercial in nature despite [Goldstein's] efforts to intertwine them with what he and his agent swear are 'significant' opportunities to capitalize off his NIL"); *Osuna Sanchez*, 2025 U.S. Dist. LEXIS 37500, at *10 ("Readily characterizing all eligibility rules as commercial . . . may overextend *Alston*"); *Brzovic*, 2025 U.S. Dist. LEXIS 89791, at *9–10 ("Brzovic argues that the court should view the Five-Year Rule as commercial . . . *Alston*.  The court disagrees." (internal citation omitted)); *Coley*, 2025 U.S. Dist. LEXIS 108342, at *16 ( "the Sherman Act does not apply to the eligibility rules in the Challenged Bylaws"); *Johnson*, 2025 U.S. Dist. LEXIS 121766, at *27 ("Because the Challenged Rules are true eligibility rules, they are not commercial in nature and are not subject to antitrust scrutiny under the Sherman Act."); *Hasz*, 2025 U.S. Dist. LEXIS 14155, at *10–11 ("Although the Five-Year Rule has an incidental effect on Hasz's ability to earn NIL money by preventing him from playing an additional season, it does not directly regulate commercial activity.  Rather, it dictates who can play college sports and for how long.").[5]

**2**.    ***Alston* did not find that eligibility rules are commercial in nature.**

In response, Plaintiffs rely on *O'Bannon v. NCAA*, 802 F.3d 1049 (9th Cir. 2015), and *Alston*, as interpreted by recent decisions in *Pavia*, *Elad*, and *Braham*, (*See* Mem., ECF No. 6, at 7-9, 17).  Neither *O'Bannon* nor *Alston* supports Plaintiffs' position.

---

[5] Even if eligibility rules were subject to Sherman Act scrutiny, and they are not, *Alston* suggests that courts may approve eligibility rules upon "a quick look." 594 U.S. at 88. *Alston* advised that "a quick look will often be enough to approve the restraints 'necessary to produce a game.'" *Id.* at 90 (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 n.7 (2010)). The Five-Year Rule is among those necessary to produce the product of college sports because, for college sports to exist, the NCAA must define who is a college student (as the Five-Year Rule does).  Accordingly, the Court should approve the Five-Year Rule under a "quick look."

In *O'Bannon*, plaintiffs challenged the NCAA's *compensation* rules, including a prohibition on student-athletes' ability to profit from their NIL.  802 F.3d 1049, 1053, 1055–56 (9th Cir. 2015).  In analyzing NIL restrictions under the Sherman Act, the *O'Bannon* court held that "the transaction in which an athletic recruit exchanges his labor and NIL rights for a scholarship at a Division I school" has an impact on commerce "because it is undeniable that both parties to that exchange anticipate economic gain from it."  *Id.* at 1065.  To the contrary, the court distinguished commercial rules that "clearly regulate the terms of commercial transactions" from non-commercial "true 'eligibility' rule[s], ***akin to the rules limiting the number of years that student-athletes may play collegiate sports*** or requiring student-athletes to complete a certain number of credit hours each semester."  *Id.* at 1066 (emphasis added).

*Alston* "involved a challenge to NCAA rules that restricted what 'education-related benefits' colleges could provide as compensation to student-athletes.  Nothing in *Alston* states that all NCAA eligibility rules are commercial in nature."  *Osuna Sanchez*, 2025 U.S. Dist. LEXIS 37500, at *9 (internal citation omitted).  *Alston* involved the education-related benefits that member schools may offer to student-athletes.  594 U.S. at 80.  The Court tailored its decision to "compensation" rules—a term the Court repeated throughout its discussion of the case.  *See, e.g.*, *id*. at 80–83.  Justice Kavanaugh's emphasized that *Alston* "involves only a narrow subset of the NCAA's compensation rules," *id*. at 108, and "[e]veryone agrees that the NCAA can require student athletes to be enrolled students in good standing," *id*. at 110 (Kavanaugh, J., concurring).  *Alston* did not disturb prior cases analyzing non-commercial eligibility rules.

### 3.    Plaintiffs' reliance on *Pavia* is misplaced.

The *Pavia* court incorrectly interpreted *Alston* to find that any NCAA rule impacting the ability to earn NIL compensation, even incidentally, is commercial in nature.  *Pavia*, 760 F. Supp.

3d 527, 537.  *Pavia*, which is not binding on this Court and has been appealed, reflects a substantial

departure from existing law.  *See Giles*, No. 8:25-cv-01488-JVS-KES, ECF No. 13, at 2 (C.D. Cal.

July 17, 2025) ("[Pavia] is clearly outside the mainstream case law.").

The *Pavia* court's reasoning is strained.  *Pavia* begins with the premise that agreements

between NIL collectives and student-athletes are commercial in nature.  *Id.*  It then reaches a

conclusion attenuated from that premise: "[i]t necessarily follows [those] restrictions on who is

eligible to play and therefore to negotiate NIL agreements is also commercial in nature."  *Id.  Pavia*

conflated regulations that set the price of student-athletes' labor—commercial restrictions—with

eligibility rules.  Under the authorities discussed above, eligibility rules that prescribe the duration

of a student-athlete's participation in athletics are not commercial rules subject to antitrust scrutiny,

despite incidental effects they have on the ability to earn NIL compensation.  Because *Braham* and

*Elad* draw support from *Pavia*'s misreading of *Alston*, they too should be rejected.

B.    Plaintiffs Cannot Show a Likelihood of Success Under the Rule-of-Reason.[6]

If the Court proceeds beyond the threshold question of whether the Five-Year Rule is

subject to the Sherman Act, then the Court must analyze whether the Rule's restraint on trade is

"*unreasonable*." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (internal quotation marks

omitted, emphasis in original) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  In assessing

whether a challenged restraint is unreasonable, the "rule of reason" presumptively applies. *Alston*,

594 U.S. at 81.

---

[6] This Response addresses only Plaintiffs' claim under Section 1 of the Sherman Act.  Plaintiffs assert in Count VII of their Complaint a violation of Section 2 of the Sherman Act based on the NCAA's asserted "Denial of Access to an Essential Facility."  Plaintiffs do not mention the "Essential Facility" claim in their memorandum, much less explain why they are likely to succeed on the merits of the claim.  The U.S. Supreme Court has "never recognized" an essential facilities claim, *see Verizon Commc'ns v. Law Offices of Curtis v. Trinko*, 540 U.S. 398, 411 (2004), and lower courts that have recognized such a claim require plaintiffs to show that a monopolist denied access to "the use of the facility to *a competitor*."  *See Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990) (emphasis added).

The rule of reason is a three-step, burden-shifting exercise.  *Am. Express*, 585 U.S. at 541. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.*  "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* at 542.  "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*  The rule-of-reason analysis requires "a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition," *Alston*, 594 U.S. at 81.

### 1.    Plaintiffs have not defined the relevant market.

Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Am. Express Co.*, 585 U.S. at 542.  "[T]he relevant market is defined as the area of effective competition," *i.e.*, the "arena within which significant substitution in consumption or production occurs." *Id.* at 543 (cleaned up).  Without defining the market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.*  (cleaned up).

Relevant antitrust markets are defined around reasonable substitutes for the product at issue. *Satellite Tel. & Associated Resources, Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 356 (4th Cir. 1983) ("'[I]n considering what is the relevant market . . . no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that [relevant market].'" (quoting *United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 395 (1954)).  A cross-elasticity study is necessary to determine the relevant market. *See, e.g.*, *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

Several courts have rejected requests to enjoin the Five-Year Rule because, *inter alia*, the record did not support the relevant market alleged. *See Ciulla-Hall*, 2025 U.S. Dist. LEXIS 22368, at *7 ("The Court presently lacks the factual record necessary to perform such a[] [relevant market] analysis"); *Arbolida*, 2025 U.S. Dist. LEXIS 31283, at *8 ("Plaintiff has not provided facts beyond his individual circumstance which would allow the court to evaluate the market for purposes of an antitrust analysis"); *Goldstein*, 2025 U.S. Dist. LEXIS 36025, at *14 (the verified complaint "do[es] not rise to the level of 'expert assessment' required to define the relative [sic] market."); *Osuna Sanchez*, 2025 U.S. Dist. LEXIS 37500, at *22 ("the Court will need to conduct a fact-specific assessment of market power and market structure to determine the JUCO Rule's substantial anticompetitive effects" (internal citations and quotations omitted)); *Brzovic*, 2025 U.S. Dist. LEXIS 89791, at *10 ("Brzovic has provided only a cursory, unsubstantiated definition of the relevant market . . . . the court [sic] cannot make the necessary factual determinations or examination of the relevant market circumstances, market power, and market share." (internal citations omitted)); *Zeigler*, 2025 U.S. Dist. LEXIS 111927, at *10–11 ("Plaintiff has not shown that Defendant enjoys the power to set NIL wages in the market" (cleaned up)).

### i.    The Market Definition Findings in *Alston* and Other Cases Are Irrelevant.

Plaintiffs claim that "[t]he relevant market here is the nationwide market for college football players, where the NCAA exercises clear monopsony power." (*See* Mem., ECF No. 6, at 14). Plaintiffs do not offer any evidence in support of their purported relevant market definition. They instead cite case law in support, *id*. at 14-15, which does not satisfy their evidentiary burden.

First, *Alston* involved a different proposed market. *Alston* involved NCAA caps on "education-related benefits" that schools could offer to student-athletes, 593 U.S. at 74, a market distinct of that for NIL compensation which Plaintiffs assert. In *Fourqurean*, the court of appeals reversed injunctive relief because, *inter alia*, the district court improperly relied on *Alston* for its

market definition finding, which was unsupported by evidence in the record.  *See* 2025 U.S. App. LEXIS 17561, at *1, 19–20 ("In his and the district court's view, the Supreme Court in *Alston* established that men's NCAA Division I FBS football is a relevant market.  But . . . . The *Alston* Court did not decide the question of market definition.")

Second, because the market definition is an issue of fact, a putative market definition in one case cannot bind the NCAA in another unless subject to judicial notice or issue preclusion. Market definition findings do not satisfy the indisputability requirement of judicial notice.  *See* Fed. R. Evid. 201(b)(2); *PNC Bank, Nat'l Ass'n v. 2013 Travis Oak Creek, L.P.*, 136 F.4th 568, 575 (5th Cir. 2025) ("Because the factual findings of another court cannot overcome Rule 201's indisputability requirement, we decline to take judicial notice of such facts here.").  Similarly, because the *Alston* involved a different market (*i.e.* for academic benefits, not NIL), its market definition is not "identical" and therefore not subject to issue preclusion (for this and other reasons). *See CentraArchy Rest. Mgmt. v. Angelo*, 806 F. App'x 176, 178 (4th Cir. 2020).

Plaintiffs' market analysis contradicts itself.  If the relevant market encompasses "the nationwide market for college football players," then JUCOs should be reasonably interchangeable substitutes for DI institutions, but Plaintiffs contend they are not.  Alternatively, if the market is only DI, then effects on JUCOs are irrelevant, as they would be felt outside the relevant market.

### ii.  Dr. Maxcy's Report in *Elad* Does Not Properly Define Plaintiffs' Proffered Market Definition.

Plaintiffs' motion includes an expert report submitted by Dr. Maxcy in *Elad v. NCAA*.  (*See* Mem., ECF No. 10-1, at 14).  This report does not define a relevant market.  Instead, Dr. Maxcy simply expresses his agreement with the market proposed by Elad:

> Plaintiff defines the relevant market for purposes of this case as 'the labor market for college football athletes in general and NCAA Division I football specifically.' I agree that this is the proper definition of the relevant market.  This definition is consistent with the definition of the relevant market the Supreme Court accepted—

and the NCAA did not challenge—in *Alston* and mirrors the market definition the court accepted in *Pavia*.

(*See* Maxcy Elad Decl. ¶ 13–14, attached hereto as Ex. 2 (internal quotations and citations omitted)).  Dr. Maxcy's adoption of Elad's legal argument, which relies upon the same error as the district court in *Fourqurean*, is not competent evidence.

Dr. Maxcy's subsequent testimony in *NCAA v. Brzovic* further evidences that his market definition "analysis" in *Elad* was inadequate. 2025 U.S. Dist. LEXIS 89791.  Dr. Maxcy conceded that he failed to conduct any economic analysis of a relevant market because:

- His opinions are not based on any market analysis, but rather his "intuition" and "experience of studying sports and NCAA labor markets" (Brzovic Hearing Transcript. 83:17–84:1, attached hereto as Ex. 3);

- He has not done any statistical analysis or economic modeling to define any relevant market. (*Id.* at 73:1–73:17) ("I didn't do a statistical sort of analysis, no.");

- He lacks the requisite data to conduct an econometric analysis to define the relevant market as the same is not publicly available. (*Id.* at 73:17–74:18) ("we don't have the NIL information. . . . we do not have a comprehensive database that would allow us to thoroughly analyze the labor market in terms of payments and compensation."); and

- He has not done any economic analysis of the potential substitute buyers for student-athletes' labor as would be typical in defining a relevant antitrust market. (*Id.* 80:24–83:16) ("There is not a statistical or econometric analysis used, that is correct.").

Dr. Maxcy acknowledged the same failures in *Elad*.  *See Elad* Hearing Transcript, at 94:16-96:2, attached hereto as Ex. 4).[7]  The *Bellamy* court noted, when it relied upon Dr. Maxcy's declaration in *Pavia*, he had not yet "conceded that his opinions are based on his 'intuition' and 'experience' rather than on any economic modeling or analysis."  2025 U.S. Dist. LEXIS 152042, at *15.

---

[7] Dr. Maxcy's report is also unreliable because it was authored before the United States District Court for the Northern District of California's final approval of the class action settlement in *House v. NCAA*.  The House settlement authorized direct payments to student-athletes. *House v. NCAA*, No. 4:20-cv-03919 (N.D. Cal. June 6, 2025) (D.E. 979.)  Dr. Maxcy's conclusions do not consider the effects of the settlement on the market.  "Whether an antitrust violation exists necessarily depends on a careful analysis of market realties.  If those market realities change, so may the legal analysis." *Alston*, 594 U.S. at 93.

### 2. Plaintiffs have not shown that the Five-Year Rule is anticompetitive.

Plaintiffs have failed to make any effort to establish that the Five-Year Rule is anticompetitive. Instead, Plaintiffs suggest they are absolved of this duty because "[t]he NCAA, both in its public statements and prior court dealings, has all but admitted that its rules often serve as restraints on markets with substantial anticompetitive effects." (*See* Mem., ECF No. 6, at 17). Plaintiffs make no attempt to identify the public statements and court dealings that constitute such admissions, the NCAA rejects this inaccurate contention, and, without any caselaw or evidentiary support, the Court should reject it as well.

Plaintiffs point to Dr. Maxcy's report in *Elad* as support, but Dr. Maxcy's report contains no probative evidence supporting that conclusion. (*See* Mem., ECF No. 6, at 14; ECF No. 10-1). Dr. Maxcy's report does not show that the Five-Year Rule lessens total benefits that student-athletes receive from schools, reduces the total number of intercollegiate competition opportunities or participation, or reduces the quality of an institution's offerings to players.

Dr. Maxcy's report lacks citations to facts or data showing that JUCO athletes compete against DI schools, let alone facts or data showing that the Five-Year Rule impacts that competition.[8] Even if Dr. Maxcy's speculative assertions that the Five-Year Rule deters certain players from electing to attend a JUCO institution prior to attempting to compete in DI football were supported, they would at most reflect harm to specific competitors, not to competition. (*See* Mem., ECF No. 10-1 at 16). "[A]n individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001); *accord*

---

[8] Dr. Maxcy's speculation that the Five-Year Rule reduces compensation conflicts with basic economic laws of supply and demand, under which relaxing eligibility rules and expanding the supply of student athletes would place downward pressure on NIL compensation for student-athletes.

*Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018); *see also Loren Data Corp. v. GXS, Inc.*, 501 F. App'x. 275, 282 (4th Cir. 2012) ("The anticompetitive conduct requirement reflects the essence of an antitrust violation, that of harm to competition, rather than to an individual competitor."); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir. 1990). To establish market-wide harm, Plaintiffs must show harm to price (lower compensation for DI football players), output (fewer overall games), or quality (poorer facilities or conditions for student athletes).[9]

### 3. If the Court proceeds to step-two of the rule-of-reason analysis, the Five-Year Rule has substantial pro-competitive benefits.

The Five-Year Rule has several procompetitive benefits.

First, several courts have concluded that the NCAA's rules governing who is eligible to compete are procompetitive because they expand output by creating and preserving the unique offerings of DI athletics. For example, the Seventh Circuit in *Agnew* cited decisions from several courts of appeals and explained that "[m]ost—if not all—eligibility rules . . . fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations" because those regulations "in college [sports]" are "necessary for the product to exist." 683 F.3d 328, 342–43 (7th Cir. 2012); *see also Smith*, 139 F. 3d at 187 ( "in general, the NCAA's eligibility rules allow for the survival of the product, amateur sports, and allow for an even playing field"); *McCormack v. NCAA*, 845 F.2d 1338, 1344–45 (5th Cir. 1988) ("The NCAA markets college football as a product distinct from professional football. The eligibility rules create the product and allow its survival" (internal citation omitted)); *NCAA v. Bd. of Regents*, 468 U.S. 85, 101–02 (1984)

---

[9] *See also Ohio v. Am. Express*, 585 U.S. 529, 542 (observing that evidence of anticompetitive effects would include evidence of "reduced output, increased prices, or decreased quality in the relevant market"); *Rock v. NCAA*, 928 F. Supp. 2d 1010, 1023-24 (S.D. Ind. 2013).

(observing that NCAA rules, which "create and define the competition," "play[] a vital role in enabling college football to preserve its character, and as a result enable[] a product . . . which might otherwise be unavailable," and "widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive."); Statement of Interest of the U.S. of Am. at 8 n.2, *Zeigler v. NCAA*, No. 3:25-cv-00226 (E.D. Tenn. June 3, 2025) (Doc. No. 28) ("[R]ules that are fundamental to the exercise of college sports would typically present procompetitive benefits enabling their approval under a fact-specific application of the rule-of-reason framework.") (attached hereto as Ex. 1).

Second, the Five-Year Rule enhances access to DI football, both expanding total athletic output and improving quality of output, *i.e.* improving student-athlete experience. DI football opportunities are finite. If student-athletes avail themselves of those opportunities for longer than they are currently eligible, then some student-athletes will necessarily lose opportunities they otherwise would have received. If the Five-Year Rule were enjoined collegiate football programs will face greater demand for more developed, experienced players, crowding out other student-athletes who would otherwise get the opportunity to replace those no longer eligible.

Third, the Five-Year Rule improves quality of output by fostering better alignment between DI athletics and academics. Courts have recognized the procompetitive nature of these results—a preserved space for collegiate competition with requirements for entry and an imposed timeframe to exit that cohesively melds NCAA member schools' academic and athletic objectives. *See McCormack*, 845 F. 2d at 1344-45 ("The goal of the NCAA is to integrate athletics with academics. [Eligibility] requirements reasonably further this goal."); *Johnson*, 2025 U.S. Dist. LEXIS 121766, at *44 ("The NCAA has demonstrated that linking eligibility to compete in college athletics with

academic progress—thereby integrating athletics with academics—is a legitimate procompetitive rationale for the Challenged Rules.").

### 4. Plaintiffs offer no substantially less restrictive ways to achieve the procompetitive benefits of the Five-Year Rule.

Plaintiffs offer no evidence in support of their burden at step-three. Instead, Plaintiffs contend that a putative admission by the NCAA relieves them of the burden of proof. Plaintiffs argue that the "Pavia Waiver . . . is an essential admission that there is no rational or procompetitive reason for the NCAA's JuCo penalty." (*See* Mem., ECF No. 6 at 17-18).

Plaintiffs' motion does not describe the circumstances and terms of the "Pavia Waiver" they contend to be an admission that absolves them of their burden. Similarly, Plaintiffs fail to explain how a limited waiver designed to alleviate immediate marketplace confusion and uncertainty undercuts the overall benefits of the rule as applied in ordinary circumstances.

Plaintiffs must establish that the Five-Year Rule is "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits." *Alston*, 594 U.S. at 101 (citation and internal quotation marks omitted). Plaintiffs' contention that "not counting [their] time spent at non-NCAA institutions towards their NCAA eligibility will not harm competition," is not evidence of the foregoing. (*See* Mem., ECF No. 6 at 18). Plaintiffs have not offered alternatives that are "virtually as effective in serving the defendant's procompetitive purposes without significantly increased cost." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (cleaned up, citation and internal quotation marks omitted). To meet their burden, Plaintiffs would need to offer economic analysis of what intercollegiate athletics would look like if the Five-Year Rule did not exist.

"[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes." *Alston*, 594 U.S. at 98. Instead, "antitrust courts must give wide berth to business judgments before finding liability." *Id*., at 102. "[C]ourts should not

second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" *Id.* at 98 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227 (D.C. Cir. 1986)). "[T]he Supreme Court has admonished that we must generally afford the NCAA 'ample latitude' to superintend college athletics." *O'Bannon*, 802 F.3d at 1074 (quoting *Bd. of Regents*, 468 U.S. at 120).

Plaintiffs' proposal to exclude seasons of competition in JUCO from "intercollegiate competition" for purposes of DI eligibility would not achieve the same procompetitive benefits as those described above.  The alternative would not maintain the same opportunities for incoming student-athletes or incentivize student-athletes to timely graduate.

Plaintiffs' alternative—which takes no issue with the limitation on four seasons of intercollegiate competition in five years but nevertheless asks the Court to define intercollegiate competition slightly different—would require this Court to "meter small deviations" to the NCAA's eligibility rules, which the Supreme Court has admonished is "not an appropriate antitrust function." *Alston*, 594 U.S. at 99 (internal citation omitted and cleaned up).  As the *Alston* Court explained, judicial "second-guess[ing] [of] degrees of reasonable necessity so that the lawfulness of conduct turn[s] upon judgments of degrees of efficiency . . . . would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements." *Id.* at 98 (internal quotation marks and citation omitted).

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR STATE LAW CLAIMS.

### A    **Negligence**

Plaintiffs contend that the NCAA "negligently communicat[ed]" the terms of the Pavia Waiver to the Plaintiffs, and the Plaintiffs suffered economic harm because of that communication. *See, e.g.*, Pls.' Mot. 10-11.  Plaintiffs' negligence claim is both legally and factually flawed.

17

The economic loss doctrine bars Plaintiffs' claim. *Aikens v. Debow*, 208 W. Va. 486, 499, 541 S.E.2d 576, 589 (2000). Negligence claims asserting only economic loss are cognizable only where there is a "special relationship" between the alleged tortfeasor and the plaintiff, sufficient to create a duty of care. *Id*. The "special relationship" typically exists where the defendant has "knowledge or specific reason to know of the potential consequences of the wrongdoing," and withholds information, knowing that omission could damage the opposing party. *White v. AAMG Const. Lending Ctr.*, 226 W. Va. 339, 347–48, 700 S.E.2d 791, 799–800 (2010) (citation omitted). The NCAA lacks the requisite special relationship with student-athletes. *See Doe v. NCAA*, 1:23-cv-00542-SEB-MJD, 2024 U.S. Dist. LEXIS 116341, at *35–42 (S.D. Ind. July 2, 2024).

Plaintiffs have not explained why, beyond their general assertions, the NCAA had any specific reason to know Plaintiffs would suffer the damages alleged in this case. It is Plaintiffs' burden to establish that a special relationship with evidence.

Plaintiffs' claim is also factually inaccurate. Plaintiffs' own allegations demonstrate the NCAA issued clear guidance that the Pavia waiver did not apply to students who exhausted their years of eligibility. The guidance cited by Plaintiffs in footnote two of the Complaint explains:

**Question No. 6**: Does this relief provide an extension of the period of eligibility for student-athletes?

**Answer**: No. To qualify for the relief provided by the Board of Directors, a student-athlete must meet all other eligibility requirements, including the period of eligibility.

The NCAA does not owe and did not breach a "duty to accurately communicate information to student athletes such as Plaintiffs regarding the implementation of its rules" by telling those student-athletes exactly how it was going to apply its rules. Compl. ¶ 218. Therefore, Plaintiffs cannot succeed on the merits of their negligence claim.

18

B.    **Breach of Contract and Promissory Estoppel.**

Plaintiffs concede they have no contract with the NCAA; instead, they assert a breach of contract claim as purported third-party beneficiaries.  To maintain a third-party beneficiary contract action, the agreement between the contracting parties "must have been made for the third party's *sole* benefit."  *Robinson v. Cabell Huntington Hospital, Inc.,* 498 S.E.2d 27, 32 (W. Va. 1997) (emphasis added) (citation omitted); *see also* W. Va. Code §55-8-12.

Plaintiffs rely upon the DI Manual as the applicable contract, but the NCAA is not a party. The Manual is an agreement ***among*** the NCAA members, not ***between*** the NCAA and its members.

Plaintiffs do not identify any agreement between the NCAA and its member institutions for their sole benefit.  The Complaint asserts that the "NCAA is in essence and is formed by a collection of agreements and conventions between its members."  Compl. ¶ 94.  Given the NCAA owes its very existence to these agreements, it impossible for Plaintiffs to be the sole beneficiaries. The Complaint concedes that the member colleges and universities also directly benefit from the agreements.  *Id.* ¶ 96.  While the NCAA creates opportunities for student-athletes, that is not enough to give those student-athletes the right to sue as third-party beneficiaries, at least not under West Virginia law, when it is clear that this was not the sole purpose of those agreements. *Robinson*, 498 S.E.2d at 32.

Plaintiffs also have neither alleged nor presented evidence of any breach by the NCAA. The NCAA told its member institutions through publicly-accessible guidance that the Pavia Waiver did not extend the five-year period of eligibility.  The NCAA could not have breached the terms of any purported contract by doing exactly what it said it was going to do.  The promissory estoppel claim fails for the same reason.

19

### C.    <u>Tortious Interference</u>

Under West Virginia law, a tortious interference claim requires (1) the existence of a contractual or business relationship or expectancy, (2) an ***intentional*** act of interference by a party outside that relationship or expectancy, (3) proof that the interference caused the claimant harm, and (4) damages.  *Tucker v. Thomas,* 853 F. Supp. 2d 576 (N.D.W. Va. 2012).  Plaintiffs have not offered any evidence of interference or knowledge of Plaintiffs' contracts.  Instead, they contend— with no evidence—that they are likely to succeed on their tortious interference claims because the NCAA acted "arbitrar[ily] and capricious[ly] in refusing to grant Plaintiffs (sic) eligibility like other athletes."  But that's the wrong legal standard.  Moreover, Plaintiffs could not have had a legitimate expectancy to business arrangements requiring they continue to play collegiate football, as they knew they had no eligibility remaining.

### III.    <u>PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM.</u>

To be entitled to the injunction they seek, Plaintiffs must make a clear showing that they are likely to be irreparably harmed absent preliminary relief.  *See Di Biase,* 872 F.3d at 230; *Direx Isr., Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991).  They must establish that (1) the harm is "certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief"; and (2) that, once incurred, the threatened harm would be "beyond remediation."  *See League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 7–8 (D.C. Cir. 2016).  The harm must be "neither remote nor speculative, but actual and imminent."  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019).  Harm compensable with money damages is not irreparable harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).

A.    <u>Plaintiffs' Delay in Seeking Relief Militates Against a Finding of Irreparable Harm.</u>

Each Plaintiff exhausted his eligibility in 2024, following the conclusion of the 2024–2025 football season.[10]    Plaintiffs are charged with knowledge of their eligibility as of the time they began playing DI football and signed an acknowledgement of the applicability of the NCAA's rules.[11]  Upon arriving at DI institutions, NCAA Bylaw 12.7.2.1 required Plaintiffs to submit "a signed statement . . . that provides information related to eligibility . . . ."  *See* NCAA DI Manual, https://www.ncaapublications.com/productdownloads/D125.pdf.    "Failure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."  *Id.*    Plaintiffs  were  required  to  acknowledge  that  they  were  "***responsible for knowing and understanding the application of all NCAA Division I regulations related to your eligibility***."    *See*    NCAA    Student-Athlete    Statement  –  Division    I, https://ncaaorg.s3.amazonaws.com/compliance/d1/2025-26/2025-26D1Comp_Form25-1a-StudentAthleteStatement.pdf. (Emphasis added).  Plaintiffs could have brought a challenge to the Five-Year Rule at any time upon matriculation at their respective DI institutions.  Had they timely challenged the Five-Year Rule, a preliminary injunction would likely have been unnecessary.

Plaintiffs further delayed seeking injunctive relief for more than seven months after the exhaustion of their eligibility.  Their delays prohibit them from belatedly claiming irreparable harm.  *See Northern Va. Hemp v. Virginia,* 700 F. Supp. 3d. 407, 427 (E.D. Va. 2023), vacated on other grounds, 125 F.4th 472 (4th Cir. 2025) (finding that a challenge filed seven months after the passage of a law "indicate[s] an absence of the kind of irreparable harm required to support a

---

[10]    https://fbschedules.com/2024-utsa-football-schedule/;    https://fbschedules.com/2024-idaho-state-football-schedule/;    https://fbschedules.com/2024-northern-iowa-football-schedule/;    https://fbschedules.com/2024-washington-football-schedule/.

[11] 2020 for Harrington, (Mem. at 5), 2021 for Robinson, (*id.* at 4), and 2022 for Weimar and Edwards (*Id.*).

preliminary injunction." (internal citation and quotation marks omitted)); *see also, e.g.*, *Southech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420 (E.D.N.C. 2006) (six to nine weeks delay weighs against injunctive relief).

Courts have recently rejected untimely requests for injunctive relief in challenges to the NCAA's eligibility rules. *Giles*, No. 8:25-cv-01488-JVS-KES, ECF No. 13, at 2 (C.D. Cal. July 17, 2025) (Giles has delayed moving the Court. . . . The Court can draw two inferences, neither of which is conducive to the Court's exercise of its discretionary equitable powers. First, there is no immediacy for the grant of relief. Second, gamesmanship lies in his timing in order to create a sense of urgency. The application for injunctive relief was filed late on a Friday afternoon after preseason practice had begun. Those who seek equity must do equity.); *Walker*, 2025 U.S. Dist. LEXIS 131541, at *17–18 (finding "multi-year delay" based on plaintiff's execution of student-athlete statement years prior); *Arbolida*, 2025 U.S. Dist. LEXIS 22368, at *12 (D. Kan. Feb. 21, 2025) (denying the motion for temporary restraining order because plaintiff's alleged injury "is due in part to [p]laintiff's own actions in waiting to file the present suit" until "the day of his team's first game"). The same district judge that granted *Pavia* rejected identical arguments that Plaintiffs here raise, ***denying injunctive relief due to delay***, explaining:

> The severity of Plaintiffs' asserted injury . . . is tempered by the delay in seeking relief. As noted above, Plaintiffs could have challenged the eligibility rules years ago, but waited until many teams had already begun to practice before seeking redress in the courts. To be sure, their perception of the value of a season of play may have evolved since they began their Division I careers, but the failure to seek redress until now suggests a lack of urgency for relief.

*Bellamy*, 2025 U.S. Dist. LEXIS 152042, at *20–21.

Plaintiffs make no attempt to explain their delay in seeking injunctive relief. They claim to have sought relief in response to *Pavia*. (*See* Mem., ECF No. 6, at 3). However, the *Pavia* decision was issued on December 18, 2024—almost eight months ago. The *Elad* decision on

22

which they also rely issued on April 25, 2025. *Id*. at 7. Plaintiffs cannot manufacture irreparable

harm by filing suit after the beginning of fall practice and less than one month before the start of

West Virginia's football season. *See Perry v. Judd,* 471 F. App'x. 219, 224 (4th Cir. 2012) (finding

that a movant "delayed inexcusably and unreasonably in filing suit" when he waited until "the

eleventh hour" and until after he was denied a place on a ballot by the Virginia State Board of

Election to file suit, especially in light of Virginia's clear election laws).

    B.    Plaintiffs' Purported Harms Are Not Irreparable.

    Plaintiffs contend that "[t]he opportunity to play major college sports is something so

unique and so fleeting that destroying even a small part of it for no reason constitutes irreparable

harm." (Mem., ECF No. 6, at 18). In support, Plaintiffs offer a listing of benefits to student athletes

found on the NCAA's website and 2014 congressional testimony by the former president of the

NCAA regarding the "value of the college model." *Id*. at 18-20. Plaintiffs further rely on this

Court's decision in *Ohio v. NCAA* and a series of authorities cited therein in which "[c]ourts have

repeatedly found that 'college students suffer irreparable harm when they are denied the

opportunity to play sports.'" *Id*. at 20-21 (citation omitted). These authorities are distinguishable.

    *Ohio* cites six authorities as support for its finding that "the denial of the opportunity to

play sports is irreparable harm." 706 F. Supp. 3d at 597. Each of these decisions involve female

student-athletes' statutory rights under Title IX to the same opportunity to participate in collegiate

athletics as male student-athletes. *Id.* Neither *Ohio* nor the authorities cited therein found that the

exhaustion of a student athlete's eligibility under longstanding NCAA bylaws constitutes a denial

of the opportunity to participate in collegiate athletics.[12]

---

[12] *Ohio* is also distinguishable insofar as this Court, in explaining that the lost ability to participate in college sports evidences irreparable harm, relied upon the premise that the interruption of one's eligibility presents a unique harm **because student-athletes' eligibility is limited by the Five-Year Rule**. *Id.* at 592 n.3. Here, unlike the plaintiffs in

Indeed, when considering non-gender-based eligibility requirements outside of the Title IX context (*e.g.*, GPA requirements, course requirements, etc.), courts have consistently found the student-athlete did ***not*** suffer irreparable harm.  "Courts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics." *McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011).[13]

In *Hall v. NCAA*, the plaintiff was ineligible to play on an NCAA DI basketball team because he failed to meet the minimum GPA requirements.  985 F. Supp. 782, 791 (N.D. Ill. 1997).  Hall made the same argument about being "denied the opportunity to play major college basketball and pursue his dream of becoming a professional[.]"  *Id.* at 800.  The *Hall* court held that plaintiff failed to show irreparable harm and denied the motion.  *Id.* at 800–01 ("the Halls presented no evidence that a one season delay will extinguish Reggie's college (and hopeful professional) career, thereby irreparably harming him. . . . while sitting out a year might inconvenience Reggie, he has not shown that such inconvenience would cause [irreparable] harm").

Moreover, Plaintiffs' argument has been rejected by a North Carolina district court on virtually identical facts.  The plaintiff in *Kupec v. Atlantic Coast Conf.* sought to enjoin an athletic conference from denying him a fifth year of eligibility.  399 F. Supp. 1377 (M.D.N.C. 1975).  Like Plaintiff, Kupec argued his professional football career would be harmed in the absence of an injunction.  *Id.* at 1379.  The court denied his request for injunctive relief. *Id.* ("Any injury which the plaintiff might suffer to his professional football career if the injunction is not granted is speculative at best.")

---

*Ohio*, Plaintiffs are not ***losing*** a year of eligibility to which they would otherwise be entitled; they are claiming harm from not being permitted ***additional time***.

[13] *See also S.B. ex rel. Brown v. Ballard Cty. Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ky. 2011); *Sharon City Sch. Dist. v. PIAA*, No. CIV.A. 9-213, 2009 WL 427373, at *2 (W.D. Pa. Feb. 20, 2009); *Dziewa v. Pennsylvania Interscholastic Athletic Ass'n, Inc.*, No. CIV.A. 08-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009).

Plaintiffs have not been deprived of an opportunity to play college football.  They have played for four or more seasons.  Accordingly, Plaintiffs have not established that they would suffer irreparable harm in the absence of an injunction.  Their request for injunctive relief must be denied.

IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN THE NCAA'S FAVOR.

"There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction." *King v. Buskirk*, 78 F. 233, 235 (4th Cir. 1897) (citation and quotation marks omitted). The eligibility rules impact the opportunities available to over 180,000 DI student-athletes. The equities counsel against enjoining eligibility rules upon a truncated record. *See Zeigler*, 2025 U.S. Dist. LEXIS 111927, at *13–14 ("given the fixed number of roster spots available . . . an injunction would run the risk of harming (1) currently-enrolled Division I basketball players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted"); *Coley*, 2025 U.S. Dist. LEXIS 108342, at * ("Granting Coley's request would upend the NCAA's Division I Bylaws and affect 'over 180,000' Division I student-athletes in 'multiple sports . . . .'  On this limited record, Coley fails to meet the high bar required to upend the status quo with the entry of an extraordinary, mandatory preliminary injunction." (internal citations omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

Dated: August 14, 2025                    Respectfully submitted,

                                          */s/Christopher D. Smith*
                                          Benjamin L. Bailey (WVSB No. 200)
                                          Christopher D. Smith (WVSB No. 13050)

BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555 (phone)
(304) 342-1110 (fax)
bbailey@baileyglasser.com
csmith@baileyglasser.com

*Attorneys for Defendant National Collegiate
Athletic Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 14, 2025, I electronically filed the foregoing ***Defendant National Collegiate Athletic Association's Response in Opposition to Motion for Preliminary Injunction*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties and counsel of record.

*/s/Christopher D. Smith*

Christopher D. Smith (WVSB No. 13050)
