**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Clarksburg**

**JIMORI ROBINSON,**[1]
**JEFFREY WEIMER,**
**TYE EDWARDS,** and
**JUSTIN HARRINGTON,**

        Plaintiffs,

    v.                              **CIVIL ACTION NO. 1:25-CV-75**
                                             Judge Bailey

**NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,**

        Defendant.

## OPINION

Plaintiffs seek an injunction forbidding the NCAA from enforcing its rules, regulations, and/or bylaws that prevent plaintiffs from immediately playing football for West Virginia University.  *See* [Doc. 1].  On August 6, 2025, this Court scheduled a hearing and directed the parties to file briefing addressing the entitlement to a preliminary injunction.  *See* [Doc. 3].  Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 5] and Memorandum in Support [Doc. 6] on August 8, 2025.  On August 12, 2025, the State of West Virginia filed a Brief of *Amicus Curiae* in Support of Plaintiffs'

---

[1]This is a misspelling of his name. Mr. Robinson's first name is correctly spelled "Jimmori," and the Court will use that spelling throughout this Opinion.  *See* West Virginia University Athletics, *Jimmori Robinson, Football Roster*, WVU Sports, https://wvusports.com/sports/football/roster/jimmori-robinson/18896 (last visited Aug. 20, 2025).

Motion for Preliminary Injunction [Doc. 9].[2]  The NCAA filed its Response [Doc. 12] on

August 14, 2025.[3]  For the reasons that follow, this Court will **GRANT** plaintiffs' request for

a preliminary injunction.

## I.    Factual Background

### A.    National Collegiate Athletic Association ("NCAA")

As stated in the National Collegiate Athletic Association's Preamble:

The National Collegiate Athletic Association is a voluntary, self-governing

organization of four-year colleges, universities and conferences committed

to the well-being and development of student-athletes, to sound academic

standards and the academic success of student-athletes, and to diversity,

equity and inclusion. Member institutions and conferences believe that

intercollegiate athletics programs provide student-athletes with the

opportunity to participate in sports and compete as a vital, co-curricular part

---

[2]The State of West Virginia states it "has an interest in ensuring free and fair competition in college athletics.  After all, the State is home to two NCAA Division I institutions, fourteen NCAA Division II institutions, and several non-NCAA institutions. Plaintiffs are all West Virginia athletes who allege they've been harmed by the NCAA's practices.  So as a person charged with enforcing the Sherman Act on behalf of the State, 15 U.S.C. § 15c, and the chief enforcer of West Virginia antitrust law, West Virginia Code § 47-18-6, the Attorney General files this brief to vindicate that interest." [Doc. 9 at 2–3].

[3]The NCAA attached to its Response the Statement of Interest filed by the United States in *Zeigler v. National Collegiate Athletic Association*, Civ. Act. No. 3:25-CV-00226 (E.D. Tenn. June 3, 2025) [Doc. 28], in which the United States stated that the NCAA's eligibility rules generally withstand antitrust scrutiny.  Notably, however, the United States also joined an action against the NCAA alleging violations of Section 1 of the Sherman Act. *See Ohio v. Nat'l Collegiate Athletic Ass'n*, Civ. Act. No. 1:23-CV-00100 (N.D. W.Va. May 30, 2024) [Doc. 138].  In *Ohio*, the United States took the position that the Transfer Eligibility Rule was anticompetitive, lacked legitimate procompetitive justifications, and that less restrictive alternatives were available.  [Id. at 8–11].

of their educational experience. The member schools and conferences likewise are committed to integrity and sportsmanship in their athletics programs and to institutional control of and responsibility for those programs. The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body.

[Doc. 5-5 at 13]. The Northern District of California provided a history of the NCAA in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*:

The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college football. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. Joint Stipulation of Facts (Stip. Facts) ¶ 1, Docket No. 1098.

The NCAA comprises three Divisions. Id. ¶ 2. Of the NCAA's eleven hundred schools, approximately three hundred and fifty schools compete in Division I. Id. ¶ 5. Division I itself is divided, for the purposes of football competition, into two subdivisions, one of which is the FBS. Id. ¶ 6. There are thirty-two conferences in Division I. Id. ¶ 7. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. Id.

3

The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors. Id. ¶¶ 11, 12. The rules that Plaintiffs challenge here govern a small subset of the conduct that the NCAA regulates.

The NCAA generates approximately one billion dollars in revenues each year. See Defs.' Ex. 0532 (D0532); Pls.' Ex. 0030 (P0030). Its revenues have increased consistently over the years. See P0030. Most of the NCAA's revenues are derived from the Division I men's basketball post-season tournament known as March Madness, and the media and marketing rights relating to it. Trial Transcript (Tr.) (McNeely) at 2134; D0532 at 0006. The total value of the current multi-year media contracts for March Madness, which extend to 2032, is $ 19.6 billion. See P0045 at 0001-02. Each year, the NCAA distributes about half of its revenues to the conferences. Joint Ex. 0021 (J0021); P0030.

Division I conferences negotiate their own contracts and generate their own revenues from regular-season basketball and regular-and post-season FBS football. See, e.g., Dr. Daniel Rascher Direct Testimony Declaration ¶¶ 169-172, Docket No. 865-3. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $ 5.64 billion. See P0045 at 0006-07. The five conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. See P0031;

P0032; P0033; P0036; see also P0037 (showing that SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year). The revenues of the Power Five have increased over time and are projected to continue to increase. See P0031; P0032; P0033; P0036; P0037. Conferences distribute most of their revenues to their member schools.

375 F.Supp.3d 1058, 1062–1063 (N.D. Cal. 2019).

**B.    Name, Image, and Likeness ("NIL") Compensation**

As described in ***Pavia v. National Collegiate Athletic Association***:

At its inception, and for over a hundred years, the NCAA limited compensation of student athletes in an attempt to maintain amateurism across college sports.  In 2021, in response to the Supreme Court's decision in ***Alston***, 594 U.S. 69 (2021), the NCAA drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness ("NIL"). *See* ***Tennessee v. Nat'l Collegiate Athletic Assoc.***, 718 F.Supp.3d 756, 759 (E.D. Tenn. 2024) [(Corker, J.)]; ***Ohio v. Nat'l Collegiate Athletic Assoc.***, 706 F.Supp.3d 583 (N.D. W.Va. 2023) [(Bailey, J.)].

As explained by the court in ***Tennessee***:

[T]he NCAA's Interim NIL Policy went into effect, allowing student-athletes to engage in NIL activity and to be compensated accordingly. This change created a market for

5

student-athletes' NIL, which quickly led to the creation of NIL

collectives, e.g., "organizations created by alumni, boosters, or

businesses with the purpose of providing NIL opportunities to

their school's athletes." Kassandra Ramsey, *NIL*

*Collectives-Title IX's Latest Challenge*, 41 Cardozo Arts & Ent.

L.J. 799, 801 (2023). The first known collective, the Gator

Collective, launched merely two months after the NCAA's

interim policy went into effect. Id. Since then, "approximately

200 NIL collectives have been created across several colleges

and universities." Id. at 802.

*Tennessee*, 718 F.Supp.3d at 760. In the years that followed, the total NIL

market "has exploded from $917 million in 2021-22 to an expected $1.67

billion in 2024-25 – with no signs of slowing down." (See Compl., Ex. 1, "NIL

at 3: The Annual Overdose Report" at 3). Although NIL opportunities are

available to all athletes, virtually all football-related NIL funds go to Division

I football players. (Id. at 4).

760 F.Supp.3d 527, 532 (M.D. Tenn. 2024) (Campbell, Jr., J.).

C.    Eligibility Rules

Generally, the NCAA Bylaws require that a student-athlete meet certain eligibility

standards. In relevant part, the NCAA Bylaws restrict the duration of a student-athlete's

eligibility to compete to four (4) seasons within a five-year period, regardless of whether

the school is an NCAA member. At issue here are NCAA Bylaws that restrict the duration

of a student-athlete's eligibility to compete to four (4) seasons within a five-year period and the "counting" of time spent at junior colleges ("JUCO"),[4] which are non-NCAA institutions, toward the total eligibility time.  The Court reviews the provisions of the NCAA Bylaws that lead to this situation below.

NCAA Bylaw 12.8 includes a provision that is often referred to as the "Five-Year Rule," which provides in relevant part, as follows:

**12.8 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:

**12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being

---

[4]Most two-year JUCOs are governed by the National Junior College Athletic Association, which has no affiliation with the NCAA.  *See* National Junior College Athletic Association, *Member College Directory*, NJCAA, https://www.njcaa.org/member_colleges/directory/members (last visited Aug. 20, 2025).

excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.

**12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2).

[Doc. 5-5 at 66].

The NCAA Bylaws define "Intercollegiate Competition" as follows:

**12.02.6 Intercollegiate Competition.** Intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution does any of the following:

(a)    Represents the institution in any contest against outside competition, regardless of how the competition is classified

8

> (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;
>
> (b)    Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or
>
> (c)    Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

[Id. at 46].[5]  A "Collegiate Institution" is defined as follows:

> **14.02.4 Collegiate Institution.** A collegiate institution (for purposes of NCAA legislation) is an institution of higher education that:
>
> (a)    Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree;
>
> (b)    Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or
>
> (c)    Is located in a foreign country.

---

[5]Notably, the definition for "Intercollegiate Competition" excludes post-secondary educational institutions like prep schools.

[Id. at 152].

Finally, NCAA Bylaw 14.3.3 reads:

**14.3.3 Seasons of Competition -- Nonqualifiers.**  Nonqualifiers, recruited or nonrecruited, shall not engage in more than three seasons of competition in any one sport.  A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I.

[Id. at 161].

These Bylaws (hereinafter "Challenged Rules"), taken together, allow a student-athlete to engage in collegiate athletic-competition for four (4) seasons within five (5) calendar years.  The clock starts from the first day of classes of a term for which the student-athlete is registered for full-time study at a "Collegiate Institution."  A "Collegiate Institution" includes four-year colleges and two-year JUCOs, but does not include post-secondary educational institutions such as prep schools, even if such schools offer athletic opportunities.

The Challenged Rules are rife with exceptions, as those who serve in the armed forces, study abroad, participate in a full-time internship or cooperative educational work experience program, get pregnant, or compete in international athletics can get more time. *See* NCAA Bylaws 12.8.1.2, 12.8.1.3, 12.8.1.4, 12.8.1.5, and 12.8.1.6.

### D.     Plaintiffs

This Court will provide a summary of each plaintiff's football career and a corresponding chart.

### 1.     Jimmori Robinson

Robinson attended Dodge City Community College, a JUCO, in the 2019–2020 academic year, and played for the football team.  [Doc. 1 at ¶ 15; Doc. 5-1 at ¶ 3]. Robinson then attended Monroe University, a JUCO, in the 2020–2021 academic year, but did not play football as its season was canceled due to COVID-19 restrictions.  [Id. at ¶ 16; Doc. 5-1 at ¶ 4].  Robinson then transferred to the University of Texas at San Antonio ("UTSA"), and attended UTSA in the 2021–2022, 2022–2023, 2023–2024, and 2024–2025 academic years.  [Id. at ¶ 17; Doc. 5-1 at ¶ 5].  He was granted a redshirt for the 2021–2022 season, and played on the football team in  2022–2023, 2023–2024, and 2024–2025.  [Id.; Doc. 5-1 at ¶ 5].  Robinson is now enrolled at West Virginia University ("WVU").  [Id. at ¶ 18; Doc. 5-1 at ¶ 2].  Because the NCAA announced it was granting a waiver[6] to all players whose eligibility was ending due to their time playing for non-NCAA institutions, Robinson withdrew his name from the National Football League ("NFL") draft

---

[6]In late December 2024, following a federal judge's injunction granting Vanderbilt Quarterback Diego Pavia an extra year of eligibility (on antitrust grounds related to his junior college participation), the NCAA Division I Board approved a one-time waiver (for the 2025–2026 academic year) allowing similarly situated athletes—those who competed at a non-NCAA institution (e.g., a JUCO or NAIA school) and would otherwise exhaust their eligibility in 2024–2025—to compete for an additional season if they meet standard eligibility criteria.  *See* Eli Lederman, *NCAA Grants Waiver to Ex-JUCO Players While Appealing Pavia Ruling*, ESPN.com (Dec. 23, 2024, 6:39 PM ET) https://www.espn.com/college-football/story/_/id/43131557/ncaa-division-board-grants-waiver-former-juco-players-appealing-diego-pavia-injunction (last visited Aug. 20, 2025). This waiver is hereinafter referred to as the "December 2024 Waiver."

and attempted to join the WVU football team because he believed the waiver applied to him.  [Doc. 5-1 at ¶ 6–9].  Through WVU, Robinson sought, but was denied, a waiver seeking to play a fourth year at an NCAA institution.  [Doc. 1 at ¶ 18; Doc. 5-1 at ¶¶ 13–14].  Robinson appealed that decision, but was denied again.  [Doc. 5-1 at ¶¶ 15–16].

| Year | Enrolled Full Time | Played Football | Counts Towards Seasons of Competition | Counts Towards Years of Eligibility |
|------|--------------------|-----------------|---------------------------------------|-------------------------------------|
| 2019–2020 | Dodge City Community College | Full Season | Yes (1) | Yes (1) |
| 2020–2021 | Monroe University | Canceled | No (COVID Waiver)[7] | No |
| 2021–2022 | UTSA | Redshirt | Yes (2) | No |
| 2022–2023 | UTSA | Full Season | Yes (3) | Yes (2) |
| 2023–2024 | UTSA | Full Season | Yes (4) | Yes (3) |
| 2024–2025 | UTSA | Full Season | Yes (5) | Yes (4) |

Robinson wants to play football in the 2025–2026 season but has no remaining eligibility under the current NCAA Division I Bylaws.  This is because his time at Dodge City Community College, a JUCO that is not a member of any NCAA Division, "counts" as one (1) year of collegiate athletic competition under the Challenged Rules.

### 2.    Jeffrey Weimer

Weimer attended Hartnell College, a JUCO, in the 2018–2019 and 2019–2020 academic years.  [Doc. 1 at ¶ 21; Doc. 5-2 at ¶ 3].  He played for the football team in

---

[7]The COVID Waiver effectively gave student-athletes six (6) years to play five (5) seasons.

2018–2019, and was granted a redshirt for the 2019–2020 season. [Id.; Doc. 5-2 at ¶ 3]. Weimer transferred from Hartnell College to City College of San Francisco ("CCSF"), a JUCO, during the 2020–2021 academic year. [Id. at ¶¶ 22–23]. Because of COVID-19 restrictions, Weimer did not compete in sports during the 2020–2021 academic year, and played on the football team in 2021–2022. [Id. at ¶ 22; Doc. 5-2 at ¶ 4]. Weimer then transferred to the University of Nevada, Las Vegas ("UNLV"), in the 2022–2023 academic year, and played for the football team. [Id. at ¶ 24; Doc. 5-2 at ¶ 5]. Due to medical and personal issues, Weimer was unable to attend college during the 2023–2024 academic year. [Id. at ¶ 25; Doc. 5-2 at ¶ 6]. Weimer then attended Idaho State University in the 2024–2025 academic year, and played for the football team. [Id. at ¶ 26; Doc. 5-2 at ¶ 7]. Weimer then enrolled at Fairmont State University in the spring of 2025 to continue his academic career, but he did not play any sports at Fairmont State University. [Doc. 5-2 at ¶ 8]. Weimer is now enrolled at WVU. [Doc. 1 at ¶ 27; Doc. 5-2 at ¶ 2]. Like Robinson, Weimer believed the December 2024 Waiver applied to him and withdrew his name from the NFL draft and attempted to join the WVU football team. [Doc. 5-2 at ¶ 9–12]. Through WVU, Weimer sought, but was denied, a waiver seeking to play a third year at an NCAA institution. [Doc. 1 at ¶ 29; Doc. 5-2 at ¶¶ 16–17]. Weimer appealed that decision, but was denied again. [Doc. 5-2 at ¶¶ 18–19].

| Year | Enrolled Full Time | Played Football | Counts Towards Seasons of Competition | Counts Towards Years of Eligibility |
|------|---------|---------|---------|---------|
| 2018–2019 | Hartnell College | Full Season | Yes (1) | Yes (1) |
| 2019–2020 | Hartnell College | Redshirt | Yes (2) | No |

| 2020–2021 | CCSF | No | No (COVID Waiver) | No |
| 2021–2022 | CCSF | Full Season | Yes (3) | Yes (2) |
| 2022–2023 | UNLV | Full Season | Yes (4) | Yes (3) |
| 2023–2024 | Did not attend[8] | | | |
| 2024–2025 | Idaho State | Full Season | Yes (5) | Yes (4) |

Weimer wants to play football in the 2025–2026 season but has no remaining eligibility under the current NCAA Division I Bylaws. This is because his time at Hartnell College and CCSF, two (2) JUCOs that are not members of any NCAA Division, "counts" as two (2) years of collegiate athletic competition under the Challenged Rules.

### 3.    Tye Edwards

Edwards attended the Georgia Military College, a JUCO, in the 2019–2020 academic year, and played for the football team. [Doc. 1 at ¶ 30; Doc. 5-3 at ¶ 3]. Edwards then attended Hutchinson Community College, a JUCO, in the 2020–2021 and 2021–2022 academic years. [Id. at ¶ 31; Doc. 5-3 at ¶ 4]. Because of COVID-19 restrictions, Edwards did not compete in the fall of 2020, participated some in the spring of 2021, and played the 2021–2022 season. [Doc. 5-3 at ¶ 4]. Edwards transferred to the UTSA in the 2022–2023 academic year and was granted a redshirt for that season. [Doc. 1 at ¶ 32; Doc, 5-3 at ¶ 5]. Edwards then attended Northern Iowa in the 2023–2024 and 2024-2025 academic years, and played for the football team both academic years. [Id. at ¶ 33; Doc. 5-3 at ¶ 6]. Edwards is now enrolled at WVU. [Id. at ¶ 34; Doc. 5-3 at

---

[8]The Court asked at the hearing whether Weimer had received a waiver for the current year. The parties confirmed that he had been granted a waiver for the 2023–2024 season.

14

¶ 2]. Like Robinson and Weimer, Edwards believed the December 2024 Waiver applied to him and withdrew his name from the NFL draft and attempted to join the WVU football team. [Doc. 5-3 at ¶¶ 7–10]. Through WVU, Edwards sought, but was denied, a waiver seeking to play a fourth year at an NCAA institution. [Doc. 1 at ¶ 36; Doc. 5-3 at ¶¶ 14–15]. Edwards appealed that decision, but was denied again. [Doc. 5-3 at ¶¶ 16–17].

| Year | Enrolled Full Time | Played Football | Counts Towards Seasons of Competition | Counts Towards Years of Eligibility |
|------|-------------------|-----------------|---------------------------------------|-------------------------------------|
| 2019–2020 | Georgia Military College | Full Season | Yes (1) | Yes (1) |
| 2020–2021 | Hutchinson Community College | Canceled/ Limited[9] | No (COVID Waiver) | No |
| 2021–2022 | Hutchinson Community College | Full Season | Yes (2) | Yes (2) |
| 2022–2023 | UTSA | Redshirt | Yes (3) | No |
| 2023–2024 | University of Northern Iowa | Full Season | Yes (4) | Yes (3) |
| 2024–2025 | University of Northern Iowa | Full Season | Yes (5) | Yes (4) |

Edwards wants to play football in the 2025–2026 season but has no remaining eligibility under the current NCAA Division I Bylaws. This is because his time at Georgia Military College and Hutchinson Community College, two (2) JUCOs that are not members

---

[9]There was no fall 2020 football season at Hutchinson Community College, but in the spring of 2021, a limited voluntary season was held that does not count towards eligibility.

of any NCAA Division, "counts" as two (2) years of collegiate athletic competition under the Challenged Rules.

### 4.    Justin Harrington

Harrington attended Bakersfield Community College, a JUCO, in the 2018–2019 and 2019–2020 academic years, and played for the football team both years. [Doc. 1 at ¶ 37; Doc. 5-4 at ¶ 3]. Harrington then attended the University of Oklahoma ("OU") in the 2020–2021, 2021–2022, 2022–2023, and 2023–2024 academic years. [Id. at ¶ 38; Doc. 5-4 at ¶ 4]. He was granted a medical redshirt for the 2020–2021 and 2023–2024 seasons and another redshirt for the 2021–2022 season. [Id.; Doc. 5-4 at ¶ 4]. Harrington only played football during the 2022–2023 season. [Id.; Doc. 5-4 at ¶ 4]. Harrington then transferred to the University of Washington for the 2024–2025 academic year, and played for the football team. [Id. at ¶ 39; Doc. 5-4 at ¶ 5]. Harrington is now enrolled at WVU. [Id. at ¶ 40; Doc. 5-4 at ¶ 2]. Like Robinson, Weimer and Edwards, Harrington believed the December 2024 Waiver applied to him and withdrew his name from the NFL draft and attempted to join the WVU football team. [Doc. 5-4 at ¶ 6–9]. Through WVU, Harrington sought, but was denied, a waiver seeking to play a third year at an NCAA institution. [Doc. 1 at ¶ 42; Doc. 5-4 at ¶¶ 13–14]. Harrington appealed that decision, but was denied again. [Doc. 5-3 at ¶¶ 15–16].

| Year | Enrolled Full Time | Played Football | Counts Towards Seasons of Competition | Counts Towards Years of Eligibility |
|------|-------------------|-----------------|--------------------------------------|-------------------------------------|
| 2018–2019 | Bakersfield Community College | Full Season | Yes (1) | Yes (1) |

| 2019–2020 | Bakersfield Community College | Full Season | Yes (2) | Yes (2) |
|-----------|-------------------------------|-------------|---------|---------|
| 2020–2021 | OU | Redshirt | No (COVID Waiver) | No |
| 2021–2022 | OU | Redshirt | Yes (3) | No |
| 2022–2023 | OU | Full Season | Yes (4) | Yes (3) |
| 2023–2024 | OU | Redshirt | Yes (5) | No |
| 2024–2025 | University of Washington | Full Season | Yes (6) | Yes (4) |

Harrington wants to play football in the 2025–2026 season but has no remaining eligibility under the current NCAA Division I Bylaws. This is because his time at Bakersfield Community College, a JUCO that is not a member of any NCAA Division, "counts" as two (2) years of collegiate athletic competition under the Challenged Rules.

## II.    Legal Standard

To qualify for preliminary injunctive relief, a plaintiff must establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See **Winter v. Natural Res. Def. Council, Inc.***, 555 U.S. 7, 20 (2008). While these factors are a balancing test, a failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's request for preliminary injunction." *See **Pavia***, 760 F.Supp.3d at 536 (quoting ***Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC***, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted)).

Federal Rule of Civil Procedure 65 provides

Every order granting an injunction and every restraining order must:

17

(A) state the reasons why it issued;

(B) state its term specifically; and

(C) describe in reasonable detail--and not by referring to the complaint or

other document--the act or acts restrained or required.

### III.    Analysis

The Court will first address the parties' arguments under the ***Winter*** framework as to plaintiffs' likelihood of success on the merits and whether, absent injunctive relief, plaintiffs will suffer irreparable harm before turning to the balancing of the equities and the public interest prongs.   In sum, the Court finds that plaintiffs satisfy all four (4) ***Winter*** factors and will grant injunctive relief.

### A.    Likelihood of Success on the Merits

While a plaintiff is required to make a clear showing that he is likely to succeed on the merits in order to obtain injunctive relief, a plaintiff is not required to establish with certainty that he will succeed on the merits.   ***Pashby v. Delia***, 709 F.3d 307, 321 (4th Cir. 2013); ***Roe v. Dep't of Defense***, 947 F.3d 207, 219 (4th Cir. 2020). Indeed "[a] district court's determination that such a showing [of likelihood of success on the merits] has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome…." ***Stinnie v. Holcomb***, 37 F.4th 977, 982 (4th Cir. 2022) (quoting ***Smyth ex rel. Smyth v. Rivero***, 282 F.3d 268, 276 (4th Cir. 2002)); ***Stinnie v. Holcomb***, 77 F.4th 200, 208 (4th Cir. 2023). Moreover, in showing a  likelihood of success on the merits, a plaintiff is not required to demonstrate a likelihood of success on all claims.   ***Power Balance LLC v. Power Force LLC, No. SACV***, 2010 WL 5174957, at *5 (C.D. Cal. Dec.

18

14, 2010); *see Hudson v. AFGE*, 292 F.Supp.3d 145, 153 (D. D.C. Nov. 9, 2017) (Boasberg, J.) ("the Court begins with [movant's] likelihood of success on the merits of at least one claim" [emphasis added])*; see also Miller v. Garland*, 2023 WL 3692841, at *34 (E.D. Va. May 26, 2023) (Alston, Jr., J.); *see also Winter*, 555 U.S. at 19 n.4 (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint).

Plaintiffs allege that the Challenged Rules violate § 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"),[10] which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

As a first matter, the NCAA contends that under *Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180, 185–86 (3d Cir. 1998), a pre-*Alston* case, its eligibility rules are not commercial and therefore not subject to scrutiny under the Sherman Act. [Doc. 12 at 6].

The Sixth Circuit has held that Section 1, "[b]y its plain language" applies "only if the rule is commercial in nature." *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). "[T]he appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'" *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 433 (6th Cir. 2008) (quoting *Worldwide Basketball*, 388 F.3d at 959). "[T]he analysis must focus on the [challenged rule] itself and not NCAA as a commercial entity." *Id*.

---

[10]The Supreme Court of the United States "has already recognized that the NCAA itself *is* subject to the Sherman Act." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96 (2021) (emphasis in original).

NCAA argues courts have consistently refused to enjoin or invalidate NCAA eligibility requirements holding those rules are non-commercial in nature. [Doc. 12 at 6–7 (citing *Bassett*, 528 F.3d at 433; *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F.Supp.2d 460, 497–98 (D.N.J. 1998))].

*Bassett* concerned a coach's challenge to enforcement of an NCAA rule prohibiting improper recruiting inducements and academic fraud. 528 F.3d at 429. *Bowers* involved a student-athlete with a learning disability who was declared ineligible to compete in intercollegiate athletics during his freshman year. Both the *Bassett* and *Bowers* courts held that the challenged rules were noncommercial and thus not subject to antitrust analysis. *See Bassett*, 528 F.3d at 429 (holding the challenged rules on recruiting student-athletes and academic fraud "are all explictly non-commercial"); *Bowers*, 9 F.Supp. 2d at 497 (relying on *Smith* and dismissing Bowers' Sherman Act claim because eligibility rules are not related to the NCAA's commercial or business activities).[11]

It is apparent, however, that those decisions were grounded in a pre-NIL world. The *Bassett* court stated that, "[i]n fact, those rules are *anti-commercial*" and that it would "violate[ ] the spirit of amateur athletics [to] provid[e] remuneration to athletes in exchange for their commitments to play for the violator's football program." 528 F.3d at 433 (emphasis in original).

Unfortunately for this Court, it "is left with an uncertain and clearly evolving legal landscape. No binding precedent categorizes all NCAA eligibility rules as commercial in

---

[11]Like *Elad*, *Bowers* originated in the District of New Jersey, which demonstrates the shifting paradigm of the approach toward classifying the NCAA Bylaws as commercial.

nature.  Yet the NIL era, in many ways, blurs the lines between clearly commercial rules and those eligibility rules once thought to be explicitly non-commercial.  Where are those lines drawn?  It's difficult to say."  *Osuna v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 684271, at *4 (E.D. Tenn. Mar. 3, 2025) (Atchley, Jr., J.).

Fortunately for this Court, three (3) courts have already held the Challenged Rules are commercial in nature and, therefore, are subject to antitrust scrutiny.  *Pavia*, 760 F.Supp.3d at 536–37 (agreeing with plaintiff's assertion that when the NCAA lifted the restriction on NIL compensation, rules regulating who can play – *i.e.*, who can enter the labor market for NCAA Division I football – became "commercial in nature"); *Elad v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1202014, at *7 (D.N.J. Apr. 25, 2025) (Quraishi, J.) (finding that the JUCO Rule is commercial in nature because a NIL agreement is a commercial transaction and the JUCO Rule limits who is eligible to play and therefore to negotiate a NIL agreement; *Braham v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 2017162, at *4–5  (D. Nev. July 18, 2025) (Du, J.).  *See also Osuna*, 2025 WL 684271, at *4 (assumed the challenged rules are commercial in nature and proceeded to the rule of reason analysis).

As illustrated in *Braham*:

The Court finds that, in a post-*Alston* world of NIL compensation and changed "market realities," *O'Bannon*'s[12] classification of NCAA eligibility rules as "noncommercial," *see* 802 F.3d at 1066, is rendered moot. *See Elad*

---

[12]*O'Bannon v. National Collegiate Athletic Association* is a 2015 Ninth Circuit case that held that rules regulating player compensation are "commercial" while rules that determine player eligibility are noncommercial.  802 F.34 1049, 1066 (9th Cir. 2015).

*v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1202014, at *7 (D.N.J. Apr. 25, 2025) (finding that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis") (quoting *Alston*, 594 U.S. at 93 (citations omitted)); *see also Pavia*, 760 F.Supp.3d at 539 (emphasizing the "new economic reality in the age of NIL compensation"). In the post-*Alston* collegiate athletic world, the challenged eligibility rules are so intertwined with commercial rules and benefits that they are, in essence, "commercial" in nature. Here, the Court agrees with similar conclusions in *Elad*, 2025 WL 1202014, at *7, and *Pavia*, 760 F.Supp.3d at 537, and finds that the Five-Year Rule as applied to JUCO players is commercial in nature because it is tied to potential NIL agreements, which are "commercial transactions." Accordingly, the Court concludes the challenged NCAA eligibility rules fall under the purview of the Sherman Act.

2025 WL 2017162, at *5 (footnote added). Building on this point, the *Elad* court explained:

Significantly, the Supreme Court's decision in *Alston* in 2021 opened the door for students to benefit from NIL deals. This has "drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness ('NIL')." *Pavia*, 2024 WL 5159888, at *1 (citations omitted). Tellingly, the Supreme Court in *Alston* specifically urges caution in applying what may be outdated authority in this context: "[w]hether an antitrust violation exists necessarily depends on a

22

careful analysis of market realities.  If those market realities change, so may the legal analysis." *Alston*, 594 U.S. at 93 (citations omitted).  Until much needed guidance is provided by the Third Circuit that clarifies the state of the law in the wake of *Alston*, this Court is left to intuit how our higher courts would rule when faced with the same facts before it.

2025 WL 1202014, at *7.

This Court is also left to intuit how our higher courts would rule when faced with the same facts before it.  The nationwide case law reveals a clear split.  Absent guidance from the Fourth Circuit or the Supreme Court, this Court aligns with *Pavia*, *Elad*, and *Braham*, concluding that the Challenged Rules are commercial in nature and therefore subject to the Sherman Act.  In the current era of NIL compensation, eligibility rules are commercial in nature.  They dictate the number of years a student-athlete can market and profit from an NCAA Division I career.

Moreover, eligibility is even more commercial now that the settlement has been approved in *In re College Athlete NIL Litigation*, 2025 WL 1675820 (N.D. Cal. June 6, 2025) (Wilken, J.).  NCAA member institutions in the five (5) most prominent conferences can share up to 22% of the revenue from media rights, ticket sales, and sponsorships with student-athletes.  College Sports Commission, *About the House Settlement*, College Sports Commission, https://www.collegesportscommission.org/about/ (last visited Aug. 20, 2025).  Each school can distribute up to $20.5 million to student-athletes for the 2025–2025 academic year.  *Id.*  And the NCAA is permitted to adopt roster limits for Division I sports.  *In re College Athlete NIL Litig.*, 2025 WL 1675820, at *8.  Eligibility

determinations now control who can share in a school's revenue and who can be paid differently by NCAA institutions.  In this case, each of the plaintiffs seek to play for WVU, a Big 12 institution.  Thus, each plaintiff would be able to share revenues and be paid if he is eligible.[13]

This Court is mindful that in electing to follow the reasoning in ***Pavia***, ***Elad***, and ***Braham***, it has necessarily chosen not to follow the reasoning of the majority and other well-intentioned district courts that have more recently found that the NCAA's eligibility rules are not commercial in nature.  ***Hasz v. Nat'l Collegiate Athletic Ass'n***, 2025 WL 2083853, at *3–5 (D. Neb. July 24, 2025) (Bataillon, J.) (finding the challenged rules are not subject to the Sherman Act because they are pure eligibility rules rather than commercial rules because they limit the number of years that student-athletes may play collegiate sports); ***Goldstein v. Nat'l Collegiate Athletic Ass'n***, 2025 WL 662809, at *3–4 (M.D. Ga. Feb. 28, 2025) (Self, III, J.) (same); ***Coley v. Nat'l Collegiate Athletic Ass'n***, 2025 WL 1616719, at *4–6 (E.D. N.C. June 6, 2025) (Dever, III, J.) (same); ***Brzovic v. Nat'l Collegiate Athletic Ass'n***, 2025 WL 1370758, at *4 (D. S.C. May 11, 2025)

---

[13]The NCAA argues that

Plaintiffs' desire to compete for [WVU] is at odds with WVU's own conduct. WVU is a member of an athletic conference that has agreed to a settlement *affirming* the NCAA's Five-Year Rule.  ***See House v. NCAA***, 4:20-CV-03919 (N.D. Cal. June 6, 2025) (D.E. 958-1 at 21, Art. 4, § 3(a); 979.)  WVU obtained valuable legal releases pursuant to that settlement and has repeatedly endorsed it. It is accordingly hard to imagine WVU supporting Plaintiffs' claims, which are so obviously at odds with its legal position and interests.

[Doc. 12 at 4 (emphasis in original)].  It was WVU—not the plaintiffs—that agreed to the settlement.  WVU's agreement does not bar the plaintiffs from pursuing claims on their own behalf.

(Norton, J.) (same); *Johnson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1790345, at *7–10 (D. Mont. June 26, 2025) (DeSoto, M.J.) (same); *Osuna*, 2025 WL 684271, at *4 (same).

This only begins the inquiry.  To succeed under Section 1 of the Sherman Act, plaintiffs must show that the NCAA "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003).  At issue is whether the Challenged Rules unreasonably restrain trade.

The Supreme Court of the United States

has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the 'restraint of trade' is best read to mean 'undue restraint.'" *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2283 (2018) (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Standard Oil Co. of N. J. v. United States*, 221 U.S. 1, 60–62 (1911).  That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition."  *American Express*, 138 S.Ct. at 2284 (internal quotation marks omitted).  Always, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the

25

consumer and restraints stimulating competition that are in the consumer's

best interest." *Ibid*. (brackets and internal quotation marks omitted).

*Alston*, 141 S.Ct. at 2151.

When analyzing a claim under Section 1 of the Sherman Act to determine whether

a restraint violates the rule of reason, courts use a "three-step, burden shifting framework."

*Am. Express*, 585 U.S. at 529.  Under this framework,

> the plaintiff has the initial burden to prove that the challenged restraint has
> a substantial anticompetitive effect that harms consumers in the relevant
> market. . . .  If the plaintiff carries its burden, then the burden shifts to the
> defendant to show a procompetitive rationale for the restraint. . . . If the
> defendant makes this showing, then the burden shifts back to the plaintiff to
> demonstrate that the procompetitive efficiencies could be reasonably
> achieved through less anticompetitive means.

*Id*.  "[T]he amount of work needed to conduct a fair assessment of these questions can

vary. . . . [T]his Court has suggested that sometimes we can determine the competitive

effects of a challenged restraint in the "'twinkling of an eye.'" *Alston*, 141 S.Ct. at 2155

(citing *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 465

U.S. 85, 110, n.39 (1984) (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis:

General Issues 37–38 (Federal Judicial Center, June 1981))).

"At one end of the spectrum, some restraints may be so obviously incapable of

harming competition that they require little scrutiny. . . . At the other end, some agreements

among competitors so obviously threaten to reduce output and raise prices that they might

be condemned as unlawful *per se* or rejected after only a quick look." ***Alston***, 141 S.Ct. at 2155–56.

Before the Court can assess whether a rule has a substantial anticompetitive effect, it "must first define the relevant market." ***Am. Express***, 585 U.S. at 542. "[T]he relevant market is defined as the area of effective competition," *i.e.*, the "arena within which significant substitution in consumption or production occurs." ***Id.*** at 543 (cleaned up). Without defining the market, "there is no way to measure the defendant's ability to lessen or destroy competition." ***Id.*** (cleaned up).

Plaintiffs assert the relevant market "is the nationwide market for the labor of NCAA Division I college football players." [Doc. 1 at ¶ 60]; *see also* [Doc. 6 at 14 ("The relevant market here is the nationwide market for college football players, where the NCAA exercises clear monopsony power.")].

The NCAA argues plaintiffs have not offered any evidence in support of their purported relevant market definition and instead cite case law in support, which does not satisfy their evidentiary burden. [Doc. 12 at 11]. The NCAA asserts that plaintiffs' market analysis is inconsistent: if JUCOs are not substitutes for Division I schools, they cannot be in the same market—but if only Division I schools are the market, JUCO impacts are irrelevant. [Id. at 12].

Other courts considering antitrust challenges to NCAA eligibility rules have found that the labor market for college athletes, in this case college football, to be relevant labor

markets.[14] *See e.g.*, **Alston**, 594 U.S. at 90 ("market for student athlete services"); **Tennessee**, 718 F.Supp.3d at 761–62 ("market for Division I athletics"); **Ohio**, 706 F.Supp.3d at 592 (finding that "the labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets"); **Elad**, 2025 WL 1202014, at *2 (giving "substantial weight" to definition of the relevant market as "the labor market for college football athletes in general and NCAA Division I football specifically"); **Braham**, 2025 WL 2017162, at *6 (finding "the relevant market is NCAA DI college football, as it is the sole pathway to NFL opportunities, and participation provides unique benefits, including NIL compensation, which are not available elsewhere, including at the JUCO level"); **Pavia**, 760 F.Supp.3d at 539 (finding "the relevant market is the labor market for college football athletes in general and NCAA Division I football specifically").

Here, the Court agrees with plaintiffs that the relevant market "is the nationwide market for the labor of NCAA Division I college football players."

### 1.    Substantial Anticompetitive Effect

Plaintiffs can demonstrate a substantial anticompetitive effect directly or indirectly. **Am. Express**, 585 U.S. at 542.  Direct evidence of an anticompetitive effect is "'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." **Id**. (citations omitted).  Indirect evidence is "proof

---

[14]However, in **Fourqurean v. National Collegiate Athletic Association**, the Seventh Circuit cautioned that reliance on **Alston** to define the relevant market "overstates the scope of the Court's ruling," as the Supreme Court there "did not decide the question of market definition." *See* 2025 WL 1944005, at *7 (7th Cir. July 16, 2025) (reversing grant of preliminary injunction where plaintiff failed to show a likelihood of success on his Sherman Act claim challenging the NCAA's Five-Year Rule).

of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted).  Plaintiffs focus primarily on indirect evidence.

The eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements.  *See Business Elec. Corp. v. Sharp. Elec. Corp.*, 485 U.S. 717, 730 (1988) (explaining that horizontal agreements are agreements between competitors at the same level in a particular industry).  There is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have "market power."  *See Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("[The] NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power in the market for [college athlete services[.]").

At issue is whether plaintiffs have presented some evidence that the challenged eligibility rules harm competition.  Plaintiffs have met this threshold. Plaintiffs maintain the challenged restraint restricts competition in the Division I football market by "limit[ing] college students' eligibility based upon time spent at non-NCAA institutions." [Doc. 1 at ¶ 132].  Plaintiffs argue that this restraint, in turn, directly harms consumers (i.e., football players) in the relevant market by preventing access to NIL benefits. [Id. at ¶ 53].  The NCAA argues plaintiffs have failed to make any effort to establish that the Challenged Rules are anticompetitive.   [Doc. 12 at 14–15].   The NCAA notes that plaintiffs point to

29

Dr. Maxcy's[15] report in *Elad* as support, but Dr. Maxcy's report contains no probative evidence supporting that conclusion.  [Id. at 14].

Plaintiffs are correct in that the Five-Year Rule harms competition in the relevant market by excluding a qualified cohort—namely, JUCO athletes. In *Pavia*, the district court conducted a similar analysis under the rule of reason and found that the NCAA eligibility rules "giv[e] a competitive advantage to NCAA Division I member schools over junior colleges – and thus the football players at each level" and that the "disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players."  760 F.Supp.3d at 539–40 (holding that plaintiff demonstrated a "likelihood that the challenged restraints have a substantial anticompetitive effect").  *See also Braham*, 2025 WL 2017162, at *6 (holding the Five-Year Rule harms competition in the relevant market by excluding a qualified cohort–namely, JUCO athletes); *Elad*, 2025 WL 1202014, at *8 (finding the JUCO Rule has a substantial effect on the labor market for college football).

The *Pavia* court went on:

> The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy

---

[15]Dr. Joel Maxcy is an economist with expertise in the fields of sports business, industrial organization, and labor economics, who holds a Ph.D. in economics from Washington State University.  [Doc. 5-7 at ¶ 1].  He is currently a professor at the LeBow College of Business at Drexel University.  [Id.].  He served as the plaintiff's expert in *Pavia* and co-authored and/or signed briefs *amici curiae* in other antitrust cases involving sports leagues, including *Alston* before the United States Supreme Court.

a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. [(Maxcy Decl., Doc. No. 33-1 at ¶ 27)].  Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice. (Id.).

NCAA Division I member institutions compete directly with NJCAA schools for football talent. (Id. at ¶ 26). NCAA Division I offers a prospective football player significant advantages over junior college football – more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes. (Id. at ¶ 27).

760 F.Supp.3d at 539–40.

The math is simple: "each season of JUCO participation costs a football player one year of NCAA eligibility." [Doc. 5-7 at ¶ 27].  The Challenged Rules induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest.  These anticompetitive practices result in real, stark differences between NCAA and non-NCAA institutions.  NCAA institutions offer "[g]reater exposure and better coaching [which]

increase[s] the probability of a professional career."  [Doc. 5-7 at ¶ 28].  And "NIL allowances indicate the exposure gained by attending an NCAA Division I college, which offers considerable financial advantages in comparison to a JUCO."  [Id.].  So, the Challenged Rules' anticompetitive effect is akin to UnitedHealth and BlueCross BlueShield collusively refusing to pay any doctor who also did business with a small-town health insurer or a Walmart and Target agreeing not to stock products from any supplier that also sells goods to a neighborhood grocery store.

The Court further finds the Five-Year Rule results in commercial harm by foreclosing the opportunity for JUCO players to pursue NIL compensation at the Division I level.  Such "disparate treatment" described above has material consequences for JUCO players who are excluded from the various benefits "disproportionately" conferred at the NCAA Division I level, including "more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities."  *See Pavia*, 760 F.Supp.3d at 540; *Braham*, 2025 WL 2017162, at *6; *Elad*, 2025 WL 1202014, at *8.

In assessing the challenged restraint for commercial harm, the Court follows the Supreme Court's guidance in *Alston* to consider the "'circumstances, details, and logic of a restraint'" before declaring it "unlawful."  *See* 594 U.S. at 97. As such, the Court finds persuasive *Pavia*'s acknowledgment of the "new economic reality in the age of NIL compensation."  *See* 760 F.Supp.3d at 540. Thus, the Court concludes that the Five-Year Rule's undue restraint on competition harms commerce, where "commerce," under the present circumstances, encompasses the opportunity for JUCOs athletes to compete for

NIL compensation.  *See Pavia*, 760 F.Supp.3d at 540; *Braham*, 2025 WL 2017162, at *7; *Elad*, 2025 WL 1202014, at *8.

Moreover, as held in *Pavia*:

> The effects on the labor market also cause downstream effects for consumers of collegiate athletics because the restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level.

> This is similar to the anticompetitive effects of the Transfer Eligibility Rule found by the court in *Ohio v. National Collegiate Athletic Ass'n*, 706 F.Supp.3d 583, 594 (N.D. W.Va. 2023) [(Bailey, J.)]. There, the court found the NCAA Rule barring students from competition until they fulfilled an academic year of residence reduced competition among NCAA schools for transfer athletes, resulting in harm to the Division I student-athletes who were directly affected by the rule and to consumers of college athletics because the value of the college athletics product and the competitiveness of teams was diminished by the absence of skilled transfer players. Id.

760 F.Supp.3d at 540.

So too here.  The Challenged Rules pigeonhole student-athletes into selecting NCAA schools where they may not be able to get on-field time in competition.  Thus, based on the foregoing, the Court finds plaintiffs have shown a likelihood that the challenged restraints have a substantial anticompetitive effect in the labor market for college football.

Accordingly, the burden then shifts to the NCAA to show a procompetitive justification for the Challenged Rules.

### 2.      Procompetitive Rationale

The NCAA offers that the procompetitive benefits of the Challenged Rules include: (1) preservation of intercollegiate athletics as a unique offering; (2) expanding total athletic output and improving quality of output; and (3) better aligning athletics and academics. [Doc. 12 at 15–17]. The Court does not find these justification compelling. *See Pavia*, 760 F.Supp.3d at 541–42 (rejecting the NCAA's argument that the eligibility rules confer procompetitive benefits, including: "(1) preserv[ation] [of] intercollegiate athletics as a unique offering; (2) increasing the number of students who compete in Division I football; (3) improve[ment] [of] the quality of the student-athlete experience; and (4) foster[ing] better alignment between athletics and academics"); *Braham*, 2025 WL 2017162, at *7 (rejecting the NCAA' s argument that the eligibility rules confer procompetitive benefits, including: "(1) preserving college athletics as a unique product that is differentiated from professional sports; (2) expanding opportunities for prospective and current student-athletes; and (3) better aligning athletics and academics."); *Elad*, 2025 WL 1202014, at *8–9 (rejecting the NCAA' s argument that the eligibility rules confer procompetitive benefits, including: "'provid[ing] a differentiated product from professional offerings such as the NFL'; and preserving the student-athlete experience for freshman students who might be unable to compete for positions with older, more experienced athletes coming from junior colleges.").

As to the first justification, the NCAA argues courts have repeatedly held that NCAA eligibility rules are procompetitive because they preserve the distinct nature of college athletics, which in turn sustains consumer demand and expands output. [Doc. 12 at 15–16].  The NCAA asserts these rules are viewed as essential to the survival of amateur sports and to maintaining a product distinct from professional sports.  [Id.].  The Court is not persuaded that restricting the NCAA Division I eligibility of former JUCO athletes to three (3) or four (4) years is relevant to the preservation of intercollegiate athletics as a unique offering.

As to the second justification, the NCAA argues that because "DI football opportunities are finite[,] if student-athletes avail themselves of those opportunities for longer than they are currently eligible, then some student-athletes will necessarily lose opportunities they otherwise would have received." [Doc. 12 at 16].  The NCAA claims that "[i]f the Five-Year Rule were enjoined collegiate football programs will face greater demand for more developed, experienced players, crowding out other student-athletes who would otherwise get the opportunity to replace those no longer eligible."  [Id.].  The Court is not persuaded.  "Division I programs use the transfer portal to fill roster spots for the next season. . . .  Those transfers – which are allowed by the NCAA – take a spot that might otherwise go to an incoming freshman player. Accordingly, the NCAA's own rule can have the same effect – a school opting for a more experienced player."  *Pavia*, 760 F.Supp.3d at 542.

As to the third justification—better aligning athletics and academics—it appears pretextual, particularly given that the NCAA's rules on eligibility duration have changed over

time, suggesting that strict adherence to these timeframes, including those affecting junior college student-athletes, does not yield procompetitive benefits.  "For example, the NCAA does not start the eligibility clock for prep school student-athletes even though those students can earn credit toward a degree and may compete athletically against junior colleges and other schools that qualify as 'collegiate institutions.'  And there are a number of reasons eligible student-athletes may be older and stronger than those on the traditional trajectory – military service, religious obligations, professional careers in other sports, or even independent athletic or academic work. (See e.g., NCAA Bylaw 12.8.1.2). Given the different treatment of other student-athletes with comparable or more post-secondary experience, the NCAA's assertion that the eligibility rules are necessary to prevent age and experience disparities and preserve the quality of experience for student-athletes falls flat." *Pavia*, 760 F.Supp.3d at 541–42.[16]

Moreover, recent changes to the NCAA Bylaws seem inconsistent with its stated goal of better aligning athletics with academics. This Court's injunction of the Transfer

---

[16]At the hearing in *Pavia*,
the Court asked counsel for the NCAA to address an example concerning prep schools. (See Hearing Trans., Doc. No. 38 at 71-77).  The United States Air Force Academy Preparatory School recently competed in a regular season football game against Snow College, a junior college in Utah.  The players in that game are viewed differently by the NCAA.  The prep school players' eligibility is not impacted by playing that season of football, while the junior college players' participation in that season costs them a year of Division I eligibility under the challenged rules should those players ultimately play at that level.  The NCAA's response, in effect, was that it chooses to define "collegiate institution" to include junior colleges but not the prep schools the junior colleges may compete against. This illustration further illustrates the illogic of the NCAA's rule concerning eligibility afforded to former junior college players.
*Pavia*, 760 F.Supp.3d at 542, n.9.

Eligibility Rule[17] in *Ohio* ultimately led to a change in that Rule.  As stated in *Pavia*, "The Court finds it highly implausible that frequent transfers, even those within NCAA institutions, benefit an athlete's academic career and promote 'natural and standard degree progression.' . . .   The NCAA's reliance on the goal of maintaining 'standard degree progression' when it is convenient and eschewing it when it is not leads the Court to conclude that the stated goal is a mere pretext to justify applying the eligibility timeframe to junior college athletes even when it is clear that junior college does not provide an academic or athletic experience equivalent to that of Division I institutions."  760 F.Supp.3d at 543.

---

[17]Prior to *Ohio*, NCAA Bylaw 14.5.5.1, commonly known as the "Transfer Eligibility Rule," provided:

> **14.5.5.1 General Rule.** A transfer student from a four-year institution shall not be eligible for intercollegiate competition until the student has fulfilled an academic year of residence (see Bylaw 14.02.10) at the certifying institution unless the student qualifies for one of the transfer exceptions set forth in Bylaws 14.5.5.1.1, 14.5.5.1.2 or 14.5.5.1.3. A transfer student (other than one under disciplinary suspension per Bylaw 14.5.1.2) may qualify for an exception to the academic year of residence requirement provided they do not have an unfulfilled residence requirement at the institution from which they are transferring. *590 (See Bylaw 14.1.11, for student-athletes participating in a recognized foreign exchange/study abroad program).

> Following this Court's decision in *Ohio*, this Bylaw was revised on April 18, 2024, and now provides:

> **14.5.5.1 Regaining Eligibility.**   For purposes of Bylaw 14.5.5, an undergraduate transfer student-athlete who was not academically eligible at the previous institution at the time of transfer may become eligible to compete at the certifying institution after the conclusion of the first regular term following transfer (consistent with Bylaw 14.4.3.4) by successfully meeting all applicable progress-toward-degree requirements at the certifying institution.

When compared to *Ohio*, the Challenged Rules are even more inappropriate because, while the Transfer Eligibility Rule at issue in *Ohio* applied to all athletes, the Challenged Rules only discriminate against student-athletes who started their college career outside the NCAA monopoly—whether by choice or because the NCAA eligibility rules prevented them from enrolling directly into an NCAA institution.[18]

Even if the NCAA's justifications were valid and not pretextual, these goals can be accomplished through the less restrictive alternatives proposed by plaintiffs.

### 3.    Less Restrictive Alternatives

Plaintiffs argue "it seems clear that there are many reasonable and easily fashionable rules that offer the same procompetitive effects without overly restricting or harming Plaintiffs and student-athletes like them." [Doc. 6 at 18]. Plaintiffs propose to exclude the seasons of competition in JUCO from "intercollegiate competition" for purposes of Division I eligibility. This Court agrees.

Minor revisions to the Challenged Rules themselves could maintain any procompetitive intent by the NCAA without damaging JUCO student-athletes. For instance, the start of the Eligibility Clock in Bylaw 12.8.1 and 12.8.1.1 could be triggered based on when the athlete first registered for classes at "an NCAA member institution" instead of when they register at a "collegiate institution" as in the current Bylaws.

---

[18]Another Bylaw that also discriminates against student-athletes who started their college career outside the NCAA monopoly is the GPA Transfer Rule. Under the 2–4 Transfer Rule, a student-athlete transferring from a JUCO school to an NCAA Division I school must have a minimum GPA of 2.500 to be eligible, whereas a student-athlete transferring between NCAA four-year institutions need only have a 2.300 GPA. *Compare* NCAA Bylaw 14.5.4 *with* NCAA Bylaw 14.5.5, which references the eligibility criteria in Bylaw 14.3.1.1. [Doc. 5-4].

Likewise, the definition of "Intercollegiate Competition" in Bylaw 12.02.6 could be changed to reference when an athlete is "in a NCAA member institution" as opposed to "either a two-year or four-year collegiate institution" as in the current Bylaws. This change would still bind players to the Five-Year Rule once they enroll at an NCAA institution, but it would no longer penalize them for beginning their academic and athletic careers at junior colleges.

And Bylaw 14.3.3 could be amended to remove the line, "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." Even with this sentence deleted, and in light of the other proposed amendments, student-athletes would still be limited to four (4) years of Division I competition; however, the change would eliminate the anticompetitive effects on JUCOs and the student-athletes who attend them.

The NCAA argues that further economic analysis is necessary to determine whether the challenged Rules have anticompetitive effects. [Doc. 12 at 17].  While such analysis will undoubtedly provide further information, the Court is comfortable on the record at this juncture concluding in the "twinkling of an eye" that the Challenged Rules are restraints on trade with substantial anticompetitive effects for the purpose of the instant Motion. Accordingly, plaintiffs have a strong likelihood of success on the merits of his Sherman Act claim.[19]

---

[19]Insofar as plaintiffs have shown a likelihood of success on their Sherman Act claim, the Court does not reach the other claims asserted in the Complaint.

**B.    Irreparable Harm**

Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." *S.A. v. Sioux Falls School Dist. 49-5*, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023) (quoting *Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834, 868 (D. Min. 2019); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264, at *16–17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate in sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F.Supp.2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist.*, 643 F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ.*, 346 F.Supp.3d 983, 997 (E.D. Mich. 2018); *but see Doe v. Portland Pub. Sch.*, 2023 WL 7301072, at *16 (D. Me. Nov. 3, 2023); *Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.*, 798 A.2d 830, 837 (Commonwealth Court of Pa. May 21, 2002).

The NCAA argues plaintiffs' delay in seeking relief from the Court militates against a finding of irreparable harm.  [Doc. 12 at 22–24 (citing *Northern Va. Hemp v. Virginia*, 700 F.Supp.3d 407, 427 (E.D. Va. 2023) (Brinkema, J.), *vacated on other grounds*, 125 F.4th 472 (4th Cir. 2025))].  The NCAA asserts plaintiffs could have brought a challenge to the Five-Year Rule at any time upon matriculation at their respective Division I institutions.  [Id. at 22].  The NCAA contends plaintiffs delayed seeking injunctive relief for

more than seven (7) months after the exhaustion of their eligibility, eight (8) months after the decision in *Pavia*, and roughly three (3) months after the *Elad* decision.  [Id. at 22–23].  The NCAA argues plaintiffs "cannot manufacture irreparable harm by filing suit after the beginning of fall practice and less than one (1) month before the start of WVU's football season."  [Id. at 24].

The Court, however, finds no undue delay.  Plaintiffs first sought relief from the NCAA, and two (2) of them did not receive a decision until June 2025.  Filing suit on August 1, 2025, can hardly be considered a delay.

Plaintiffs argue the "opportunity to play major college sports is something so unique and so fleeting that destroying even a small part of it for no reason constitutes irreparable harm."  [Doc. 6 at 18].  Plaintiffs assert that the "face the loss of immediate and lifelong advantages, decreasing their odds of graduating college, preventing them from experiencing life-changing travel, preventing them from receiving national and international exposure which may open doors to playing professional sports, limiting their job prospects out of college, and overall leaving them less prepared for life."  [Id. at 19].

The NCAA counters that the authorities relied on by plaintiffs are distinguishable. [Doc. 12 at 24].  The NCAA asserts *Ohio* cites six (6) authorities as support for its finding that "the denial of the opportunity to play sports is irreparable harm."  706 F.Supp.3d at 597.  The NCAA argues each of these decisions involve female student-athletes' statutory rights under Title IX to the same opportunity to participate in collegiate athletics as male student-athletes.  The NCAA asserts neither *Ohio* nor the authorities cited therein found

that the exhaustion of a student-athlete's eligibility under longstanding NCAA bylaws constitutes a denial of the opportunity to participate in collegiate athletics.  [Doc. 12 at 24].

The NCAA also asserts that "***Ohio*** is also distinguishable insofar as this Court, in explaining that the lost ability to participate in college sports evidences irreparable harm, relied upon the premise that the interruption of one's eligibility presents a unique harm ***because student-athletes' eligibility is limited by the Five-Year Rule***.  *Id*. at 593 n.3. Here, unlike the plaintiffs in ***Ohio***, Plaintiffs are not losing a year of eligibility to which they would otherwise be entitled; they are claiming harm from not being permitted ***additional time***." [Id. at 24–25, fn. 12].

The Court is not persuaded by the NCAA's attempt to distinguish Ohio and the authorities cited therein on the basis that they involved Title IX claims. While those cases may have arisen in the context of gender equity, the principle they establish—that the denial of the opportunity to participate in collegiate athletics can constitute irreparable harm—applies more broadly. This harm is particularly acute in today's collegiate landscape, where student-athletes not only compete but also have access to time-sensitive NIL opportunities that may be permanently lost if they are denied the ability to participate. The irreparable nature of the harm arises from the limited duration of eligibility and the non-compensable nature of both athletic participation and NIL earning potential at the collegiate level.

Moreover, the NCAA's assertion that plaintiffs here are merely seeking "additional time" rather than being deprived of time they were "otherwise entitled to" ignores the nature of the relief sought.  Plaintiffs allege that the NCAA's eligibility rules, as applied, improperly

foreclose their opportunity to compete and train at the Division I level, thereby causing the same type of time-sensitive and irreparable harm identified in *Ohio* and similar cases.

This Court has no trouble concluding as many other courts have, that the denial to play sports is irreparable harm. *Ohio*, 706 F.Supp.3d at 597 (collecting cases). *See also Pavia*, 760 F.Supp.3d at 544 ("In addition [to the finding that the denial of the ability to play sports is irreparable harm], although the value of missed NIL opportunities could potentially be quantified, the lost opportunity to play NCAA Division I football for four seasons results in loss opportunity for exposure and building his 'personal brand.'"); *Elad*, 2025 WL 1202014, at *9 ("Elad's harms are clear on this record. A loss of his NIL agreement if he is unable to play this season can be quantified, but his lost opportunity to play a year of Division I football for a Big Ten team is incalculable in terms of personal experience. This season at Rutgers is a chance for Elad to build memories and lasting relationships both on and off the field, and to help lead the Rutgers football program to success."); *Braham*, 2025 WL 2017162, at *8–9 (finding that barring Braham from the 2025–2026 NCAA Division I football season would cause irreparable harm by depriving him of his final opportunity to compete, integrate with his team, gain exposure to professional recruiters, and pursue NIL contracts valued at $500,000—losses that cannot be remedied by money alone).

The NCAA relies on pre-*Alston* and pre-NIL cases to support its claim that courts have routinely rejected the idea that exclusion from intercollegiate athletics constitutes irreparable harm. [Doc. 12 at 25]. Yet those cases do not account for the modern realities

43

of NIL compensation and the evolving economic significance of college athletic participation.

Plaintiffs' harms are clear on the record. If the injunction is denied, plaintiffs will forfeit an entire season of Division I football at WVU, along with the accompanying benefits of travel, national exposure, and opportunities for professional advancement or NIL agreements—opportunities that contribute to the team's success and foster valuable relationships.  Finally, this case is not likely to be resolved on the merits before the Fall 2025 season,[20] so plaintiffs have shown irreparable harm will result before this case can be resolved on the merits.

### C.    Balance of the Equities

The Court balances the equities as between the parties.  As set forth above, plaintiffs are likely to suffer substantial, immediate, and irreparable harm should they be prevented from playing this season.  The NCAA, by contrast, would suffer little harm insofar as, should they later succeed on the merits, they can terminate plaintiffs' eligibility.  Accordingly, the Court finds that the balance of the equities weighs heavily in plaintiffs' favor.

### D.    The Public Interest

Finally, the Court must weigh whether the public interest favors injunctive relief pending the outcome of this litigation.  "As a practical matter, if a plaintiff demonstrates

---

[20]WVU's first football game of the 2025–2026 season is Saturday, August 30, 2025, at 2:00 p.m. against Robert Morris University in Morgantown, West Virginia. West Virginia University Athletics, *2025 Football Schedule*, WVUSPORTS.COM, https://wvusports.com/sports/football/schedule/2025 (last visited Aug. 20, 2025).

both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." ***Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.***, 42 F.3d, 1421 1427 n.8 (3d Cir. 1994).  The Court has already found a likelihood of success on the merits and irreparable harm. Moreover, "free and fair competition in the labor markets is essential to the American economy." ***Williams v. Nat'l Collegiate Athletic Ass'n***, 2024 WL 397760, at *3 (D.N.J. Feb. 2, 2024) (citation omitted). The Court therefore concludes that an injunction in this instance would serve the public interest.

## IV.  Relevant Case Law to Date

The Court finds it useful to outline the legal landscape surrounding the Challenged Rules, which is summarized in the following table:

| Case Name | Sport | JUCO or DII | Court | Date | Granted Eligibility? |
|---|---|---|---|---|---|
| ***Pavia v. NCAA***, 760 F.Supp.3d 527[21] | Football | JUCO | Middle District of Tennessee, Nashville Division | December 18, 2024 | Yes |
| ***Wade v. NCAA***, 2025 WL 5212665 | Basketball | DI, DII, and JUCO | Southern District of Mississippi, Eastern Division, Hattiesburg | December 23, 2024 | No |

---

[21] The ***Pavia*** appeal is fully briefed and set for argument on October 23, 2025.  Case No. 24-6153 [Doc. 33].

| *Ciulla-Hall v. NCAA*, 2025 WL 438707 | Baseball | DII | District of Massachusetts, Boston | February 7, 2025 | No[22] |
| *Arbolida v. NCAA*, 2025 WL 579830 | Baseball | JUCO | District of Kansas, Kansas City | February 21, 2025 | No |
| *Goldstein v. NCAA*, 2025 WL 662809 | Baseball | JUCO | Middle District of Georgia, Athens Division | February 28, 2025 | No |
| *Osuna v. NCAA*, 2025 WL 684271[23] | Baseball | JUCO and DI | Eastern District of Tennessee, Northern Division at Knoxville | March 3, 2025 | No |
| *Elad v. NCAA*, 2025 WL 1202014[24] | Football | JUCO | District of New Jersey, Trenton | April 25, 2025 | Yes |
| *Brzovic v. NCAA*, 2025 WL 1370758 | Basketball | DII | District of South Carolina, Charleston Division | May 11, 2025 | No |

---

[22] Ciulla-Hall, a Division II baseball player at Stonehill College during the 2020–2021 academic year, participated in twenty-one (21) of thirty-two (32) games after COVID-19 canceled most of the season. Under the NCAA's COVID-19 Policy, athletes were eligible for an extra year only if their teams played 20 or fewer games, making him ineligible. The court denied his request for a temporary injunction, finding he failed to show the NCAA acted arbitrarily or that he was likely to succeed on his antitrust claims.

[23] Osuna filed a Motion for Reconsideration, which was denied on May 21, 2025. *See Osuna v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1463149 (E.D. Tenn. May 21, 2025).

[24] The *Elad* appeal is fully briefed and argument is set for September 15, 2025. Case No. 25-1870 [Doc. 43].

46

| *Fourqurean v. NCAA*, 2025 WL 1944005[25] | Football | DII | Seventh Circuit | May 28, 2025 | No |
|---|---|---|---|---|---|
| *Coley v. NCAA*, 2025 WL 1616719 | Football | DI | Eastern District of North Carolina, Western Division | June 6, 2025 | No |
| *Hamilton v. NCAA*, 2025 WL 1615752 | Track and Field | DI | Eastern District of Louisiana, New Orleans | June 6, 2025 | No |
| *Zeigler v. NCAA*, 2025 WL 1671952 | Basketball | DI | Eastern District of Tennessee, Northern Division, at Knoxville | June 12, 2025 | No |

---

[25] This is the only case that has made its way to a United States Court of Appeals. The district court granted a preliminary injunction enjoining the NCAA from enforcing its Five-Year Rule to prevent Fourqurean from playing a fifth season of college football. *See* 771 F.Supp.3d 1043 (W.D. Wis. 2025).  The Seventh Circuit held:

> Given the dearth of evidence (or even allegations) of anti-competitive effect offered by Fourqurean so far, he has failed to show some likelihood that the Five-Year Rule constitutes an unreasonable restraint of trade—and thus some likelihood of success on the merits of his Sherman Act claim.
>
> We do not exclude the possibility that on a fuller record, Fourqurean will succeed in establishing his claim. We also recognize that the 2025–26 college football season begins soon. In this context, we encourage the parties and the district court to expedite the coming litigation. While it is not our prerogative to direct the parties how to proceed, we also note that the NCAA's bylaws allow the NCAA's Committee for Legislative Relief to grant "relief from application of NCAA legislation to a particular situation in which no other entity has the authority to act," which appears to create some flexibility for the NCAA to address the hardship to Fourqurean that concerned the district court.

143 F.4th at 871.  This Court notes there was a dissenting opinion in *Fourqurean*. *See id.* 871–877.

| Johnson v. NCAA, 2025 WL 1790345 | Basketball | DII | Montana, Missoula Division | June 26, 2025 | No |
|---|---|---|---|---|---|
| Walker v. NCAA, 2025 WL 1901907 | Basketball | JUCO and DII | Middle District of Louisiana, Baton Rouge | July 1, 2025 | No[26] |
| Giles v. NCAA, Civ. Act. No. 8:25-CV -1488 | Football | JUCO | Central District of California, Southern Division - Santa Ana | July 17, 2025 / August 18, 2025[27] | No |
| Braham v. NCAA, 2025 WL 2017162[28] | Football | JUCO | District of Nevada, Reno | July 18, 2025 | Yes |
| Hasz v. NCAA, 2025 WL 2083853 | Football | JUCO | District of Nebraska, Omaha | July 24, 2025 | No |
| Hill v. NCAA, Civ. Act. No. 4:25-CV-591 | Football and Basketball | JUCO | Eastern District of Arkansas, Central Division | July 24, 2025 | No |
| Bellamy et al. v. NCAA, Civ. Act. No. 3:25-CV-750 | Football | JUCO | Middle District of Tennessee, Nashville Division | August 7, 2025 | No to all four (4) student-athletes |

---

[26] Walker played two (2) years at separate JUCOs before transferring to a Division II school for two (2) additional years. The court did not reach the merits, finding instead that Walker's delay in filing suit was "excessively long and unjustified." 2025 WL 1901907, at *7.

[27] The court first denied a temporary restraining order on July 17, 2025. On August 18, 2025, the court held a hearing with respect to plaintiff's motion for a preliminary injunction and issued a tentative ruling from the bench at the hearing. [Doc. 25].

[28] The NCAA filed its Notice of Appeal in *Braham* on August 8, 2025. *See Braham v. Nat'l Collegiate Athletic Ass'n*, Civ. Act. No. 3:25-CV-00253-MMD-CSD [Doc. 32] (D. Nev.).

| | | | | | |
|---|---|---|---|---|---|
| ***Boyd v. NCAA***, Civ. Act. No. 3:25-CV-729 | Basketball | NAIA | Middle District of Tennessee, Nashville | | TBD[29] |
| ***Robinson v. NCAA***, Civ. Act. No. 2:25-CV-6454 | Football | JUCO | Central District of California, Western Division - Los Angeles[30] | August 18, 2025 | No |
| ***Wingfield v. NCAA***, Civ. Act. No. 2:25-CV-6875 | Football | JUCO | Central District of California, Western Division - Los Angeles | August 18, 2025 | No |
| ***Martinson v. NCAA***, Civ. Act. No. 2:25-CV-1376 | Football | JUCO | District of Nevada, Las Vegas | | TBD. Hearing scheduled for August 20, 2025 |

Of the nineteen (19) cases that have been decided above, nine (9) cases dealt specifically with student-athletes who attended a JUCO before transferring to a NCAA institution.

In ***Arbolida***, the court held that Arbolida failed to present facts beyond his individual circumstances to support a market definition for antitrust analysis.  2025 WL 579830, at

---

[29]On August 12, 2025, the court stated the "status of the pending motion for preliminary injunction is that the Court is considering the merits of the requested relief and the parties' briefing and will issue a decision as soon as practicable."  [Doc. 39].

[30]This was originally filed in the District of New Jersey.  ***See Robinson v. Nat'l Collegiate Athletic Ass'n***, Civ. Act. No. 3:25-CV-07661-ZNQ-TJB (D.N.J.).  Robinson consented to transfer this matter to the United States District Court for the District of California because the District of New Jersey was an improper venue. Civ. Act. No. 3:25-CV-07661-ZNQ-TJB [Doc. 15] (June 25, 2025).

*3.   It also found the NCAA's intercollegiate and five-year rules were not clearly anticompetitive.  *Id*.  Additionally, the court weighed Arbolida's delay in filing suit and the possibility of regaining multiple years of eligibility against him on the irreparable harm prong.  *Id*. at *4.   Nonetheless, the court noted that, with a more developed record, Arbolida could potentially succeed in a future preliminary injunction hearing, even though the motion for a temporary restraining order was denied.  *Id.* at *5.   On March 11, 2025, Arbolida voluntarily dismissed the case in its entirety without prejudice and withdrew all pending motions under Federal Rule of Civil Procedure 41(a)(1)(A)(i). Civ. Act. No. 2:25-CV-02079-JWB-BGS (D. Kan.) [Doc. 24].

In ***Goldstein***, the court—relying on ***O'Bannon***—initially held that the challenged NCAA Bylaws are not commercial in nature and thus not subject to antitrust scrutiny.  2025 WL 662809, at *3–4 ("In the Court's view, though, ***Alston*** is more scalpel than ax.").[31] Even assuming antitrust scrutiny applied, the court found Goldstein failed to show the Bylaws had a substantial anticompetitive effect. *Id*. at *4–6. He submitted no expert report, economic analysis, or even a single exhibit to support the required rule-of-reason analysis. *Id*. at *5–6.   On March 4, 2025, Goldstein voluntarily dismissed the case in its entirety without prejudice and withdrew all pending motions under Federal Rule of Civil Procedure 41(a)(1)(A)(i). Civ. Act. No. 3:25-CV-00027-TES (M.D. Ga.) [Doc. 30].

In ***Hasz***, the court aligned with ***Coley***, ***Brzovic***, ***Johnson***, and ***Goldstein***, holding that the NCAA's Five-Year Rule is an eligibility rule—not a commercial one.   2025 WL

---

[31]Though it should be evident from this Opinion, the Court states it plainly: in a world shaped by NIL, ***Alston*** operates more as an ax than a scalpel.

2083853, at *3–4.  The court found no evidence in the record to support Hasz's claim of unfair competition beyond his own affidavit describing personal harm. *Id*. at *5.  However, the court acknowledged that "this is not to say that Hasz might not be able to produce evidence at a later stage of the case." *Id*.  The NCAA was directed to answer or otherwise respond to the Complaint on or before September 3, 2025.  Civ. Act. No. 8:25-CV-00398-JFB-RCC (D. Neb.) [Doc. 28].

In *Hill*, the court noted that the case appeared to be primarily a Sherman Act case, however, counsel for plaintiff expressly conceded that the Sherman Act claim is not strong enough to merit preliminary injunctive relief. *Hill v. Nat'l Collegiate Athletic Ass'n*, Civ. Act. No. 4:25-CV-591[Doc. 31 at ¶ 1]. Hill's counsel argued that a claim under the Arkansas Deceptive Trade Practices Act was sufficient to justify preliminary injunctive relief. [Id. ¶ 2].  at However, the Complaint did not assert such a claim. [Id.]. The Court concluded it would be improper to consider a claim not raised in Hill's original Complaint or in the motion for preliminary injunction.  [Id.].  The court ultimately held:

This is a sad case all around.  Even if it turns out that the NCAA acted entirely appropriately, a superb athlete will be unable to continue to showcase his football talents at the collegiate level—perhaps because of a perfect storm of unfortunate circumstances.  And, to be frank, there is at least a whiff that the NCAA might have acted less than entirely appropriately (intentionally or unintentionally).  But, at the end of the day, the Court cannot, should not, and will not play the role of business monitor of the NCAA.  The Court must focus exclusively on whether the NCAA's actions violated federal

or state law.  Perhaps, with more time, Mr. Hill can prove such a violation

occurred.  But right now, there is not enough to justify preliminary relief.

[Id. at ¶ 5 (footnote omitted)].

The same judge who penned *Pavia* also issued a Memorandum and Order in

***Bellamy et al. v. Nat'l Collegiate Athletic Ass'n***, Civ. Act. No. 3:25-CV-00750 [Doc. 39]

(Aug. 7, 2025).[32]  However, Judge Campbell ruled against the student-athletes:

Plaintiffs rely heavily on the Court's decision in *Pavia*, arguing that many of

the issues decided in that case are equally applicable to these Plaintiffs nine

months later.  In fact, Plaintiffs rely on the expert declaration from Joel Maxcy

that was submitted in the *Pavia* case.  (Doc. No. 1-19).  Although many of

the issues presented are the same, this case is different from *Pavia* in

several ways.  First, although Pavia challenged the same Bylaws as those

at issue in this case, because Pavia had one year of eligibility remaining on

the five-year clock, effectively the only Bylaws at issue were the Bylaws

stating that athletic competition while enrolled in junior college counted

toward the four-years of intercollegiate competition – Bylaws 12.8 and

---

[32] There are four (4) plaintiffs in this case: Christopher Bellamy, Demarcus Griffin, TJ Smith, and Targhee Lambson.

With respect to Christopher Bellamy, the *Pavia* Waiver did not apply to him because 2024–25 was not his final season of eligibility and it did not include relief from the five-year period of eligibility.

With respect to Targhee Lambson, before the court issued the *Pavia* injunction and the NCAA issued the blanket waiver, he  signed with an agent to prepare for a chance to play in the NFL and received $250 per week for training expenses (a total of $2,750). Lambson is currently ineligible to play due to the Bylaw prohibiting the use of an agent, which is not one of the Bylaws plaintiffs seek to enjoin.

12.02.6.  Here, Plaintiffs are eligible only if junior colleges are excluded from the definitions of intercollegiate competition (Bylaw 12.02.6) *and* collegiate institution (Bylaw 14.02.4) so that neither the five-year period of eligibility nor the four years of intercollegiate competition would commence until enrollment at a NCAA institution.

In addition, Dr. Maxcy has expanded upon the opinions offered in ***Pavia*** and has been subject to cross examination at [ ] hearings in ***Elad v. NCAA*** and ***Brzovic v. NCAA***.  In those cases, he conceded that his opinions are based on his "intuition" and "experience" rather than on any economic modeling or analysis. . . .

At this juncture, the Court need not reach those issues because the specific circumstances of the Plaintiffs in this case are different than those of Pavia.  Even assuming Plaintiffs show a likelihood of success on the merits, consideration of the remaining factors – irreparable harm, balance of the equities, and the public interest – leads the Court to conclude that a preliminary injunction is not warranted.

[Doc. 39 at 10–11].  Specifically, the court found that plaintiffs failed to demonstrate the need for immediate preliminary relief and that denying such relief would not necessarily prevent them from regaining the opportunity to play if they ultimately prevail on the merits. [Id. at 13].  Unlike in ***Pavia***, whose irreparable harm was tied directly to the coming season, the court held plaintiffs have not made such a showing.  [Id. at 14].  The court also found

that the "severity of Plaintiffs' asserted injury, that they will be ineligible to play Division I football during the coming season, is tempered by the delay in seeking relief."  [Id.].[33]

In *Giles*, in denying his temporary restraining order, the court held that *O'Bannon* remains controlling law and that *Pavia* "is clearly outside the mainstream case law."[34] Civ. Act. No. 8:25-CV-01488-JVS-KES (C.D. Cal. July 17, 2025) [Doc. 13 at 1]. The court also criticized Giles's delay in seeking relief, drawing two (2) inferences: (1) there was no true urgency, and (2) the timing was tactical, intended to create a sense of urgency.  [Id. at 3].

Most recently, the Court heard the Motions for Preliminary Injunction filed by Giles and two (2) other plaintiffs, Kaedin Robinson and DaJuanye Wingfield, on August 18, 2025.  *Giles v. Nat'l Collegiate Athletic Ass'n*, Civ. Act. No. 8:25-CV-1488 [Doc. 26]; *Robinson[35] v. Nat'l Collegiate Athletic Ass'n*, Civ. Act. No. 2:25-CV-6454 [Doc. 29]; *Wingfield[36] v. NCAA*, Civ. Act. No. 2:25-CV-6875 [Doc. 26].  Relying on *O'Bannon*, the Court denied the motions for preliminary injunction, concluding that the Five-Year Rule

---

[33] The court found the timing is particularly noteworthy for Christopher Bellamy, who has not played college football since the 2023–24 season, and for TJ Smith, who submitted a declaration in the *Pavia* case, but did not seek relief on his own behalf at that time.

[34] While *Pavia* remains in the minority, it is not an outlier—other courts have granted injunctions in favor of student-athletes.

[35] The court also noted that even if it were to find no delay and grant a preliminary injunction, Robinson may still be ineligible to play under the No Agent, No Draft Bylaw because he signed with an agent to represent him and entered his name in the 2025 NFL Draft.  [Doc. 29 at 5, 16].

[36] The court also noted that even if it were to find no delay and grant a preliminary injunction, Wingfield may still be ineligible to play under the Progress-Toward-Degree Bylaw because he took classes that did not count toward his degree.  [Doc. 26 at 6, 16].

constitutes a "true" eligibility rule.  The court explained that the Rule merely "caps the number of years that student athletes can participate in college sports" and is therefore "distinguishable from rules limiting NILs or education-related compensation, where an economic exchange lies at the heart of the rule."  [Id. at 8–10].

The next group of cases involves student-athletes who transferred from Division II to Division I institutions.  Unlike the present case, however, each of those athletes came from a Division II program—not a JUCO—placing their eligibility determinations in a different competitive and regulatory context.  In ***Ciulla-Hall***, ***Brzovic***, ***Fourqurean***, and ***Johnson***, the courts denied the student-athletes an additional year of eligibility.   *See* ***Ciulla-Hall***, 2025 WL 438707, at *2 (Ciulla-Hall attended Stonehill College, where he played NCAA Division II baseball for one (1) season);[37] ***Brzovic***, 2025 WL 1370758 at *1 (Brzovic attended Southeastern Oklahoma State University, where he played NCAA Division II basketball for two (2) seasons);[38] ***Fourqurean***, 143 F.4th at 865 (Fourqurean attended Grand Valley State University, where he NCAA Division II football for two (2) seasons); ***Johnson***, 2025 WL 1790345, at *3 (Johnson attended Western Washington University, where he played NCAA Division II basketball for four (4) years).[39]

---

[37]Nothing has happened in this case since Judge Casper issued an Order on February 7, 2025.  *See* Civ. Act. No. 1:25-CV-10271-DJC (D. Mass.).

[38]Brzovic voluntarily dismissed the action with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i), as the NCAA had not yet filed an answer or dispositive motion. Civ. Act. No. 2:25-CV-02885-DCN (D.S.C.) [Doc. 31].

[39]Johnson voluntarily dismissed the action with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i), as the NCAA had not yet filed an answer or dispositive motion. Civ. Act. No. 9:25-CV-00060-KLD (D. Mont.) [Doc. 35].

The next group involves student-athletes who all started their careers at a Division I institution.  In **Coley**, Coley played four (4) seasons of football at two (2) Division I schools—the University of Maryland and North Carolina State University.  2025 WL 1616719, at *1–2.  He challenged the NCAA bylaw providing that a Division I football player uses a season of eligibility once he appears in more than four (4) games in a season. *Id*. at *2–3.  In other words, playing in more than four (4) games in a single season "burns" a season of eligibility.  In each of his four (4) seasons, Coley exceeded that threshold. *Id*. at *1–2.  He nevertheless sought a hardship waiver, citing both mental and physical struggles throughout his college career.  *Id*. at *3.  The court held that Coley failed to make a clear showing of likely success on the merits and denied his request for an additional year of eligibility.  *Id*. at *10.[40]  On July 15, 2025, Coley voluntarily dismissed the case in its entirety without prejudice under Federal Rule of Civil Procedure 41(a)(1). Civ. Act. No. 5:25-CV-00098-D-BM (D.N.C) [Doc. 25].

In **Hamilton**, Hamilton first enrolled in college in 2019, but did not begin to complete in track and field until 2022 due to a serious injury he sustained in high school.  Hamilton contends that, because he did not qualify as a "student-athlete" under the Bylaws until August of 2022, his eligibility clock should run from 2022–2027, despite enrolling in school in 2019.  The court denied Hamilton's request for a temporary restraining order because he "provide[d] no information about what cause of action he brings against the NCAA or his likelihood of success on the merits."  2025 WL 1615752, at *2. Briefing on the motion

---

[40]The court further held that Alston does not require applying the Sherman Act to the challenged Bylaws merely because they indirectly impact a student-athlete's ability to earn NIL compensation.  2025 WL 1616719, at *6.

for preliminary injunction is currently underway.  *See* Civ. Act. No. 2:25-CV-00924-NJB-MBN (E.D. La.).

The NCAA cited ***Zeigler*** in its brief to support its position that most district courts have denied injunctive relief in similar cases brought by student-athletes.  While the court in ***Zeigler*** did deny such relief, that case involved a student-athlete who had already completed four (4) years of competition at the University of Tennessee.  2025 WL 1671952.  Zeigler alleged that the Four-Seasons Rule is an unreasonable restraint on student-athlete services and NIL compensation in violation of the Sherman Act.  *Id.* at *1–2.  Notably, the ***Zeigler*** court also held that the Four-Seasons Rule is commercial in nature and therefore subject to the Sherman Act.  *Id.* at *3.  Zeigler filed a Notice of Appeal on June 17, 2025, but voluntarily dismissed it, and the Sixth Circuit dismissed the appeal on July 2, 2025.  Civ. Act. No. 3:25-CV-00226-KAC-DCP (E.D. Tenn.) [Docs. 42 & 45].

***Zeigler*** differs significantly from the case at hand. Zeigler sought a wholesale change to the NCAA's Four-Seasons Rule—essentially asking the court to create a universal Five-Seasons Rule that would grant all student-athletes five (5) years of eligibility. In contrast, plaintiffs here seek a narrowly tailored remedy: recognition that time spent competing at a JUCO should not count against their NCAA eligibility, particularly where those years occurred outside the NCAA.

The remaining three (3) cases deal with student-athletes who have a mix of Division I, Division II, and JUCO experience.  In ***Wade***, Wade attended UC Davis (2018–2019) but did not play basketball.  2025 WL 5212665, at *1.  He spent three (3) years at Contra Costa College (JUCO), then transferred to Cal State Northridge (Division I), receiving a

medical hardship waiver for 2022–2023.  *Id.*  He played at Cal State Stanislaus (Division II) in 2023–2024 before transferring to Southern Miss for 2024–2025.  *Id.*  The court denied his request for an *ex parte* temporary restraining order.  *Id.* at *4.  The court noted that Wade's eligibility dispute with the NCAA dated back to at least July 2024, making it improper to grant an *ex parte* order without allowing the NCAA to respond.  *Id.* at *3. The court also found Wade had not alleged that he was or would be in the starting lineup, play in games, hold a leadership role, or generate specific NIL income.  *Id.*  The court ultimately reasoned that absent more on the record, a temporary restraining order was not necessary when it is not clear whether Wade would even garner playing time or what amount of NIL compensation Wade would receive.  *Id.*  A hearing on a motion for preliminary injunction was held January 10, 2025, followed by three (3) telephonic settlement conferences.  Civ. Act. No. 2:24-CV-00196-TBM-RPM.  [Doc. 12].  On January 17, 2025, the court entered an Order of Dismissal with Prejudice based on the parties' joint *ore tenus* motion. [Doc. 20].

In ***Osuna***, Osuna began his collegiate baseball career at Walters State, a JUCO, where he played for two (2) seasons.[41]  2025 WL 684271, at *1.  Osuna then transferred to UNC Chapel Hill and played three (3) seasons with the Tar Heels.  *Id.* The court first pointed out that the December 2024 Waiver issued after ***Pavia*** did "not apply to Osuna, however, because it only covers athletes who will use this year of eligibility in the 2025–26 academic year. Osuna would use his year of eligibility in the 2024–25 academic year by playing this spring, so the Blanket Waiver is of no benefit to him."  *Id.* at *2.  Nonetheless,

---

[41] His first season was cut short due to COVID-19.

Osuna chose to enter the transfer portal and give Division I baseball another shot.  He committed to the University of Tennessee in January 2025.  *Id*.

Unlike plaintiffs in this case, who are attempting to use a year of eligibility in the 2025–2026 academic year, Osuna attempted to use a year of eligibility in the 2024–2025 academic year, which was not covered by the December 2024 Waiver.  The court held that: "Readily characterizing all eligibility rules as commercial, which is the logical end to Plaintiff's position, may overextend *Alston* and contravene the Sixth Circuit's instruction to consider only 'the rule itself' when conducting this inquiry."  *Id*. at *4.  The court also found that the "case's current posture and its largely undeveloped record causes the Court to question whether it can readily characterize the challenged restraint as anticompetitive after only a 'quick look.'"  *Id*.  On May 21, 2025, the court entered an Order stating:

> The Court recently denied Plaintiff's motion for reconsideration and indicated that the parties "may file a motion to reopen this case within 14 days of the Sixth Circuit's decision in *Pavia*." [Doc. 46 at 7]. The Court enters this order to clarify that if the parties believe that this litigation should continue while *Pavia* remains pending on appeal, they may file a motion requesting such relief, and the Court will entertain the motion.

Civ. Act. No. 3:25-CV-00062 [Doc. 47].

In *Walker*, Walker spent two (2) years at a JUCO and two (2) years at a Division II institution.  Ultimately, the court found that Walker's delay in filing was excessive and unreasonable.  2025 WL 1901907, at *6.  The court noted that the NCAA may file

responsive pleadings to Walker's Complaint under the usual deadlines prescribed by the Federal Rules of Civil Procedure.  *Id*. at *8.

Every lawyer's favorite phrase applies to the case law on this issue: "It depends." With today's decision, the case law on this issue now reflects a 8–4 split as to whether participation at a junior college begins a student-athlete's eligibility clock.  "District courts can and often do reach opposite conclusions when confronted with similar issues, and appellate courts exist to resolve those disagreements."  *Osuna*, 2025 WL 1463149, at *2. Out of the nineteen (19) cases listed above, only one (1) has made its way to a United States Court of Appeals.  Until this Court receives guidance from the Supreme Court of the United States or the Fourth Circuit, it remains steadfast in its view that, in the post-NIL and post-*Alston* landscape, the Challenged Rules are so closely intertwined with commercial regulations and benefits that they are, in effect, commercial in nature and thus subject to the Sherman Act.

The NCAA argues the "result would permit student athletes to compete in *eighteen seasons of intercollegiate competition*: two seasons of JUCO competition, four seasons in Division III, Division II, and NAIA competition, only then to matriculate to a DI member institution at roughly the age of thirty-two with a fresh four-season clock." [Doc. 12 at 4 (emphasis in original)].  That outcome is a mischaracterization of this Court's holding.  The Court is not endorsing unlimited eligibility across multiple associations.  Rather, the Court finds that time spent competing at a JUCO—an institution outside the NCAA's direct governance—should not count against a student-athlete's NCAA eligibility.  The eligibility "clock" should begin only when the student-athlete enrolls at an NCAA-member institution,

consistent with the principle that the NCAA's rules should not retroactively penalize participation in non-NCAA competition.

This Court echos the sentiment of the **_Elad_** court:

> Nevertheless, it is difficult to discern which district court will ultimately be proven correct.  To be clear, this Court means to express no hubris in this regard.  The divergence of opinions at the district court level is evidence of only one thing: the uncertain landscape we now find ourselves in post **_Alston_** where well-reasoned and intentioned district judges may disagree.  It is readily apparent that guidance from the courts of appeals, and possibly the Supreme Court, is needed.  This Court welcomes that guidance, and if ultimately deemed incorrect in its analysis, will have clearer precedent to follow moving forward.  In the interim, until this matter is fully adjudicated, or this court receives the necessary guidance on the impact and limitations the Supreme Court intended, [Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington] play[ ].

2025 WL 1202014, at *11.

## V.    Security

Plaintiffs request that this Court not require security in this case. [Doc. 6 at 24]. Counsel for the NCAA stated that it would not require a bond.  Based on the parties representation, and the Court's review of the record before it, the Court finds that because it does not appear that the NCAA will suffer any financial burden in complying with this

61

injunctive relief, no security is necessary. Accordingly, the Court finds that no security will need to be posted prior to the issuance of the accompanying Order.

## VI.    Rule of Restitution

Plaintiffs ask this Court to enjoin the NCAA's Rule of Restitution (Bylaw § 12.11.4.2) in addition to the Challenged Rules. [Doc. 6 at 23–24]. The NCAA does not oppose this request. As this Court held in ***Ohio***:

> NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," provides:

> **12.11.4.2 Restitution.** If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed, or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:

(a)  Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b)  Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c)  Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d)  Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e)  Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f)  Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g)     Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h)     Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i)     Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

[Doc. 2-2 at 79–80].  The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor.  It is in fact a measure designed to inhibit a person's access to the courts.

64

Knowing this, many Division I institutions will not permit the student-athlete to compete, even if a court issues a temporary restraining order or a preliminary injunction finding that those rules are likely illegal. This, in turn, deters student-athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

It appears to this Court that the Rule of Restitution's purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor. The Rule of Restitution forces student-athletes to run the risk of severe personal punishment and the risk of subjecting their institutions or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. For instance, suppose this Court issues an injunction that allows a student-athlete, like RaeQuan Battle, to play for the remainder of the 2023–2024 basketball season. Suppose, hypothetically, WVU goes on to win the Big 12 Championship and National Championship. If this Court does not enjoin NCAA Bylaw 12.11.4.2, NCAA could require that WVU be stripped of the Big 12 and National Championship Titles, all over WVU following a court order instructing WVU that RaeQuan Battle is good to play on gamedays. Thus, this Court will enjoin NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions.

706 F.Supp.3d at 600–602. *See also Pavia*, 760 F.Supp.3d at 545 (enjoining the NCAA from enforcing the Rule of Restitution); *Elad*, 2025 WL 1202014, at *10–11 (same); *Braham*, 2025 WL 2017162, at *10 (same).

It is self-evident that the Rule of Restitution would chill both plaintiffs' and WVU's ability to rely on this Court's injunction by exposing them to severe penalties should the injunction later be voluntarily vacated, stayed, or reversed.  Consistent with its decision in *Ohio*, this Court sees no reason to depart from that reasoning and holds that the Rule of Restitution must be enjoined for the injunction to have effect.

## VII.    Conclusion

For the reasons set forth above, the Court will **GRANT** plaintiffs Motion for Temporary Restraining Order and Preliminary Injunction [**Doc. 5**].  The NCAA will be **ENJOINED** from enforcing the Five-Year Rule as it applies to Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington.  The NCAA is **ORDERED** to immediately grant West Virginia University and/or Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington's waivers of any NCAA eligibility rule that would preclude them from engaging in intercollegiate competition in the 2025–2026 season based on their time spent at a junior college.  The NCAA is also **ORDERED** to declare Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington eligible to play for West Virginia University during the 2025–2026 season.  No security will be required.

Finally, the NCAA is **ENJOINED** from enforcing its Rule of Restitution (Bylaw § 12.11.4.2) against Jimmori Robinson, Jeffrey Weimer, Tye Edwards, Justin Harrington and/or West Virginia University for complying with, and relying on, this Order.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** August 20, 2025.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE