**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JIMMORI ROBINSON,**
**JEFFREY WEIMER, TYE**
**EDWARDS and JUSTIN**
**HARRINGTON,**

**Plaintiffs,**

**v.** **Civil Action No. 1:25-cv-75**
**Honorable John Preston Bailey**

**NATIONAL COLLEGIATE**
**ATHLETIC ASSOCIATION,**

**Defendant.**

---

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

Plaintiffs Jimmori Robinson, Jeffrey Weimer, Tye Edwards, and Justin Harrington ("Plaintiffs"), by and through counsel, file their *Response in Opposition to Defendant's Motion to Dismiss*.

"The Court must 'accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *See Skyline Restoration, Inc. v. Church Mut. Ins. Co.* 20 F.4th 825, 829 (4th Cir. 2021) (*quoting King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face.'" *Strickland v. United States*, 32 F.4th 311, 347 (2022) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009)).

II. **Plaintiffs' Amended Complaint Sufficient Pleads a Relevant Market and Plausible Harms to Competition within that market.**

"The Supreme Court has cautioned that identifying the scope of a relevant market requires resolving empirical questions that 'can be determined only after a factual inquiry into the commercial realties faced by consumers.' *Eastman Kodak Co. v. Image Tech Servs., Inc.,* 504 U.S. 451, 482, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) (citation and quotation marks omitted). Accordingly, we have recognized that 'market definition is deeply fact-intensive inquiry,' and that courts therefore 'hesitate to grant motions to dismiss for failure to plead a relevant product market.' *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (citation and quotation marks omitted). Motions to dismiss should generally not be granted in such cases except '[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products.' *Id*." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d. Cir. 2024).

"Consequently, dismissal of an antitrust claim for failure to plead the relevant market can be problematic." *E.I. du Pont de Nemours & Co. v. Kolon Indus*. 637 F.3d 435, 443 (4th Cir. 2011). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motion to dismiss for failure to plead a relevant product market. *See Found for Interior Design Educ. Research v. Savannah Coll. Of Art & Design*, 224 F.3d 521, 531 (6th Cir. 2001) ('Market definition is a highly fact-based analysis that generally requires discovery.') (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S. Ct. 2072, 119 L.Ed. 2d. 265 (1992)); *Double D Spotting Serve., Inc. v. Supervalu, Inc.*, 136 F. 3d 554, 560 (8th Cir. 1998) (noting that 'courts are hesitant to dismiss antitrust action before the parties have had an opportunity for discovery.'); *Queen*

*City Pizza, Inc. v. Domino's Pizza, Inc*., 124 F.3d 430, 436 (3d Cir. 1997) (explaining that 'in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers') (citing *Easement Kodak,* 504 U.S. at 482, 112 S. Ct. 2072); *cf. Hayden Pulb'g Co. v. Cox Broad, Corp*., 730 F. 2d 64, 70 n. 8 (2d Cir. 1984) ('The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that "a pronouncement as to market definition is not one of law, but of fact…"') (citations and alterations omitted). There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market. *Queen City*, 124 F.3d at 436." *Id*. (*quoting Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).

"Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure to even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id*. (*quoting Todd,* 275 F.3d at 200)).

The Amended Complaint identifies the proposed relevant market to be for the labor of NCAA Division 1 college football players. (ECF No. 43 at ¶62). Defendant motion argues that Plaintiffs have failed to offer allegations concerning interchangeability; cross-elasticity of demand; and that Plaintiffs make a self-defeating market definition because Plaintiffs acknowledge that there are other platforms for which post-high school athletes may compete.

The Amended Complaint alleges that "the NCAA has both monopsony power over the services of college athletes and monopoly power over the performance and

broadcasts of college sports in the relevant market." (ECF No. 43 at ¶61). The Amended Complaint further alleges that "NCAA Division I member institutions compete to obtain and retain the best Division 1 football players by providing in-kind benefits, namely, Division I scholarships, access to academic programs, access to training facilities, and instruction from premier coaches. In some cases, the capped compensation includes pay in case, through the provision of a housing and food allowance" (*id*. at ¶62); "[O]nly Division I member institutions have the ability to engage in revenue sharing with student-athletes" (*id.* at ¶64); "The National Junior College Athletic Association ("NJCAA") does not permit revenue sharing with student-athletes (*id*. at ¶66); "The National Association of Intercollegiate Athletics does not permit revenue sharing with student-athletes" (*id*. at ¶67); "The NCAA enjoy near complete dominance of, and exercise monopsony power in, the market for services of Division I football" (*id*. at ¶70).

"The fact that this case involves a buyer-side conspiracy affects how the market is defined. Normally, the market 'is composed of products that have reasonable interchangeability for the purposes for which they are produced - - price, use and qualities considered.' *AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). 'In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product.' *Id*.; *see also IIA Phillip E. Agreeda et al*., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* P. 562a (1995). Thus, the inquiry is whether a 'hypothetical cartel' would be 'substantially constrained' from increasing prices by the ability of customers to switch to another producer. *AD/SAT*, 181 F.3d at 228. There is a

danger in applying these factors mechanically in the context of monopsony or oligopsony. These factors are reversed in the context of a buyer-side conspiracy. Blair & Harrison, *supra*, at 324; *see also* IIA Agreed et al., *supra*, P 574, at 302 n. 12 (explaining that the equation for measuring market power in monopsony is a 'mirror image' of the relationships that create market power in a seller"). In such a case, 'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.' Blair & Harrison, *supa*, at 324. A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question. *See id.*; *see also* IIA Areeda et al., *surpa.* P 574, at 302 n. 12." *Todd v. Exxon Corp*., 275 F.3d 191, 202 (2001).

As stated *supra,* Plaintiffs allege sufficient facts that would justify the relevant market being Division 1 college football labor. Division 1 is the only market that provides special benefits of attending Division 1 member institutions, including premier coaching, in kind benefits, name image and likeness opportunities, and revenue sharing.

The NCAA, in part, alleges that Plaintiffs have failed to allege how they could not be paid to play football in the NFL. Similar to the defendants in *Todd*, who argued that plaintiffs should not have limited their proposed markets to exclude employers of lawyers to the oil and petrochemical industry (*Id* at 203), the NCAA essentially argues that Plaintiffs have narrowed its proposed market (Division I football players) without considering a non-NCAA football option.

Division I college football offers premier coaching, academics opportunities, significant name, image and likeness opportunities and revenue sharing and national exposure. The uniqueness of Division 1 differentiates it from any other substitute. No

other division in the NCAA structure allows for revenue sharing (ECF No. 43 at ¶65). While Defendant would have this Court believe that this is simply a different payment structure, it is on its face not. It is additional compensation exclusive to one division within the NCAA hierarchy. Neither the NJCAA nor the NAIA permit revenue sharing (*Id*. at ¶ 66-67). Unlike amateur athletics, professional leagues do not offer academic opportunities or programs to attain degrees in higher education (*Id*. at ¶68).

Defendant, arguing against the Plaintiffs proposed market, separate these aspects. On the one hand, Defendant argues that revenue sharing is just another method of payment, rather than additional commercial opportunism exclusive to Division I, and therefore Plaintiffs have failed to allege substitutes that provide payment for college football, such as the NFL. Then Defendant argues that JUCO is a suitable substitute for Division I football because college athletes can compete, without mentioning the disparity in Division I financial opportunities or exclusive of revenue sharing.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E.I. du Pont de Nemours & Co*., 353 U.S. 586, 593-595. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as separate economic entity, the product's peculiar characteristics and uses, unite production facilities, district customers, distinct prices, sensitively to price changes, and specialized vendors." *Brown Shoe Co., v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 510 (1962).

Plaintiffs allege sufficient facts to distinguish the relevant market within the world of college football and the lack of an interchangeable substitute of potential "buyers" of college football labor.

Plaintiffs have also sufficiently alleged that the JUCO Penalty harms the relevant market. The JUCO Penalty artificially restricts the number of potential Division I football players.

"While employees who are precluded from selling their labor have not necessarily suffered an antitrust injury, 'employees may challenge antitrust violations that are premised on restraining the employment market.' Phillip Areeda & Herbert Hovenkamp, Antitrust Law P 337A (rev. ed. 1995) (footnotes omitted); see also Brian R. Henry, 'Sorry, We Can't Hire You… We Promised Not To': The Antitrust Implication of Entering Into No-Hire Agreements, 11-Fall Antitrust 39 (1996) ('Most courts considering the issue have held that employees suffer 'injury' recognized by the antitrust laws when their employment opportunities are restricted by a no-hire agreement between employers and thus having standing to sue the entity imposing such a provision.'). As a leading treatise on antitrust states: 'Antitrust law addresses employer conspiracies controlling employment terms precisely because they tamper with the employment market and hereby impair the opportunities of those who sell their services there. Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services. It would be perverse indeed to hold that the very object of the law's solicitude and the persons most directly concerned - - perhaps the only persons concerned – could not challenge the restraint.'" *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140-41 (3d. Cir. 2001).

The NCAA enforces the rules on behalf of its members, the competitors, against retaining football players who had used a portion of their eligibility period at non-NCAA institutions. "The NCAA is an association of schools which compete against each other to attract television revenues, not to mention fans and athletes." By limiting the potential pool of athletes that the competing schools can draw from to fill their roster, the NCAA and its members have created a horizontal restraint on Division I football players.

Plaintiffs were recruited to play at West Virginia University. The arbitrary constraints at issue here limit competitors from recruiting athletes who have participated, in part, in a non-NCAA organization. That the NCAA's policies may be beneficial to those athletes who are able to play at a Division I member institution is irrelevant.

**III Plaintiffs State Law Claims Have Been Sufficiently Plead**

Under West Virginia law, "to establish prima facie proof of tortious interference, a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *C. W. Dev. v. Structures, Inc.*, 185 W. Va. 462, 465, 408 S.E.2d 41, 44 (W. Va. 1991). "However, a plaintiff is not required to establish a prima facie case at the pleading stage. Instead, the circuit court should examine the allegations as a whole to determine whether they call for relief on any possible theory, and it may not dismiss a complaint where sufficient facts have been alleged that, if proven, would entitle the plaintiff to relief." *Mountaineer Fire & Rescue Equip., LLC v. City Nat'l Bank of W. Va.* 244 W. Va. 508, 522, 854 S.E.2d 870, 884 (W. Va. 2020). "Although the plaintiffs need not prove a link between the damages they complain of and defendants' alleged misconduct at the motion to dismiss state, they

must at least allege some fact that would allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Imagine Medispa, LLC v. Transformations, Inc.,* 999 F. Supp. 873, 884 (S.D. W. Va. 2014) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009)).

Count I and II of the Amended Complaint allege that Plaintiffs had a contractual relationship with West Virginia University; had contractual relationships with Country Roads Trust, Gold and Blue Enterprises, and other third parties for the use of their names, images and likeness; that the NCAA was aware of these relationships by acting in an arbitrary and/or capricious manner with regard to Plaintiffs' eligibility, ignored Plaintiffs' rights and violated the NCAA's own rules and guidelines; and that the Plaintiffs were harmed by the alleged interference.

This Court considered similar counts and allegations in a separate matter and found that the plaintiff in that case sufficiently plead tortious interference. *See Battle v. NCAA*, 2024 U.S. Dist. LEXIS 94501 at 8-9, 2024 WL 4685604 (N.D. W. Va. May 28. 2024). Plaintiffs have sufficiently pled a tortious interference in Counts I and II of the Amended Complaint. The NCAA's motion to dismiss this Count should be denied.

To maintain a third-party beneficiary contract action under West Virginia law, the agreement between the contracting parties "must have been made for the third-party's sole benefit." *Robinson v. Cabell Huntington Hospital, Inc.*, 201 W. Va. 455, 460, 498 S.E.2d 27, 32 (W. Va. 1997). The West Virginia Supreme Court of Appeals has held that W. Va. Code § 55-8-12 was applicable "wherein the plaintiff was one of a class of persons designated in a contract for whose benefit the contract was made; and that a member of such class could maintain an action at law, although not a party to the contract." *United*

*Dispatch v. E. J. Albrecht Co.*, 135 W. Va. 34, 42, 62 S.E.2d 289, 294 (W. Va. 1950) (*citing Jenkins v. Railway Co.,* 61 W. Va. 597, 57 S.E. 48 (W. Va. 1907)); *see also Goff v. Penn Mut. Life Ins. Co.*, 229 W. Va. 568, 572, 729 S.E.2d 890, 894 (W. Va. 2012).

> "It is well established that formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 434, 361 (D.C. Cit. 2005) (internal citation omitted). "[T]he Conference Bylaws constitute[] a contractual agreement between the Parties." *Rutgers The State Univ. v. Am. Ath. Conf.*, No. 12-7898, 2013 U.S. Dist. LEXIS 1572144, 2013 WL 5936632 at *8 (D. N.J. 2013); see also *Compton v. Alpha Kappa Alpha Sorority, Inc*., 64 F. Supp. 3d 1, 16 (D.D.C. 2014) (finding "[an] [organization's] Constitution and Bylaws form a contract between that [organization] and its members.").

*Mt. E. Conf. v. Franklin Univ.* 2023 U.S. Dist. LEXIS 39017, 2023 WL 2415277 at 10-11* (N. D. W. Va. 2023). The Constitution and Bylaws of the NCAA are binding agreements between the NCAA and its members. During all relevant times, Plaintiff was a collegiate student-athlete.

The NCAA Constitution—as cited directly in Plaintiff's Complaint—is quite clear that student-athletes are the beneficiaries of the NCAA's agreements:

> The National Collegiate Athletic Association is a voluntary, self-governing, organization for four-year colleges, universities and conferences ***committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion*.** Member institutions and conference believe that intercollegiate athletics programs provide ***student-athletes***, with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience. The member schools and conferences likewise are committed to integrity and sportsmanship in their athletic programs and to institutional control of and responsibility for those programs. The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national

> championships, as an integral part of the education program and the student-athlete as an integral part of the student body. (*Adopted: 1/20/2022 effective 8/1/2022).*

NCAA Constitution Preamble (emphasis added). The NCAA Constitution further provides:

> Intercollegiate student-athletes are matriculated, degree-seeking students in good standing with their institution who choose voluntarily to participate in NCAA sports. It is the responsibility of each member institution to establish and maintain an environment in which a student-athlete's activities are conducted with the appropriate primary emphasis on the student-athlete's academic experience.

NCAA Constitution, Article 1(A): Principles (The Primacy of Academic Experience):

> Student-athletes may not be compensated by a member institution for participating in a sport but may receive educational and other benefits in accordance with guidelines established by their NCAA division.

NCAA Constitution, Article 1(B): Principles (The Collegiate Student-Athlete Model):

> Intercollegiate athletic programs shall be conducted by the Association, divisions, conferences and member institutions in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes.

NCAA Constitution, Article 1(D): Principles (Student-Athlete Well-Being):

> Divisional bylaws shall be designed to promote informed decisions and balance the interests or prospective and current (or transfer) student-athletes, their education institutions and intercollegiate athletics as a whole.

NCAA Constitution, Article 1(H): Principles (Recruiting Standards):

> Bylaws shall be designed to promote the opportunity for institutions and eligible student-athletes to engage in fair competition. This commitment requires that all member institutions compete without the framework of the Collegiate Model of athletics in which athletics competition is an integral part of the student-athlete's effort to acquire a degree in higher education.

NCAA Bylaws, Article 20.10.1.3: Division Membership (The Commitment to Fair Competition).

It would make sense that the bylaws and constitution of the governing body for collegiate athletics would be for the benefit of the student-athlete without whom the very concept of collegiate athletics would not exist. It would make sense that bylaws and regulations would be put into place to ensure fair competition and protect student-athletes from privation and predation by coaches, institutions, and conferences, *etc*., while helping to ensure they obtain a degree in higher education. It would make sense that tournaments and matches, rules, and regulations for respective sports are generated for the benefit, the very health and safety, of the student-athletes. What does not make sense is the position taken by the NCAA that "[W]hile the NCAA creates opportunities for student-athletes, that is not enough to give those student-athletes the right to sue as third-party beneficiaries, at least not under West Virginia law, when it is clear that this was not the sole purpose of the alleged agreements." (ECF 45 at p. 17).

Plaintiffs allege that Defendants have breached the aforementioned provisions of the agreements for which they are the sole beneficiaries. Plaintiffs have sufficiently pled that they are third-party beneficiaries to the Bylaws and Constitutions of the NCAA, and therefore, NCAA's motion to dismiss Count III of the Amended Complaint should be denied.

Plaintiffs have also sufficiently alleged a claim for negligent and fraudulent misrepresentation.

"'One under a duty to give information to another, who makes an erroneous statement when he has no knowledge on that subject, and thereby misleads the other to his injury, is as much liable in law as if he had intentionally stated a falsehood.' Syllabus

Point 1, *James v. Piggott*, 70 W. Va. 435, 74 S.E. 667 (1910)." *Folio v. City of Clarksburg*, 221 W. Va. 387, 405, 655 S.E.2d 143 (2007).

> [I]t is elementary doctrine that a false representation may be made scienter, so as to afford a right of action in damages, in contemplation of law, in any of the following ways: (1) with actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; or (3) under circumstances in which the person making it ought to have known if he did not know of its falsity. *State v. Berkley*, 41 W. Va. 455, 23 S.E. 608 [1985]; 1 Bigelow, Frauds, 509. A representation in respect to a matter, with the intent to influence the conduct of another, implies necessarily the belief of the party making it that the statement is true. If the fact be within his means of knowledge, and he have no knowledge of the fact, a jury would be authorized to believe that the statement was knowingly false. The question of whether a defendant should know the falsity of his representations was squarely met in *Osbourne v. Holt, supra*. It was there held that one who represents that a certain condition exists with the expectation that another will act thereon, when in fact he has no knowledge and regard thereto, will be as liable to another who deals with him on the basis of such representation, should it turn out to be false, as though he knew of the falsity thereof at the time it was made. "He is under a duty to know," said the court, "that the things he represents as facts are in fact true at the time he makes the representation. It is no excuse for him to say that he did not know they were false." Citing in support thereof the decided cases of *Stout v. Martin*, 87 W. Va. 1, 104 S.E. 157; *James v. Piggott*, 70 W. Va. 435, 74 S.E. 667; *Tolley v. Poteet*, 62 W. Va. 231, 57 S.E. 811; *Crislip v. Cain*, 19 W. Va. 438.

*Id*. at 405-406 (*quoting Horton v. Tyree*, 104 W. Va. 238, 242-43, 139 S.E. 737, 738 (1927)). The Amended Complaint alleges that the statement issued by the Defendant on or around December 23, 2024, was false, or alternatively incomplete. The Amended Complaint alleges that the Defendant knew or should have known that Plaintiffs and other student-athletes in similar circumstances to Plaintiffs would act and rely upon the

statement. Defendant was in a unique position of knowledge and held a special relationship to Plaintiffs. Defendant is the ultimate authority in eligibility of student-athletes in Division I football. The NCAA's governing documents stated that their bylaws "shall be designed to ***promote informed decisions and balance the interests of prospective and current (or transfer) student-athletes***, their education institutions and intercollegiate athletics as a whole." NCAA Constitution, Article 1(H) (Recruiting Standards) (***emphasis added***).

The NCAA attaches a copy of the "Pavia Waiver," has evidence to overcome the requirement that facts plead be assumed as true. However, the attachment is definitive proof. The NCAA does not identify how the Waiver was released or to whom it was released. It does not even argue that the Waiver produced was the representation provided to Plaintiffs. It does not contradict the allegations in the Amended Complaint that the representations to the Plaintiffs, and others like them, were either false or incomplete (ECF 43 at ¶ 138-39). It does not contradict the allegations that the NCAA had a duty to disclose the full nature of the Waiver. (ECF 43 at ¶ 158).

If anything, the provided Waiver strengthens Plaintiffs' claim of fraudulent misrepresentation. Contrary to the NCAA's arguments, Plaintiffs never admitted to receiving the Waiver. It was the fact that they never received it, and the NCAA, or third parties, made the misrepresentation, and the NCAA made no effort to correct the misrepresentations or fully announce the Waiver's extent until after the damage was done, all while having knowledge that Plaintiffs and similar athletes were acting upon the misrepresentation.

NCAA further argues that Plaintiffs have failed to allege damages for Count V of the Amended Complaint (ECF No. 45 at p.18-19). However, the Amended Complaint explicitly alleges that Plaintiffs were damaged by the negligent and fraudulent misrepresentations. (ECF No. at ¶¶ 161-62). This Court has previously stated in the order permitting the amendment that "Plaintiffs allege facts sufficient at this stage to plead a claim for negligent and/or fraudulent misrepresentation." (ECF No. 42).

Plaintiffs have sufficiently pleaded a claim for negligence. Negligence constitutes a defendant had a duty of care, breach of that duty, and damages caused by the breach. *Webb v. Brown & Williamson Tobacco Co*., 2 S.E.2d 898, 899 (W. Va. 1939). Plaintiffs have alleged that Defendant had a duty of care to the Plaintiffs. One that may be more specific, the NCAA's governing documents stated that their bylaws "shall be designed to ***promote informed decisions and balance the interests of prospective and current (or transfer) student-athletes***, their education institutions and intercollegiate athletics as a whole." NCAA Constitution, Article 1(H) (Recruiting Standards) (***emphasis added***). The NCAA has argued that these are not contractual agreements for which Plaintiffs could assert a claim for breach of contract as a third-party beneficiary. What then does this provision of the governing documents mean? "One who engages in affirmative conduct and thereafter realizes or should realize that such conduct created an unreasonable risk of harm to another, is under a duty of care to exercise reasonable care to prevent the threatened harm." *Syl. Pt. 2.* Robertson v. LeMaster*,* 171 W. Va. 607, 301 S.E.2d 563 (1983). Here, the NCAA assumed the duty of providing information for the informed decision of prospective or current student-athletes. Plaintiffs allege that they have breached its duty.

As to the contention that Plaintiffs' negligence claims are barred by the economic loss doctrine, a special relationship exists between Plaintiffs and NCAA. Plaintiffs allege that the NCAA was aware that similar situated student-athletes were making decisions upon its negligence and it was foreseeable that Plaintiffs would do the same and be harmed. NCAA's argument that Plaintiffs' negligence claims are barred are without merit.

The NCAA's motion to dismiss Plaintiffs' negligence counts should be denied.

**CONCLUSION**

For the foregoing reasons, the Defendant's motion to dismiss should be denied.

Dated: August 21, 2026.

**JIMMORI ROBINSON,**
**JEFFREY WEIMER, TYE**
**EDWARDS and JUSTIN**
**HARRINGTON,**
**By Counsel**

***/s/ James A. Gianola***
James A. Gianola (WV Bar #1378)
LEWIS GIANOLA PLLC
1714 Mileground Road
Morgantown, WV 26505
(304) 291-6300 (Office)
(304) 291-6307 (Fax)
jgianola@lewisgianola.com

Andrew W. Holbrook (WV Bar #12663)
LEWIS GIANOLA PLLC
300 Summers Street, Suite 700
Charleston, WV 25301
(304) 345-2000 (Office)
(304) 343-7999 (Fax)
dholbrook@lewisgianola.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JIMMORI ROBINSON,**
**JEFFREY WEIMER, TYE**
**EDWARDS and JUSTIN**
**HARRINGTON,**

**Plaintiffs,**

**v.** **Civil Action No. 1:25-cv-75**
**Honorable John Preston Bailey**

**NATIONAL COLLEGIATE**
**ATHLETIC ASSOCIATION,**

**Defendant.**

**CERTIFICATE OF SERVICE**

I, James A. Gianola, certify that on August 21, 2026, the ***"RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS"*** was filed via CM/ECF, which will send notification of such filing to counsel of record.

***/s/ James A. Gianola***

James A. Gianola (WV Bar #1378)
LEWIS GIANOLA PLLC
1714 Mileground Road
Morgantown, WV 26505
(304) 291-6300 (Office)
(304) 291-6307 (Fax)
jgianola@lewisgianola.com

Andrew W. Holbrook (WV Bar #12663)
LEWIS GIANOLA PLLC
300 Summers Street, Suite 700
Charleston, WV 25301
(304) 345-2000 (Office)
(304) 343-7999 (Fax)
dholbrook@lewisgianola.com