**•IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Clarksburg**

**JIMMORI ROBINSON,**
**JEFFREY WEIMER,**
**TYE EDWARDS,** and
**JUSTIN HARRINGTON,**

Plaintiffs,

v.

**CIVIL ACTION NO. 1:25-CV-75**
Judge Bailey

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**

Defendant.

**ORDER**

Pending before the Court is Defendant National Collegiate Athletic Association's Motion to Dismiss the Amended Complaint [Doc. 44], filed August 7, 2026. Plaintiffs filed a Response in Opposition [Doc. 46] on August 21, 2026. A Reply [Doc. 47] was filed on August 28, 2026. For the reasons that follow, the Court will grant in part and deny in part the Motion.

## I. Background

Plaintiffs initiated this matter on August 1, 2025, in an effort to become eligible to participate in the 2025–26 NCAA football season. [Doc. 1]. After considering the parties' briefing and oral argument, this Court granted plaintiffs a temporary restraining order ("TRO") and preliminary injunction, allowing them to play football for West Virginia University. [Doc. 17]. The NCAA appealed that decision. [Doc. 18].

On April 3, 2026, the United States Court of Appeals for the Fourth Circuit vacated the preliminary injunction and remanded this matter, ruling this Court did not properly define the relevant market for plaintiffs' services. ***Robinson v. Nat'l Collegiate Athletic Ass'n***, 172 F.4th 271 (4th Cir. 2026). On April 28, 2026, this Court ordered the NCAA to answer plaintiffs' Complaint. [Doc. 29]. On May 12, 2026, the NCAA filed a Motion to Dismiss, arguing, *inter alia*, that plaintiffs' claims were rendered moot due to their participation in the 2025–26 NCAA football season. [Docs. 33 & 34]. Per Rule 7.02(b)(1) of the Local Rules of Civil Procedure, a response to the NCAA's Motion was due May 26, 2026.

May 26, 2026, came and went, and plaintiffs did not file a response to the NCAA's Motion to Dismiss. Meanwhile, on May 18, 2026, this Court entered a Scheduling Order which provided a deadline of June 11, 2026, for joinder and amendments. [Doc. 37 at 1]. On June 11, 2026, plaintiffs filed a Motion for Leave to Amend the Complaint. [Doc. 38]. After briefing, the Court granted plaintiff's Motion to Amend [Doc. 42] and plaintiffs filed their Amended Complaint [Doc. 43].

On August 7, 2026, the NCAA filed the instant Motion to Dismiss. *See* [Doc. 44]. As a threshold matter, the NCAA argues the Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because plaintiffs lack standing to maintain their lawsuit because this Court's granting injunctive relief through the 2025–2026 football season remedied plaintiffs' complained-of injuries, and the injunctive relief has rendered their lawsuit moot. [Doc. 44 at 1; Doc. 44-1 at 3–4].

Next, the NCAA argues this Court should dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) because plaintiffs have not alleged facts that render any of their claims to relief plausible. [Doc. 44 at 1; Doc. 44-1 at 4–14].

The NCAA further asserts if the Court dismisses the Sherman Act claims, then the Court should decline to exercise jurisdiction over the remaining state-law claims because the NCAA and plaintiffs are not completely diverse from one another. [Doc. 44 at 2; Doc. 44-1 at 14–21]. The NCAA argues even if the Court exercises supplemental jurisdiction over said claims, the claims should be dismissed as inadequately plead. [Id.].

## II. Legal Standards

### A. 12(b)(1)

A party may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. A trial court may consider evidence by affidavit, deposition, or live testimony without converting the proceeding to one for summary judgment. ***Adams v. Bain***, 697 F.2d 1213, 1219 (4th Cir. 1982); ***Mims v. Kemp***, 516 F.2d 21 (4th Cir. 1975). Because the court's very power to hear the case is at issue in a Rule 12(b)(1) motion, the trial court is free to weigh the evidence to determine the existence of its jurisdiction. No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. *See* ***Materson v. Stokes***, 166 F.R.D. 368, 371 (E.D. Va. 1996) (Morgan, J.). Whenever it

appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. *See* Fed. R. Civ. P. 12(h)(3).

**B. 12(b)(6)**

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 570 (2007); *see also* ***Giarratano v. Johnson***, 521 F.3d 298, 302 (4th Cir. 2008) (applying the ***Twombly*** standard and emphasizing the necessity of *plausibility*). When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff. ***Edwards v. City of Goldsboro,*** 178 F.3d 231, 243–44 (4th Cir. 1999).

When rendering its decision, the Court should consider only the allegations contained in the Complaint, the exhibits to the Complaint, matters of public record, and other similar materials that are subject to judicial notice. ***Anheuser-Busch, Inc. v. Schmoke***, 63 F.3d 1305, 1312 (4th Cir. 1995). In ***Twombly***, the Supreme Court, noted that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ." ***Twombly***, 550 U.S. at 555, 570 (upholding the dismissal of a complaint where the plaintiffs did not "nudge[ ] their claims across the line from conceivable to plausible.").

This Court is well aware that "[M]atters outside of the pleadings are generally not considered in ruling on a Rule 12 Motion." ***Williams v. Branker***, 462 Fed.App'x. 348, 352

(4th Cir. 2012). "Ordinarily, a court may not consider any documents that are outside of the Complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." ***Witthohn v. Fed. Ins. Co.***, 164 Fed.App'x. 395, 396 (4th Cir. 2006). However, the Court may rely on extrinsic evidence if the documents are central to a plaintiff's claim or are sufficiently referred to in the Complaint. ***Id.*** at 396–97.

## III. Analysis

### A. Mootness

The NCAA first argues plaintiffs' claims are moot because this Court's preliminary injunction allowed plaintiffs to participate in the 2025–26 football season. [Doc. 45 at 3–4].

For a plaintiff to maintain an action in federal court, the "plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." ***Uzuegbunam v. Preczewski***, 592 U.S. 279, 282 (2021). "That limit applies throughout the course of litigation to the moment of final appellate disposition, so a case may become moot after entry of a district court's judgment and while an appeal is pending." ***Eden, LLC v. Justice***, 36 F.4th 166, 169–70 (4th Cir. 2022). "[F]or a controversy to be moot, it must lack at least one of the three required elements of Article III standing: (1) injury in fact, (2) causation, or (3) redressability." ***Townes v. Jarvis***, 577 F.3d 543, 546–47 (4th Cir. 2009).

While the NCAA is correct that plaintiffs filed this action, in part, to obtain an extension of their NCAA eligibility so that they could compete during the 2025–26 football season, that is not the only relief sought in the Amended Complaint. Although plaintiffs

ultimately obtained the requested eligibility relief and competed during the 2025–26 season, they also seek damages arising from the NCAA's alleged conduct. *See generally* [Doc. 43].

Accordingly, plaintiffs' claims are not rendered moot merely because they competed during the 2025–26 season. The Court therefore turns to the merits of each claim alleged in the Amended Complaint.

**B. Count I: Tortious Interference – School and Count II: Tortious Interference**

In order to establish a claim of tortious interference with contract, a plaintiff must show: (1) the existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by an outside party; (3) that the interference caused harm; and (4) damages. Syl. Pt. 5, ***Hatfield v. Health Mgmt. Assocs. of W.Va.***, 223 W.Va. 259, 672 S.E.2d 395 (2008). "Although the plaintiffs need not prove a link between the damages they complain of and defendants' alleged misconduct at the motion to dismiss stage, they must at least allege some fact that would allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" ***Imagine Medispa, LLC v. Transformations, Inc.,*** 999 F.Supp. 873, 884 (S.D. W.Va. 2014) (Copenhaver, Jr., J.) (quoting ***Ashcroft v. Iqbal***, 556 U.S. at 678–79)).

Count I of the Complaint alleges that plaintiffs had a contractual relationship with West Virginia University; that the NCAA was aware of these relationships; that the NCAA interfered with these relationships between plaintiffs and West Virginia University by acting in an arbitrary and/or capricious manner with regard to plaintiffs and their eligibility, ignoring their rights, and violating the NCAA's own rules, guidelines and blanket waiver; that the

NCAA had a duty to not tortiously and/or needlessly interfere with plaintiffs' relationships; and that plaintiffs were harmed by said interference. *See* [Doc. 43 at ¶¶ 80–88].

Similar to Count I, Count II of the Amended Complaint alleges that plaintiffs have (or could have) a contractual relationship with the Country Roads Trust, Gold and Blue Enterprises, and other third parties for the use of their names, images, and likenesses; that the NCAA was aware of these relationships (and potential relationships); that the NCAA interfered with the relationship between plaintiffs, the Country Roads Trust, Gold and Blue Enterprises, and other third parties by refusing to grant plaintiffs waivers when they were entitled to one, acting arbitrarily and/or capriciously with regard to plaintiffs and their eligibility, ignoring plaintiffs' rights, and violating the NCAA's own rules, guidelines, and blanket waiver; and that plaintiffs were harmed by said interferences. *See* [id. at ¶¶ 89–100].

Taken as true, along with all factual allegations in the Complaint, plaintiffs have sufficiently plead that the NCAA has tortiously interfered with contractual relationships at this stage of the proceedings. Thus, the NCAA's Motion with respect to Counts I and II is **DENIED**.

**C. Count III: Breach of Contract – Third Party Beneficiary**

To maintain a third-party beneficiary contract action under West Virginia law, the agreement between the contracting parties "must have been made for the third party's sole benefit." ***Robinson v. Cabell Huntington Hosp., Inc.***, 201 W.Va. 455, 460, 498 S.E.2d 27, 32 (1997) (quoting ***Woodford v. Glenville State College Hous. Corp.***, 159 W.Va. 442, 448, 225 S.E.2d 671, 674 (1976)).

Further, West Virginia Code § 55-8-12 provides:

> If a covenant or promise be made for the sole benefit of a person with whom it is not made, or with whom it is made jointly with others, such person may maintain, in his own name, any action thereon which he might maintain in case it had been made with him only, and the consideration had moved from him to the party making such covenant or promise.

The West Virginia Supreme Court of Appeals has held that West Virginia Code § 55-8-12 "applied to a case wherein the plaintiff was one of a class of persons designated in a contract for whose benefit the contract was made; and that a member of such class could maintain an action at law, although not a party to the contract." ***United Dispatch v. E. J. Albrecht Co.***, 135 W.Va. 34, 42, 62 S.E.2d 289, 294 (1950) (citing ***Jenkins v. Chesapeake & Ohio Railway Co.***, 61 W.Va. 597, 57 S.E. 48 (1907)).

At this stage of the proceedings, plaintiffs have pled a cognizable claim for breach of contract as a third-party beneficiary. The Constitution and Bylaws of the NCAA are binding agreements between the NCAA and its members for the benefit of student-athletes. During all relevant times, plaintiffs were collegiate athletes.

As Chief Judge Kleeh has previously held:

> "It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members." ***Meshel v. Ohev Sholom Talmud Torah***, 869 A.2d 343, 361 (D.C. Cir. 2005) (internal citation omitted). "[T]he Conference Bylaws constitute[ ] a contractual agreement between the Parties." ***Rutgers, The***

> ***State Univ. v. Am. Athletic Conf.***, 2013 WL 5936632, at *8 (D. N.J. 2013); *see also* ***Compton v. Alpha Kappa Alpha Sorority, Inc.***, 64 F.Supp.3d 1, 16 (D. D.C. 2014) (finding "[an] [organization's] Constitution and Bylaws form a contract between that [organization] and its members.").

***Mountain East Conference v. Franklin University***, 2023 WL 2415277, at *4 (N.D. W.Va. Mar. 8, 2023) (Kleeh, C.J.).

The NCAA Constitution, as cited directly in plaintiffs' Amended Complaint, is quite clear that student-athletes are the beneficiaries of the NCAA's agreements:

> The National Collegiate Athletic Association is a voluntary, self-governing, organization for four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion.

NCAA Constitution Preamble. *See also* [Doc. 43 at ¶ 56].

There are a number of other articles within the NCAA Constitution that highlight the fact that student-athletes are the beneficiaries of the NCAA's agreements. *See* [Doc. 46 at 10–12].[1]

Plaintiffs have pled that they are "one of a class of persons designated in a contract for whose benefit the contract was made; and that a member of such class could maintain

[1] More specifically, plaintiffs point to Article 1(A): Principles (The Primacy of Academic Experience); Article 1(B): Principles (The Collegiate Student-Athlete Model); Article 1(D): Principles (Student-Athlete Well-Being); and Article 1(H): Principles (Recruiting Standards).

an action at law, although not a party to the contract." *See* ***United Dispatch,*** 135 W.Va. at 42, 62 S.E.2d at 294. Because plaintiffs have sufficiently alleged that they are third-party beneficiaries to the Bylaws and Constitution of the NCAA, the NCAA's Motion with respect to Count III is **DENIED**.

**D. Count IV: Promissory Estoppel**

In West Virginia, a promissory estoppel claim requires the plaintiff to prove the following:

> (1) a promise; (2) reasonable reliance on the promise by the plaintiff; (3) that it was foreseeable to the defendant that the plaintiff would rely on the promise; (4) that the plaintiff suffered damages as a result of her reasonable reliance upon the promise of the defendant; and (5) under a circumstance that injustice can only be avoided through enforcement of the promise.

***Koerber v. Wheeling Island Gaming, Inc.***, 2013 WL 162669, at *4 (N.D. W.Va. Jan. 15, 2013) (Stamp, Jr., J.) (citing ***Everett v. Brown***, 174 W.Va. 35, 321 S.E.2d 685 (1984)). *See also* Syl. Pt. 4, ***Hoover v. Moran***, 222 W.Va. 112, 662 S.E.2d 711 (2008) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a *third person* and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires." (emphasis added)).

At this stage of the proceedings, plaintiffs have sufficiently pled that the NCAA made certain promises that plaintiffs relied upon when making decisions regarding attending

college. As pled in the Amended Complaint, those promises include, but are not limited to:

(1) promises that the NCAA would apply its rules and regulations uniformly and fairly in a non-arbitrary and non-capricious manner;

(2) promises that the NCAA would not make arbitrary and capricious decisions when it came to college student athletes' eligibility;

(3) promises that the NCAA would consider and take into special account situations where adherence to NCAA rules and regulations would harm college student athletes' welfare;

(4) promises that the NCAA would follow its own guidelines when considering whether to grant waivers from NCAA rules and regulations to college student-athletes;

(5) promises that the NCAA would genuinely consider requests for waivers from NCAA rules and regulations made by college student-athletes; and

(6) promises that the NCAA would not count time played at non-NCAA institutions towards athletes' eligibility at NCAA institutions.

[Doc. 43 at ¶¶ 122–127]. Plaintiffs also allege they relied on the NCAA's promises; the NCAA knew or should have known of that reliance; plaintiffs reasonably relied on those promises in making decisions about attending college and returning to college rather than pursuing the NFL draft; and plaintiffs were damaged as a result. *See* [id. at ¶¶ 128–133].

Taken as true, along with all factual allegations in the Amended Complaint, plaintiffs have sufficiently pled a claim for promissory estoppel at this stage of the proceedings. Thus, the NCAA's Motion with respect to Count IV is **DENIED**.

**E. Count V: Misrepresentation**

Count V alleges that the NCAA's actions constitute negligent and/or fraudulent misrepresentation. *See* [Doc. 43 at ¶¶ 135–162].

In West Virginia,

> To state a claim for negligent misrepresentation ... a plaintiff must establish (1) that a defendant represented a matter as being true, (2) that the defendant had no knowledge of the truth of his representation, (3) that the representation was false, and (4) that the plaintiff relied on the false representation to his detriment.

***Kerns v. Range Res. – Appalachia, LLC***, 2011 WL 3753117, at *7 (N.D. W.Va. Aug. 23, 2011) (Keeley, J.) (citations omitted and numbers added). The Supreme Court of Appeals of West Virginia has also held that a plaintiff must allege a "sufficient special relationship or duty" toward a defendant. ***Kidd v. Mull***, 215 W.Va. 151, 595 S.E.2d 308, 317 (2004).

"The elements of fraudulent misrepresentation are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." ***Resh v. Realty Concepts, Ltd***, 2016 WL 593809, at *5 (S.D. W.Va. Feb. 12, 2016) (Chambers, C.J.) (internal citation and quotation marks omitted). Pursuant to Rule 9(b) of the Federal Rules of Civil

Procedure, a claim for fraudulent misrepresentation must "stat[e] with particularity the circumstances constituting fraud or mistake." ***Kerns***, 2011 WL 197908, at *6 (internal citation and quotation marks omitted). "The circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." ***Id.*** (internal citation and quotation marks omitted).

Plaintiffs have sufficiently pled their fraudulent and negligent misrepresentation claims. Plaintiffs allege that the NCAA's December 23, 2024 blanket waiver was represented as providing an additional year of eligibility to similarly situated student-athletes, but that the representation was false or incomplete because the NCAA failed to clarify that the Five-Year Rule still applied. [Doc. 43 at ¶¶ 136–140]. Plaintiffs further allege that the NCAA knew student-athletes were relying on that representation but did not clarify the waiver's scope until March 13, 2025. [Id. at ¶¶ 141–145]. Plaintiffs also allege that the NCAA had a special relationship with plaintiffs and a duty to provide accurate information because it was the final authority on Division I eligibility and its own Constitution required its bylaws to promote informed decisions by student-athletes. [Id. at ¶¶ 146–150, 158–160]. Plaintiffs allege that the NCAA acted fraudulently, with gross indifference or malice, and that its silence was misleading even if it did not intend to extend the waiver to student-athletes who had exhausted their eligibility. [Id. at ¶¶ 151–152].

Plaintiffs also allege that they reasonably relied on the NCAA's representations and silence by withdrawing or withholding their names from the 2025 NFL Draft, believing they

would receive an additional year of eligibility. [Id. at ¶¶ 153–157]. They further allege that, had the NCAA timely clarified that the Five-Year Rule applied, they would have acted differently and either remained in or entered the NFL Draft. [Id. at ¶ 156]. Plaintiffs allege that these misrepresentations caused them actual damages. [Id. at ¶¶ 159–162]. Taken as true, these allegations sufficiently plead misrepresentation, duty, reliance, foreseeability, and resulting damages to plaintiffs at this stage. Thus, the NCAA's Motion with respect to Count V is **DENIED**.

### F. Count VI: *Per Se* Violation of § 1 of the Sherman Act, 15 U.S.C. § 1

Plaintiffs' *per se* claim is dismissed with prejudice because it is barred by ***NCAA v. Alston***, 594 U.S. 69 (2021).

The ***Alston*** decision forecloses plaintiffs' *per se* theory as a matter of law. In ***Alston***, the Supreme Court endorsed a "fuller review" of NCAA rules under the rule of reason because the NCAA's structure "is hardly of the sort that would warrant quick-look approval for all its myriad rules and restrictions." ***Alston***, 594 U.S. at 89–90. The Court explained that certain restraints "at opposite ends of the competitive spectrum," may be subject to abbreviated antitrust review, *i.e.*, those "so obviously incapable of harming competition" that they may be approved after a quick look and those that "so obviously threaten to reduce output and raise prices," which may be condemned as unlawful *per se* or following quick-look review. ***Id.*** at 88–89.

Additionally, in the appeal from this Court's preliminary injunction, the Fourth Circuit concluded that "the NCAA rules challenged in this case clearly fall under the category of

'restraints in the great in-between' that must be evaluated under rule of reason analysis." ***Robinson v. NCAA***, 172 F.4th 271, 292 (4th Cir. 2026).

Accordingly, plaintiffs' *per se* claim fails as a matter of law and is **DISMISSED WITH PREJUDICE**.

### G. Count VII: Unreasonable Restraint of Trade in Violation of § 1 of the Sherman Act, 15 U.S.C. § 1 and Count VIII: Denial of Access to an Essential Facility Violation of Sherman Act, 15 U.S.C. § 2

The NCAA argues plaintiffs have failed to plausibly allege facts supporting their asserted market definition, which is an essential element of their Sections 1 and 2 claims. *See* [Doc. 45 at 5–11]. The Court disagrees.

Under both their Section 1 and Section 2 claims, plaintiffs must plausibly allege a relevant market. ***Ohio v. Am. Express***, 585 U.S. 529, 542 (2018) (explaining that before the Court can assess whether a rule has a substantial anticompetitive effect, it "must first define the relevant market"); ***2311 Racing LLC v. NASCAR, LLC***, 139 F.4th 404, 409 (4th Cir. 2025) ("To prevail under Section 2 of the Sherman Act — the provision relied on by the district court in issuing the preliminary injunction — a plaintiff must show (1) that the defendant possessed monopoly power in the relevant market, and (2) that the defendant willfully acquired or maintained that power through anticompetitive conduct.").

"[T]he relevant market is defined as the area of effective competition," *i.e.*, the "arena within which significant substitution in consumption or production occurs." ***Am. Express***, 585 U.S. at 543 (cleaned up). Without defining the market, "there is no way to measure the defendant's ability to lessen or destroy competition." ***Id.*** (cleaned up).

The Supreme Court has cautioned that identifying the scope of a relevant market requires resolving empirical questions that "can be determined only after a factual inquiry into the commercial realities faced by consumers." ***Eastman Kodak Co. v. Image Tech. Servs., Inc.***, 504 U.S. 451, 482 (1992) (citation and quotation marks omitted). Consistent with this principle, the Fourth Circuit has emphasized that market definition is "a fact-intensive exercise centered on the commercial realities of the market and competition." ***E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.***, 637 F.3d 435, 442 (4th Cir. 2011). Indeed, in ***Kolon***, the Fourth Circuit reversed dismissal of an antitrust counterclaim where the plaintiff had plausibly alleged a distinct geographic market and explained that "[w]hether [the] proffered relevant geographic market definition will hold up upon a fact-intensive inquiry remains to be seen," but that dismissing the claim at the pleading stage was nevertheless error. ***Id.*** at 443–44.

Motions to dismiss should generally not be granted in such cases except "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." ***Chapman v. New York State Div. for Youth***, 546 F.3d 230, 238 (2008) (alteration in original) (quoting ***Queen City Pizza, Inc. v. Domino's Pizza, Inc.***, 124 F.3d 430, 436 (3d Cir. 1997)).

Dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic. As then-Judge, now-Justice Sotomayor noted in ***Todd v. Exxon Corp.***, 275 F.3d 191, 199 (2d Cir. 2001):

Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *See* ***Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design***, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.") (citing ***Eastman Kodak Co. v. Image Technical Servs., Inc.***, 504 U.S. 451, 482 (1992)); ***Double D Spotting Serv., Inc. v. Supervalu, Inc.***, 136 F.3d 554, 560 (8th Cir. 1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); ***Queen City Pizza, Inc. v. Domino's Pizza, Inc.***, 124 F.3d 430, 436 (3d Cir.1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers") (citing ***Eastman Kodak***, 504 U.S. at 482); *cf.* ***Hayden Publ'g Co. v. Cox Broad. Corp.***, 730 F.2d 64, 70 n.8 (2d Cir. 1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact....'") (citations and alterations omitted). There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market. ***Queen City***, 124 F.3d at 436.

* * *

> Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

***Todd***, 275 F.3d at 199–200 (footnotes omitted) (reversing district court's dismissal of the complaint, which plead a relevant market).

The Second Circuit's analysis in ***Todd*** is instructive because it addressed market definition in the context of an alleged buyer-side restraint. There, the Second Circuit explained that the traditional inquiry into reasonable interchangeability and cross-elasticity must be adapted to the monopsony context. ***Id.*** at 201–02. In an ordinary seller-side market, the relevant question is whether consumers can substitute among competing sellers in response to a price increase. ***Id.*** In a buyer-side market, by contrast, the relevant inquiry is whether workers view alternative employers as reasonably good substitutes. ***Id.*** at 202. Thus, "[t]his market is comprised of buyers who are seen by sellers as being reasonably good substitutes." ***Id.*** The availability of substitute buyers constrains a buyer's ability to exercise market power in much the same way that substitute products constrain a seller's ability to exercise market power. ***Id.***

That distinction matters here. Plaintiffs do not allege a conventional product market in which the NCAA is selling a product to consumers. Rather, they allege a labor market in which NCAA Division I member institutions collectively purchase the athletic services of college football players. The relevant question, therefore, is whether the employers

competing for those services are reasonably interchangeable from the perspective of the players—not merely whether other entities somewhere in the broader sports industry employ football players.

Plaintiffs have alleged such a market. The Amended Complaint identifies the proposed relevant market as:

> the nationwide market for the labor of NCAA Division I college football players. In this labor market, current and prospective college students compete for roster spots on Division I football teams. NCAA Division I member institutions compete to obtain and retain the best Division I football players by providing in-kind benefits, namely, Division I football scholarships, access to academic programs, access to training facilities, and instruction from premier coaches. In some cases, the capped compensation includes pay in cash, through the provision of a housing and food allowance, but in all cases, the amount of in-kind and cash compensation is strictly capped by means of the conspiracy alleged herein.

[Doc. 43 at ¶ 62].

Plaintiffs also allege several facts concerning the commercial realities that purportedly distinguish Division I football from alternative opportunities.

First, plaintiffs allege that "[o]nly Division I member institutions have the ability to engage in revenue sharing with student-athletes." [Doc. 43 at ¶ 64]. Second, they allege that there is "no similar, equal or alternative market to NCAA Division I" because "[n]o other division of the NCAA can offer revenue sharing to student athletes." [Id. at ¶ 65].

Third, plaintiffs allege that the National Junior College Athletic Association does not permit revenue sharing with student-athletes. [Id. at ¶ 66]. Fourth, plaintiffs allege the same with respect to the National Association of Intercollegiate Athletics. [Id. at ¶ 67]. Fifth, plaintiffs allege that "[n]o professional league offers access to academic programs or opportunities to attain degrees in higher education." [Id. at ¶ 68]. Finally, plaintiffs allege that the NCAA "enjoys near complete dominance of, and exercises monopsony power in, the market for athletic services of Division I football" and that there is "no viable substitute for the NCAA" because NCAA Division I "essentially is the relevant market for elite college football." [Id. at ¶¶ 70–71].

Taken together, these allegations do more than merely assert a conclusory market definition. They identify the services being exchanged, the participants in the alleged labor market, the geographic scope of that market, and several alleged characteristics that distinguish Division I football from purported alternatives. At the pleading stage, those allegations are sufficient to make the proposed market facially plausible.

The NCAA nevertheless argues plaintiffs have not adequately alleged interchangeability or cross-elasticity of demand. While the Court acknowledges these considerations are important, the NCAA's argument effectively asks the Court to resolve a factual and economic dispute about the boundaries of the market before discovery. As noted *supra*, that is not generally appropriate on a motion to dismiss where the Amended Complaint identifies a proposed market and alleges facts explaining why purported substitutes are not reasonably interchangeable.

The appeal in this case is also instructive. The Fourth Circuit vacated this Court's preliminary injunction after concluding that this Court failed to conduct the fact-specific market analysis required on the preliminary injunction record. In particular, the Fourth Circuit faulted plaintiffs for presenting "no factual evidence" supporting their proposed market and for relying instead on other judicial decisions defining the student-athlete labor market. ***Robinson***, 172 F.4th at 295. The Fourth Circuit explained that, in a rule-of-reason case, courts must examine the relevant market with sufficient specificity to determine market power, competitive effects, and identified unresolved questions. ***Id.*** While the Fourth Circuit did not "specify[ ] the exact quantity of evidence required for an antitrust plaintiff to meet their burden of proof to establish market definition," it provided examples:

> is the correct market definition that of all college football (i.e., including NCAA Division I, II, and III as well as JUCOs) or is it just NCAA Division I? Are players from Division II and III schools reasonable substitutes, such that these schools should be part of the market definition? What about JUCOs? Are any athletes choosing JUCOs over Division I schools and, if not, is it because of the JUCO Rule? How does the availability of revenue-sharing change the market's recruitment? How does foreclosing experienced former JUCO players from their would-be third and fourth years of NCAA competition affect the Division I football labor market? Do NCAA Division I football teams compete with NFL teams for players post-***Alston***?

***Id.*** at 292.

"The absence of cold, hard data is especially glaring in a market that is rapidly changing" and courts are put in difficult positions, even on motions for preliminary injunctions, where the parties have not established even a coherent theory that grapples with recent changes to the market. ***Pavia v. NCAA***, 154 F.4th 407, 417 (6th Cir. 2025) (Thapar, J., concurring).

At this stage of the proceedings, the Court is not called upon to make definitive findings concerning the boundaries of the market. The question is whether plaintiffs have alleged enough facts to make their proposed market plausible. At this stage, they have.

The Amended Complaint identifies the relevant service as the athletic labor of NCAA Division I football players and the relevant buyers as NCAA Division I member institutions. It alleges a nationwide geographic market. It identifies specific characteristics of Division I football—including revenue sharing, scholarships, academic opportunities, training facilities, and premier coaching—that allegedly distinguish Division I opportunities from junior-college, other collegiate, and professional alternatives. And it alleges that the NCAA and its member institutions collectively possess near-complete dominance over that market. Whether those allegations ultimately prove sufficient to establish a distinct Division I labor market is a question that may be tested with discovery, economic evidence, and the parties' competing views of reasonable substitutes. But that question cannot fairly be resolved against plaintiffs on the pleadings alone.

Nor does the possibility that Division II, Division III, junior-college, or professional football opportunities might compete at the margins compel dismissal. The existence of some alternative employment opportunities does not itself establish that those

opportunities belong in the same relevant market. The pertinent question is whether those alternatives are reasonably interchangeable substitutes from the perspective of the workers whose labor is allegedly restrained. *See **Todd***, 275 F.3d at 201–02. Plaintiffs have alleged facts explaining why they contend that the alternatives identified by the NCAA do not provide a comparable substitute for Division I football. Whether those allegations are ultimately borne out by the evidence is a factual question.

The Court therefore concludes that plaintiffs have adequately pleaded a relevant market for purposes of their Sherman Act claims. This conclusion is necessarily limited to the sufficiency of the pleadings. The Court does not hold that the nationwide market for NCAA Division I college football labor is conclusively the relevant market, nor does it determine that Division II, Division III, junior-college, or professional opportunities can never constitute substitutes. Those are factual and economic questions that may be addressed on a more developed record.

Accordingly, the NCAA's Motion to Dismiss Counts VII and VIII is **DENIED**.

### H. Count IX: Contract and Combination in Restraint of Trade and Count X: Establishment of Monopoly in Violation of West Virginia Law

For the same reasons discussed in Section III.G, the NCAA's Motion to Dismiss Counts IX and X is **DENIED**.

### I. Count XI: Negligence

In West Virginia, the plaintiff must establish three (3) elements in a negligence suit: (1) a duty that the defendant owes to the plaintiff, (2) a negligent breach of that duty, and (3) injuries received as a proximate result from that breach. ***Webb v. Brown & Williamson Tobacco Co.***, 121 W.Va. 115, 2 S.E.2d 898, 899 (1939). The plaintiff must

prove these elements by a preponderance of the evidence. ***Id.*** at 899. "These elements of duty, breach and injury are essential to actionable negligence and in the absence of any of them the action must fall." ***Atkinson v. Harmon***, 151 W.Va. 1025, 1031, 158 S.E.2d 169, 173 (1967). "The bare fact of an injury standing alone, without supporting evidence, is not sufficient to justify an inference of negligence." ***Mrotek v. Coal River Canoe Livery, Ltd.***, 214 W.Va. 490, 492, 590 S.E.2d 683, 685 (2003) (quoting ***Walton v. Given***, 158 W.Va. 897, 902, 215 S.E.2d 647, 651 (1975)).

The NCAA argues plaintiffs' claims are barred by the economic loss doctrine. [Doc. 45 at 19–20].

In ***Aikens v. Debow***, the West Virginia Supreme Court of Appeals held as follows:

> [W]e conclude that an individual who sustains purely economic loss from an interruption in commerce caused by another's negligence may not recover damages in the absence of physical harm to that individual's person or property, a contractual relationship with the alleged tortfeasor, or some other special relationship between the alleged tortfeasor and the individual who sustains purely economic damages sufficient to compel the conclusion that the tortfeasor had a duty to the particular plaintiff and that the injury complained of was clearly foreseeable to the tortfeasor.

208 W.Va. 486, 500, 541 S.E.2d 576, 589 (2000).

In the absence of physical harm to their person or property, plaintiffs must allege a "special relationship" or "privity of contract" as required under ***Aikens***. *See* ***White v. AAMG Const. Lending Ctr.***, 226 W.Va. 339, 700 S.E.2d 791, 798 (2010) ("Whether a

defendant has a special relationship with a plaintiff ... is a determination that must be rendered by a court as a matter of law."). As ***Aikens*** explained:

> The existence of a special relationship will be determined largely by the extent to which the particular plaintiff is affected differently from society in general. It may be evident from the defendant's knowledge or specific reason to know of the potential consequences of the wrongdoing, the persons likely to be injured, and the damages likely to be suffered. Such special relationship may be proven through evidence of foreseeability of the nature of the harm to be suffered by the particular plaintiff or an identifiable class and can arise from contractual privity or other close nexus.

208 W.Va. at 499, 541 S.E.2d at 589.

At this stage of the proceedings, plaintiffs have sufficiently pled a claim for negligence. Plaintiffs allege that the NCAA owed them a duty to provide accurate information and reasonable guidance concerning eligibility and its rules. [Doc. 43 at ¶ 243]. They claim the NCAA breached that duty by announcing the non-NCAA competition waiver in a manner that led them to believe they would receive another year of eligibility and by providing unclear eligibility guidance. [Id. at ¶¶ 244–245]. Plaintiffs allege these breaches caused them harm and damages. [Id. at ¶¶ 246–248].

As to the NCAA's argument that plaintiffs' negligence claims are barred by the economic loss doctrine, plaintiffs have sufficiently pled that a special relationship exists between plaintiffs and the NCAA. Plaintiffs allege the NCAA was aware that similarly-situated student-athletes were making decisions and it was foreseeable that

plaintiffs would do the same and be harmed. [Id. at ¶¶ 50, 141–143, 146, 148]. Accordingly, the NCAA's Motion to Dismiss Count XI is **DENIED**.

## VII. Conclusion

For the foregoing reasons, Defendant National Collegiate Athletic Association's Motion to Dismiss the Amended Complaint [**Doc. 44**] is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** as to Count VI, which is **DISMISSED WITH PREJUDICE**, and is **DENIED** as to Counts I, II, III, IV, V, VII, VIII, IX, X and XI of the Amended Complaint.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** September 1, 2026.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**